# 25-2105

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

◆◆◆

THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES,
ATTORNEY GENERAL OF THE STATE OF NEW YORK

*Plaintiff-Appellee,*

–v.–

CITIBANK, N.A.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:24-cv-659-JPO) (Hon. J. Paul Oetken)

## BRIEF FOR APPELLANT

Charles Michael
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900

Julia B. Strickland
STEPTOE LLP
2029 Century Park East
Suite 980
Los Angeles, CA 90067
(213) 439-9400

Jeffrey B. Wall
Morgan L. Ratner
Rishabh Bhandari
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

Miles H. Greene
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Citibank, N.A. states as follows:

Citibank, N.A. is an indirect wholly owned subsidiary of Citigroup Inc., a publicly held corporation.  No other publicly held corporation owns 10% or more of Citibank, N.A.'s stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION ......................................................6

STATEMENT OF THE ISSUES............................................................6

STATEMENT OF THE CASE................................................................7

    A.    Legal Background.........................................................7

        1.    Early regulation of consumer wire transfers ........................7

        2.    The Electronic Fund Transfer Act.........................................9

        3.    Article 4A of the UCC ............................................................13

        4.    The Dodd-Frank Act................................................................18

    B.    Procedural Background ...................................................19

SUMMARY OF THE ARGUMENT.....................................................25

ARGUMENT ........................................................................................28

I.    THE DISTRICT COURT ERRED IN HOLDING THAT EFTA COVERS ELECTRONICALLY INITIATED CONSUMER WIRE TRANSFERS...................................................................................29

    A.    EFTA's Text Exempts Consumer Wire Transfers........................30

        1.    Both ordinary and specialized usage treat a transfer of funds as the entire end-to-end process ...........................31

        2.    Canons of statutory interpretation support reading Section 7(B) as an end-to-end exemption.............................36

        3.    Subsequent amendments also support reading Section 7(B) as an end-to-end exemption.............................42

i

4.    The district court's contrary interpretation is inconsistent with the statutory text....................................44

B.    EFTA's History And Purposes Confirm That It Exempts Consumer Wire Transfers..............................................48

C.    EFTA's Uniform Interpretation By Regulators And Courts Further Confirms That It Exempts Consumer Wire Transfers ...................................................................................52

II.    THE DISTRICT COURT ERRED IN HOLDING THAT EFTA COVERS INTRABANK TRANSFERS ....................................................59

A.    EFTA's Definition Of An Unauthorized Electronic Fund Transfer Does Not Cover Intrabank Transfers ...........................60

B.    EFTA's Reimbursement Framework Does Not Fit Intrabank Transfers ...................................................................................66

CONCLUSION....................................................................................................69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Life Ins. Co.* v. *Big Y Foods, Inc.*,
    52 F.4th 66 (2d Cir. 2022)..................................................................52

*Aikens* v. *Portfolio Recovery Assoc.*,
    716 Fed. Appx. 37 (2d Cir. 2027) ................................................ 61-63

*Arkansas Best Corp.* v. *C.I.R.*,
    485 U.S. 212 (1988)..........................................................................46

*Bacher for Bacher* v. *Boehringer Ingelheim Pharms.*,
    110 F.4th 95 (2d Cir. 2024)..............................................................47

*Bakhtiari* v. *Comerica Bank*,
    2024 WL 3405340 (N.D. Cal. July 12, 2024)...................................56

*Banco del Austro, S.A.* v. *Wells Fargo Bank, N.A.*,
    215 F. Supp. 3d 302 (S.D.N.Y. 2016)...............................................16

*Bankamerica Corp.* v. *United States*,
    462 U.S. 122 (1983)..........................................................................55

*Banque Worms* v. *BankAmerica Int'l*,
    570 N.E.2d 189 (N.Y. 1991)..............................................................17

*Becker* v. *Genesis Fin. Servs.*,
    2007 WL 4190473 (E.D. Wash. Nov. 21, 2007) ................................ 61, 63-64

*Bodley* v. *Clark*,
    2012 WL 3042175 (S.D.N.Y. July 23, 2012) ....................................57

*Calderon-Cardona* v. *Bank of N.Y. Mellon*,
    770 F.3d 993 (2d Cir. 2014) .......................................................35, 58

*Caraco Pharm. Labs., Ltd.* v. *Novo Nordisk A/S*,
    566 U.S. 399 (2012)..........................................................................47

*Christopher* v. *SmithKline Beecham Corp.*,
   567 U.S. 142 (2012)........................................................................55

*Corley* v. *United States*,
   556 U.S. 303 (2009)........................................................................39

*FCC* v. *AT&T Inc.*,
   562 U.S. 397 (2011)....................................................................44, 47

*Feliciano* v. *Department of Transp.*,
   605 U.S. 38 (2025)..................................................................... 31-32

*Fischer & Mandell LLP* v. *Citibank, N.A.*,
   2009 WL 1767621 (S.D.N.Y. June 22, 2009)...................................57

*George* v. *McDonough*,
   596 U.S. 740 (2022)........................................................................33

*Heiser* v. *Islamic Republic of Iran*,
   735 F.3d 934 (D.C. Cir. 2013).........................................................35

*Kanji* v. *Bank of Am., N.A.*,
   2020 WL 8175548 (C.D. Cal. Aug. 25, 2020) ............................ 56-57

*L.S.* v. *Webloyalty.com*,
   954 F.3d 110 (2d Cir. 2020) ............................................................38

*Loper Bright Enters.* v. *Raimondo*,
   603 U.S. 369 (2024)........................................................................52

*Lowe* v. *SEC*,
   472 U.S. 181 (1985).........................................................................46

*McClellon* v. *Bank of Am.*,
   2018 WL 4852628 (W.D. Wash. Oct. 5, 2018)................................57

*Monsalvo* v. *Bondi*,
   604 U.S. 712 (2025)........................................................................36

*Moore* v. *JPMorgan Chase Bank*,
   2022 WL 16856105 (N.D. Cal. Nov. 10, 2022) ...............................65

iv

*Nazimuddin* v. *Wells Fargo Bank, N.A.*,
 2025 WL 33471 (5th Cir. Jan. 6, 2025)............................................................57

*Phelan* v. *Local 305 of United Ass'n of Journeymen*,
 973 F.2d 1050 (2d Cir. 1992) .................................................................... 65-66

*Pope* v. *Wells Fargo Bank, N.A.*,
 2023 WL 9604555 (D. Utah Dec. 27, 2023)....................................................58

*Powerex Corp.* v. *Reliant Energy Servs., Inc.*,
 551 U.S. 224 (2007)..........................................................................................36

*Pulsifer* v. *United States*,
 601 U.S. 124 (2024)...................................................................................40, 47

*Rahimian* v. *Wells Fargo Bank*,
 2024 WL 4818797 (C.D. Cal. Sept. 20, 2024)................................................56

*Rotkiske* v. *Klemm*,
 589 U.S. 8 (2019)..............................................................................................59

*Skidmore* v. *Swift & Co.*,
 323 U.S. 134 (1944)..........................................................................................52

*Stepakoff* v. *IberiaBank Corp.*,
 637 F. Supp. 3d 1309 (S.D. Fla. 2022)............................................................56

*Sturgeon* v. *Frost*,
 587 U.S. 28 (2019)...................................................................................... 40-41

*Texas Dep't of Housing & Cmty. Affairs* v. *Inclusive Cmtys. Project*,
 576 U.S. 519 (2015)..........................................................................................42

*Trivedi* v. *Wells Fargo Bank*,
 609 F. Supp. 3d 628 (N.D. Ill. 2022)...............................................................56

*United States* v. *Battiste*,
 24 F. Cas. 1042 (C.C.D. Mass. 1835)..............................................................40

*United States* v. *Bronstein*,
 849 F.3d 1101 (D.C. Cir. 2017).......................................................................41

v

*United States* v. *Scott*,
990 F.3d 94 (2d Cir. 2021) .................................................................44

*Wachovia Bank* v. *Schmidt*,
546 U.S. 303 (2006).............................................................................44

*Wike* v. *Vertrue, Inc.*,
566 F.3d 590 (6th Cir. 2009).............................................................67

*Wingard* v. *TBK Bank, SSB*,
768 F. Supp. 3d 1282 (D. Colo. 2025) .............................................66

*Wright* v. *Citizen's Bank of East Tenn.*,
640 Fed. Appx. 401 (6th Cir. 2016)..................................................57

**Statutes**

15 U.S.C. § 1693(b)..............................................................................10

15 U.S.C. § 1693a(2)................................................................. 10, 38-39

15 U.S.C. § 1693a(7)....................................................................*passim*

15 U.S.C. § 1693a(12)..................................................................*passim*

15 U.S.C. § 1693b ................................................................................18

15 U.S.C. § 1693f ..................................................................... 12-13, 66

15 U.S.C. § 1693g .................................................................... 11-12, 66

15 U.S.C. § 1693*l* .................................................................................12

15 U.S.C. § 1693m ...............................................................................13

15 U.S.C. § 1693*o* ...............................................................................18

15 U.S.C. § 1693*o*-1 ......................................................................18, 43

28 U.S.C. § 1292(b)................................................................................6

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. 111-203, 124 Stat. 1376 (2010)........................................4, 42

Fair Credit Billing Act and Equal Credit Opportunity Act,
Pub. L. 93-495, 88 Stat. 1500 (1974)......................................................49

Financial Institutions Regulatory and Interest Rate Control Act,
Pub. L. 95-630, 92 Stat. 3641 (1978).....................................................13

N.Y. U.C.C. § 4-A-103(1)..............................................................................15

N.Y. U.C.C. § 4-A-104(1).........................................................................15, 33

N.Y. U.C.C. § 4-A-104, Official Comment 6...............................................15

N.Y. U.C.C. § 4-A-108 ...........................................................................17, 53

N.Y. U.C.C. § 4-A-108, Official Comment.....................................................17

N.Y. U.C.C. § 4-A-202 .............................................................................2, 16

N.Y. U.C.C. § 4-A-203, Official Comment 4.................................................17

N.Y. U.C.C. § 4-A-204 ......................................................................... 2, 16-17

N.Y. U.C.C. § 4-A-303 ..................................................................................15

N.Y. U.C.C. § 4-A-304 ..................................................................................16

N.Y. U.C.C. § 4-A-305 ..................................................................................15

N.Y. U.C.C. § 4-A-402(3)...............................................................................15

N.Y. U.C.C. § 4-A-403(1)...............................................................................15

N.Y. U.C.C. § 4-A-404 ..................................................................................15

N.Y. U.C.C. § 4-A-405(1)...............................................................................15

N.Y. U.C.C. § 4-A-501(1)...............................................................................17

N.Y. Exec. L. § 63(12) .............................................................................19, 67

N.Y. Sess. L. § 208 (1990).............................................................................14

U.C.C. Art. 4A, Prefatory Note ...................................................................1, 14

## Regulatory Materials

12 C.F.R. pt. 210, subpart B, Appx. A .........................................................34, 54

12 C.F.R. § 210.25 .........................................................................................34

12 C.F.R. pt. 1005, supp. I................................................................11, 41, 62

12 C.F.R. § 1005.3 ..........................................................................................11

31 C.F.R. § 1010.100 ......................................................................................34

42 Fed. Reg. 31,763 (June 23, 1977).............................................................9

44 Fed. Reg. 18,468 (Mar. 28, 1979)......................................................13, 54

46 Fed. Reg. 46,876 (Sept. 23, 1981) ...........................................................34

55 Fed. Reg. 40,791 (Oct. 5, 1990) ..................................................... 17-18, 54

76 Fed. Reg. 81,020 (Dec. 27, 2011) .............................................................18

77 Fed. Reg. 6,194 (Feb. 7, 2012) ...........................................................*passim*

78 Fed. Reg. 72,813 (Dec. 4, 2013) ...............................................................55

86 Fed. Reg. 31,376 (June 11, 2021)..............................................................14

## Other Authorities

123 Cong. Rec. S18884 (Nov. 4, 1977).........................................................49

124 Cong. Rec. S11756 (July 25, 1978).........................................................50

*About Us*, Western Union.................................................................................7

Alex Robertson, *Safe to Swipe?*, 93 Tex. L. Rev. 505 (2014) ............................9

Black's Law Dictionary (4th ed. 1968)...........................................................45

CFPB, *Money transfer FAQs* .........................................................................34

David L. Mengle, *Daylight Overdrafts and Payment System Risks*, Econ. Rev. 15 (1985) .......................................................................9

Dept. of the Treasury, *Proposed Amendment to 31 C.F.R. Part 103* (Oct. 15, 1990) ................................................................34

Donald J. Rapson, *Historical Background to 1990 Revision of UCC Articles 3 and 4*, ALI, C812 ALI-ABA 9 (1992) ..................................14

FDIC, *Electronic Funds Transfer Risk Assessment* (Oct. 2020)....................55

FDIC, *Interpretive Letter: Users' Rights Under EFTA in the Event of Bank Error Regarding an Electronic Wire Transfer*, 1994 WL 393720 (Apr. 26, 1994)................................................................55

FinCEN, *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System Under the Bank Secrecy Act* 55 (Oct. 2006) ................................................................34

1919 Federal Reserve Bank of N.Y. Fourth Ann. Rep. ..................................33

1953 Federal Reserve Bank of Clev. Ann. Rep.................................................32

1971 Federal Reserve Bank of N.Y. Ann. Rep...................................................7

1975 Federal Reserve Bank of St. Louis Review.............................................33

Federal Reserve System, *Federal Reserve Payments Study* (2025) ....................................................................................................8

Harry E. Werner, *Regulation of Wire Transfers and the Recoverability of Consequential Damages*, 36 Buff. L. Rev. 743 (1987) ................................................................14

Jonathan Macey & Geoffrey Miller, *Nondeposit Deposits and the Future of Bank Regulation*, 91 Mich. L. Rev. 237 (1992)............................7

Mark Sneddon, *The Effect of UCC Article 4A on the Law of International Credit Transfers*, 29 Loy. L.A. L. Rev. 1107 (1996) ................................................................14

*NCEFT Interim Report* (Feb. 1977) ................................................................51

NCUA, *Examiner's Guide* (2019)................................................................ 55-56

ix

OCC, *Comptroller's Handbook on Payment Systems* (Oct. 2021) ..................34

OCC, *Message from the Director—Wire Transfer Scams and Ways to Protect Yourself* (July 2023) .............................................55

*Pricing Policy Committee*, Paul Volcker Papers (Feb. 5, 1979).......................7

Roland E. Brandel & Eustace A. Olliff III, *The Electronic Fund Transfer Act: A Primer*, 40 Ohio St. L. J. 531 (1979)..................................49

S. 2293, 95th Cong., 1st Sess. (1977) ....................................................50

S. Rep. No. 95-915 (1978) ........................................................9-10, 37, 48

S. Rep. No. 95-1273 (1978) ...................................................................50

Webster's Third New International Dictionary (1961) ....................................45

William J. Baer, *Reflections on 20 Years of Merger Enforcement*, FTC (Oct. 29, 1996).................................................................................35

## INTRODUCTION

Since Western Union launched the first consumer-wire-transfer service in the nineteenth century, consumers have used wire transfers to make significant purchases, arrange their assets, and support loved ones. These days, millions of consumers send trillions of dollars each year through electronically initiated wire-transfer services provided by Citibank and other financial institutions. Those wire transfers flow from one consumer's account, through intermediary settlement services run by banks and the Federal Reserve, to the recipient's account.

For many years, Federal Reserve rules, including Regulation J, governed these transfers. In 1989, that regulation was supplemented by Article 4A of the Uniform Commercial Code, which has since been adopted by every State and the District of Columbia. Article 4A provides a "comprehensive body of law that defines the rights and obligations that arise from wire transfers." Uniform Laws Annotated, U.C.C. Article 4A, Prefatory Note (1989). Among other things, it requires banks to refund their customers for any unauthorized wire transfer unless the bank demonstrates that it accepted the transfer in good faith and in compliance with

commercially reasonable security procedures. N.Y. U.C.C. §§ 4-A-202(2), 4-A-204(1).

Since 1978, a different regulatory scheme—the Electronic Fund Transfer Act—has governed other newer (and typically smaller) electronic transfers, such as debit-card transactions and ATM withdrawals. EFTA differs from Article 4A in several ways, including that it requires banks to reimburse customers almost immediately for virtually all losses stemming from an unauthorized electronic transfer. Critically, Congress exempted from EFTA "any transfer of funds ... made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer," 15 U.S.C. § 1693a(7)(B)—*i.e.*, wire transfers.

Until the district court's decision, these two regulatory systems coexisted peacefully. Congress, courts, federal regulators, state legislatures, consumer advocates, and the entire financial-services industry have long understood that the consumer protections in Article 4A, rather than EFTA, govern claims arising from unauthorized consumer wire transfers. Across EFTA's nearly 50-year history, the agencies empowered to administer it have

2

never once brought an enforcement action alleging that a consumer wire transfer (or any part of one) is subject to EFTA's framework. Instead, those regulators have repeatedly confirmed that "wire transfers are entirely exempt from the EFTA" and "instead are governed by . . . Article 4A." 77 Fed. Reg. 6,194, 6,211-6,212 (Feb. 7, 2012).

Nevertheless, in January 2024, the New York Attorney General filed this civil lawsuit against Citibank, raising several EFTA claims (among others) related to unauthorized consumer wire transfers. To circumvent EFTA's exemption for wire transfers, the NYAG advanced a novel theory that each wire transfer should be viewed as not one transfer but at least three: one from the sender to its bank, one from the sender's bank to the recipient's bank, and one from the recipient's bank to the recipient. The NYAG alleged that only the second of those components—the transmission of funds from one bank to the other—is exempt from EFTA. The district court agreed and declined to dismiss this portion of the NYAG's complaint. The court acknowledged, however, that its unprecedented reading of EFTA would "affect[] the day-to-day operations of major financial institutions." JA455.

3

This novel trifurcated-transfer theory cannot be reconciled with EFTA's text. It is not how any ordinary speaker conceives of a "transfer of funds"—which generally involves getting the money from the sender to the ultimate recipient. Just as notably, it would render the critical statutory exemption "technically redundant." NYAG MTD Opp., ECF No. 25, at 21. That is because, under the NYAG's reading, Section 1693a(7)(B)'s sole purpose is to exempt the bank-to-bank component of a consumer wire transfer. But standalone bank-to-bank transmissions of funds *are not covered by EFTA* in the first place, so Congress had no need to exempt them. Nor can the NYAG's theory be squared with Congress's decision in 2010 to extend EFTA's disclosure and cancellation provisions to one specific type of cross-border consumer wire transfer. *See* Dodd-Frank Act, Pub. L. 111-203, § 1073 (2010). That amendment would be inexplicable if, as the NYAG believes, EFTA had in fact already covered all consumer wire transfers for the previous three decades.

In addition to running afoul of EFTA's text, the district court's decision breaks from consistent regulatory guidance and numerous judicial decisions. At least five federal agencies—including the two agencies tasked with implementing EFTA—have consistently said that consumer wire transfers

4

are exempt from EFTA. A number of district courts and at least two courts of appeals have said the same. All of those authorities are correct: Article 4A covers electronic consumer wire transfers, while EFTA covers certain other types of electronic consumer fund transfers. The district court thus erred in accepting the NYAG's invitation to rewrite EFTA, upend nearly half a century of settled practice, and require a sea change from the U.S. financial-services industry. This Court should correct that error.

The district court also allowed the NYAG to pursue another EFTA claim against Citibank, as an apparent backstop to its flawed primary theory. The NYAG alleged that *intra*bank transfers that precede an unauthorized consumer wire transfer—*i.e.*, where money is moved between two accounts controlled by the same consumer—are independently subject to EFTA's remedial provisions. That claim also fails as a matter of law. Such intrabank transfers do not meet EFTA's statutory definition of unauthorized electronic fund transfers because they impose no net harm on the consumer. Nor can EFTA's reimbursement scheme apply to such transfers because they do not produce an *independent* consumer loss. Any loss comes from a subsequent unauthorized external transfer, which EFTA does not govern for the reasons already given.

This Court correctly granted Citibank's petition for interlocutory appeal of these critical issues. It should now reverse the denial of Citibank's motion to dismiss on the NYAG's EFTA counts.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). On April 22, 2025, the district court certified for interlocutory appeal its January 21, 2025 order denying in part Citibank's motion to dismiss. On May 2, 2025, Citibank timely filed a petition for leave to file this appeal, which this Court granted on September 3, 2025. This Court has jurisdiction under 28 U.S.C. § 1292(b).

## STATEMENT OF THE ISSUES

1. Whether electronically initiated consumer wire transfers fall within EFTA's exemption for "any transfer of funds . . . made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." 15 U.S.C. § 1693a(7)(B).

2. Whether an intrabank transfer in which money is moved between a single consumer's accounts constitutes an "unauthorized electronic fund transfer" subject to EFTA's remedial provisions. 15 U.S.C. § 1693a(12).

6

## STATEMENT OF THE CASE

### A.    Legal Background

### 1.    Early regulation of consumer wire transfers

Western Union launched the first consumer wire transfers in 1871, allowing individuals to transfer money via telegraph networks.  *See About Us*, Western Union, https://perma.cc/X362-25EG.  A century later, wire transfers had gained popularity with consumers and businesses alike.  *See* Jonathan Macey & Geoffrey Miller, *Nondeposit Deposits and the Future of Bank Regulation*, 91 Mich. L. Rev. 237, 245-246 (1992).[1]  Consumers value wire transfers because they offer a "fast and efficient option for consumers to send money through their financial institutions to other consumers and businesses."  JA276.

To a consumer, a wire transfer appears as one unit:  the consumer selects a sending account and a receiving account.  As a technical matter, however, a typical wire transfer proceeds in several behind-the-scenes steps. The sender issues a payment order to her bank, the sender's bank exchanges

---

[1]  *See also* 1971 Federal Reserve Bank of N.Y. Ann. Rep. 50, https://perma.cc/VD7R-FQLA (removal of fees on small-dollar wires encouraged bank "customers to transfer funds by wire" rather than checks); *Pricing Policy Committee*, Paul Volcker Papers 67-68, 81-82 (Feb. 5, 1979), https://perma.cc/SM2J-B8MD  (Federal Reserve data estimating that more than a million small-dollar wires were sent annually by 1977).

messages with the recipient's bank over a wire-transfer network, the sender and recipient receive a debit and a credit from their respective banks in the amount of the originating payment order, and the banks receive a corresponding debit or credit to their accounts held with the wire-transfer service. JA22-23. The participating banks' accounts are settled either in real time or periodically (*e.g.*, at the end of the day). *See* JA275-276.

These fund transfers are made possible by two principal wire-transfer systems in the United States. Fedwire is a nationwide wire system operated by the Board of Governors of the Federal Reserve System, and CHIPS is a New York-based wire system operated by the Clearing House Payments Company. Both are predominantly used for commercial transactions. Consumer wire transfers, however, make up a notable minority of the Fedwire and CHIPS systems: in 2021, consumers sent roughly $4.27 trillion through 41.9 million wire transfers, accounting for 11% of the total number of wires initiated. *See* JA18; Federal Reserve System, *Federal Reserve Payments Study* (2025), https://perma.cc/KD6G-TXJK. The average consumer wire transfer thus amounts to roughly $100,000. *Id.* Consumers tend to use such transfers for large, one-off events like the down payment for a house.

8

After Fedwire's introduction in 1918, the Federal Reserve regulated fund transfers over this system through a series of bank rules. *See* David Mengle, *Daylight Overdrafts and Payment System Risks*, Econ. Rev. 15, 18 (1985). In 1977, the Federal Reserve adopted subpart B of Regulation J, which comprehensively codified the then-existing framework to "set forth the duties and liabilities" of parties carrying out such "wire transfers of funds." 42 Fed. Reg. 31,763, 31,763 (June 23, 1977). Among other things, Regulation J required banks to "promptly credit" the beneficiary of a Fedwire transfer and authorized the Federal Reserve to facilitate the unwinding of "erroneous" or "irregular" transfers. *Id.* 31,765-31,766. The Federal Reserve made clear that Regulation J did not "touch on other electronic payments," such as point-of-sale transactions. *Id.*

### 2. The Electronic Fund Transfer Act

In the 1960s and 1970s, a "new generation" of electronic banking technologies began to emerge, including the point-of-sale transactions that Regulation J pointedly exempted. S. Rep. No. 95-915, at 2 (1978). ATMs, for example, were first introduced in the United States in 1969. Alex Robertson, *Safe to Swipe?*, 93 Tex. L. Rev. 505, 506 n.9 (2014). Debit cards were introduced around the same time. *Id.* at 506.

9

In 1978, Congress enacted EFTA to address the rise of such "relatively new banking and payment services."  S. Rep. No. 95-915, at 2.  The Act's "purpose" was to "provide a basic framework" for determining the "rights, liabilities, and responsibilities" with respect to "electronic fund transfer systems."  15 U.S.C. § 1693(b) (1978).  Congress was especially concerned with "four principal types" of newly available electronic fund transfers: (i) ATMs, (ii) pay-by-telephone systems, (iii) direct deposits and automatic payments, and (iv) point-of-sale transfers.  S. Rep. No. 95-915, at 2.

EFTA covers those types of transfers through a series of statutory definitions aimed at consumer transactions.  As a baseline, EFTA applies to "electronic fund transfer[s]," which it defines as "any transfer of funds" that "is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account."  15 U.S.C. § 1693a(7).  A covered "account" must be "established primarily for personal, family, or household purposes"—meaning a consumer account rather than a commercial one.  *Id.* § 1693a(2).  Electronic fund transfers expressly include "point-of-sale transfers, [ATM] transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone."  *Id.* § 1693a(7).

10

EFTA excludes five distinct categories of transactions. 15 U.S.C. § 1693a(7). The relevant exception here is Section 1693a(7)(B), which provides that an electronic fund transfer "does not include . . . any transfer of funds . . . made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." As the Federal Reserve explained in subsequent regulations, the statutory reference to "service[s] that transfer[] funds held at either Federal Reserve banks or other depository institutions" covers Fedwire and "similar wire transfer system[s]," including CHIPS. 12 C.F.R. § 1005.3(c)(3); *see* 12 C.F.R. pt. 1005, supp. I, 3(c)(3), cmt. 3.

When it applies, EFTA provides broad protection for consumers from unauthorized transfers. An electronic fund transfer is "unauthorized" if it is "initiated by a person other than the consumer without actual authority" and "the consumer receives no benefit." 15 U.S.C. § 1693a(12). The Act's comprehensive reimbursement scheme requires banks to cover all but a small portion of losses that a consumer suffers from any such unauthorized transfer, provided the consumer timely notifies the bank about her loss. *See* 15 U.S.C. § 1693g. More specifically, if the consumer notifies her bank of an

11

unauthorized transfer within two business days of discovery, the consumer's losses are capped at $50, and the bank must reimburse any loss above that. *Id.* § 1693g(a).

EFTA also imposes a litany of procedural requirements on financial institutions with respect to covered electronic fund transfers. In particular, it requires a quick investigation into any allegedly unauthorized or erroneous transfer. If the consumer notifies her bank within 60 days of receiving her monthly statement, the bank must conduct an investigation and report its findings to the consumer "within ten business days." 15 U.S.C. § 1693f(a)(3). That time period can be extended only if the bank "provisionally recredit[s]" the consumer's account within those ten days. *Id.* § 1693f(c). If the bank determines that an error occurred, it has only a single business day to reimburse the consumer for any loss, including interest. *Id.* § 1693f(b). By contrast, if the bank determines that no error took place, it has three business days to explain its findings, and it must provide upon request all documentation that the bank relied on to make that determination. *Id.* § 1693f(d). EFTA also contains an anti-waiver provision that bars parties from contracting out of its consumer-protection rules. *Id.* § 1693*l*.

12

To enforce EFTA's various provisions, Congress provided consumers with a private right of action. *See* 15 U.S.C. § 1693m(a). A consumer may bring an EFTA claim within one year of the date of any alleged violation, *id.* § 1693m(g), and may seek actual damages, costs, attorney's fees, and a statutory award ranging from $100 to $1,000, *id.* § 1693m(a)(1)-(3). Consumers may even be entitled to treble damages in certain circumstances if the bank fails to comply with EFTA's investigatory framework. *See id.* § 1693f(e).

When EFTA was enacted, Congress gave administrative enforcement and rulemaking authority to the Federal Reserve Board. *See* Pub. L. 95-630, Title XX, §§ 904(a), 918 (1978). In 1979, the Board promulgated Regulation E to implement EFTA. Regulation E "[e]xempt[ed]" from its coverage "[a]ny wire transfer of funds for a consumer through the Federal Reserve Communications System or other similar network that is used primarily for transfers between financial institutions or between businesses." 44 Fed. Reg. 18,468, 18,481 (Mar. 28, 1979).

### 3. Article 4A of the UCC

In 1989, the American Law Institute and National Conference of Commissioners on Uniform State Laws approved Article 4A of the UCC to

13

supplement Regulation J and provide a complete legal framework to regulate wire transfers.[2] This development had been in the works since the promulgation of Regulation J's subpart B, and before EFTA's enactment. As early as 1977, the UCC had established a special committee to explore how best to regulate electronically initiated wire transfers. Donald J. Rapson, *Historical Background to 1990 Revision of UCC Articles 3 and 4*, ALI, C812 ALI-ABA 9, 11 (1992). The final product was ready in 1989, and by the mid-1990s, Article 4A had been adopted by all 50 States and the District of Columbia. *See* 86 Fed. Reg. 31,376, 31,377 (June 11, 2021); Mark Sneddon, *The Effect of UCC Article 4A on the Law of International Credit Transfers*, 29 Loy. L.A. L. Rev. 1107, 1109 n.6 (1996). New York's legislature adopted Article 4A in 1990. *See* N.Y. Sess. Law § 208 (1990).

Article 4A provides a "comprehensive body of law that defines the rights and obligations that arise from wire transfers." Uniform Laws Annotated, U.C.C. Article 4A, Prefatory Note (1989). It defines a wire

---

[2] As one commentator explained just before Article 4A's approval, because "EFTA exclude[d] wire transfers from coverage" and Regulation J applied only to Fedwire, wire transfers conducted through other systems, like CHIPS, remained governed only by private agreements. Harry E. Werner, *Regulation of Wire Transfers and the Recoverability of Consequential Damages*, 36 Buff. L. Rev. 743, 751-752 (1987). Article 4A filled this gap.

14

transfer as a "series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." N.Y. U.C.C. § 4-A-104(1) & Official Comment 6. That series encompasses "any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order," and is "completed" once the recipient's bank accepts the payment order for the recipient's benefit. *Id.* § 4-A-104(1). A payment order is defined, in turn, as "an instruction of a sender to a receiving bank . . . to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary." *Id.* § 4-A-103(1)(a).

Article 4A's provisions address every step of a wire transfer, from end to end. For example, Article 4A requires a customer to pay her bank in the amount of her originating payment order once her bank accepts that payment order. N.Y. U.C.C. §§ 4-A-402(3), 4-A-403(1)(c). At the other end of the sequence, Article 4A requires the recipient's bank to pay the recipient in the amount of the payment order once the bank accepts the final payment order. *Id.* §§ 4-A-404, 4-A-405(1). Between those steps, Article 4A imposes liability on banks for delayed or erroneous execution of wire transfers. *Id.* §§ 4-A-303, 4-A-305.

15

Like EFTA, Article 4A protects consumers from unauthorized transfers. At a high level, both "allocate[] the risk of loss to the bank that received and honored [an] unauthorized order." *Banco del Austro, S.A.* v. *Wells Fargo Bank, N.A.*, 215 F. Supp. 3d 302, 304 (S.D.N.Y. 2016). But the two frameworks differ in material ways. In particular, Article 4A gives some protection to banks that adhere to reasonable security procedures. It generally requires a bank to refund any unauthorized wire transfer if the consumer informs the bank within 90 days of the debiting of her account. N.Y. U.C.C. §§ 4-A-204, 4-A-304. The liability shifts to the consumer, however, if (1) the bank and its customer have reached an agreed-upon "commercially reasonable method of providing security against unauthorized payment orders" and (2) the bank "accepted the payment order in good faith and in compliance with the security procedure." *Id.* § 4-A-202(2). The reasonableness of such security procedures turns on multiple factors, such as the circumstances of the customer known to the bank, alternative security procedures offered to the customer, and the security procedures in use by similarly situated banks. *Id.* § 4-A-202(3).

Moreover, unlike EFTA, Article 4A provides banks and their customers flexibility by permitting the parties to vary certain of its default

16

rules by agreement. N.Y. U.C.C. § 4-A-501(1). That said, a bank cannot avoid its basic obligation to refund a consumer under Article 4A for unauthorized transfers. *Id.* § 4-A-204(2). In short, Article 4A "encourage[s] banks to institute reasonable safeguards against fraud," while stopping short of turning banks into "insurers against [all] fraud." *Id.* § 4-A-203, Official Comment 4.

The UCC's drafters intended "to make Article 4A and EFTA mutually exclusive," expressly providing that Article 4A "does not apply to a funds transfer any part of which is governed by [EFTA]." N.Y. U.C.C. § 4-A-108 & Official Comment. In crafting this framework, Article 4A's architects aimed to achieve "[n]ational uniformity in the treatment" of wire transfers, along with "speed, efficiency, certainty[,] . . . and finality." *Banque Worms* v. *BankAmerica Int'l*, 570 N.E.2d 189, 195 (N.Y. 1991).

The Federal Reserve took note of Article 4A's "comprehensive" framework and its rapid adoption by numerous States. 55 Fed. Reg. 40,791, 40,791 (Oct. 5, 1990). As a result, the Board amended Regulation J in 1990 to incorporate Article 4A into subpart B, which governs Fedwire fund transfers. *Id.* at 40,791-40,792. The Board, which also enforced EFTA at the time, reiterated that Regulation J and Article 4A would govern a wire transfer

17

where the "originator's or beneficiary's account [was] a consumer account" because EFTA and Regulation E "do not apply to funds transfers through Fedwire." *Id.* at 40,804; *see id.* ("Fedwire funds transfers to or from consumer accounts are exempt from [EFTA] and Regulation E.").

### 4. The Dodd-Frank Act

In 2010, as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Congress amended EFTA in two ways. First, it extended certain disclosure and error-resolution provisions under EFTA to a single type of consumer wire transfer: remittance transfers. Remittance transfers are money transfers sent by an individual in the United States to an overseas recipient, and they can be processed through major wire-transfer networks. 77 Fed. Reg. 6,194, 6,195 (Feb. 7, 2012); 15 U.S.C. § 1693*o*-1. The partial expansion of EFTA to cover this subset of consumer wire transfers provided "particularly important [protections] for low-income immigrants" who send money to support their families abroad. 77 Fed. Reg. 6,194, 6,199, 6,272-6,273. Second, the Dodd-Frank Act transferred regulatory authority for EFTA from the Board to the CFPB. *See* 76 Fed. Reg. 81,020, 81,020 (Dec. 27, 2011); 15 U.S.C. §§ 1693b(a)(2), 1693*o*.

18

The CFPB understood that the Dodd-Frank amendments had extended portions of EFTA only to qualifying remittance transfers, and that Article 4A continued to govern all other wire transfers. In guidance accompanying its rules implementing the new remittance-transfer protections, the CFPB explained that, before the amendments, "wire transfers [we]re *entirely exempt from the EFTA and Regulation E* and instead [we]re governed by . . . Article 4A of the U[CC]." 77 Fed. Reg. 6,194, 6,211-6,212 (Feb. 7, 2012) (emphasis added). That is because "Congress had specifically structured the EFTA to exclude wire transfers." *Id.* at 6,195 (citing 15 U.S.C. § 1693a(7)(B)). The CFPB then noted that "Article 4A will no longer apply to . . . international consumer wire transfers," which would be governed by EFTA's disclosure and error-resolution framework instead. *Id.* at 6,211.

## B. Procedural Background

1. In January 2024, the NYAG filed a civil action against Citibank. It raised eight claims under New York Executive Law § 63(12), which authorizes the NYAG to enjoin and seek damages for "repeated fraudulent or illegal acts." JA64-80.

19

Counts 1, 2, and 3 involve EFTA and are the subject of Citibank's petition for interlocutory appeal. The NYAG primarily alleges that Citibank has routinely violated EFTA by treating consumer wire transfers as subject to Article 4A's liability scheme rather than EFTA's. That claim rests on a novel theory of wire transfers. According to the NYAG's complaint, a consumer wire transfer should be treated as at least *three* separate transfers—one between the sender and the sender's bank, one between the sender's bank and the recipient's bank, and one between the recipient's bank and the recipient. JA22-26.

In the NYAG's telling, Congress exempted only the middle leg from EFTA. JA22-26. That would mean that the first leg of a consumer wire transfer, in which the consumer sends her bank a payment order requesting a wire transfer and the bank debits the consumer's account in that amount, falls outside the exemption in Section 1693a(7)(B). JA12, 19, 23, 41. The result of that theory, the NYAG alleges, is that Citibank must reimburse consumers for any wire transfers over the last six years that were "unauthorized" within the meaning of EFTA. JA26, 64-66. The NYAG thus seeks hefty damages, potentially hundreds of millions of dollars, *e.g.*, JA18, all based on Citibank's good-faith application of Article 4A's framework to

20

consumer wire transfers—something every court and financial regulator at the state and federal level has blessed for decades.

In one of the EFTA counts, the NYAG even takes aim at intrabank transfers. Those are fund transfers between a single consumer's accounts— for example, from a savings account to a checking account—that may precede an unauthorized external wire transfer. JA27, 35, 66-68. On the NYAG's view, these intrabank transfers are also "unauthorized" fund transfers under EFTA because they are undertaken to consolidate funds to facilitate external wire transfers—even though there is no net loss that results from these intrabank transfers themselves because the consumer is on both sides of the transfer.

The NYAG also raised several non-EFTA claims. In Count 4, it alleged in the alternative that Citibank had violated Article 4A by failing to employ commercially reasonable security procedures. JA69-72. In Count 5, the NYAG alleged that Citibank had violated New York's SHIELD Act, which requires businesses that store sensitive consumer data to implement reasonable security safeguards. JA72-74. In Count 6, the NYAG alleged for similar reasons that Citibank had violated the federal Red Flags Rule, which is a rule promulgated by the Federal Trade Commission that requires

21

financial institutions to maintain an identity-theft prevention program. JA74-76. And in Counts 7 and 8, the NYAG alleged that Citibank had violated state law by engaging in deceptive practices, including by making alleged misrepresentations related to its commitment to safety and its investigation of fraudulent fund transfers. JA76-80.

For all of these alleged violations, the NYAG seeks, among other things, an order requiring Citibank to "provide restitution and damages to all injured consumers, whether known or unknown at the time of the decision," along with the disgorgement of all "profits" related to the claims. JA81. The NYAG also demands that Citibank "pay a civil penalty of $5,000" to the State for each asserted instance of allegedly deceptive business practices. JA81.

2. Citibank moved to dismiss the complaint, but the district court allowed the NYAG's EFTA claims to proceed. Describing the wire-transfer EFTA claim as a "question of first impression" in this Circuit, the court agreed with the NYAG that the statute's exemption for wire transfers applies only to the bank-to-bank segment of a consumer wire transfer. JA282, 293. The court acknowledged that EFTA's drafters "might not have anticipated" that construction of Section 1693a(7)(B), and that it risked rendering the subsection "unnecessary" because the bank-to-bank segment

22

of a consumer wire transfer was never covered by EFTA in the first instance. JA291, 306. The court nonetheless surmised that Congress may simply have added the exemption as "clarifying language to ensure that purely interbank wires were beyond the reach of EFTA." JA291-292. Although the court acknowledged the significant contrary authorities, it reasoned that they largely had not "considered the precise statutory interpretation question" raised by the NYAG's trifurcated-transfer theory. JA301.

The district court also allowed the NYAG's intrabank-transfer claim to proceed. The court recognized that Section 1693a(12) requires that the consumer receive "no benefit" from an unauthorized fund transfer, but found that element satisfied because the intrabank transfers were conducted to facilitate "subsequent" fraud and occurred without the consumer's awareness. JA311. In reaching that conclusion, the court expressly "looked past" the intrabank transfers themselves and relied on the harms that a consumer would incur from the subsequent external fraudulent wire transfers. JA310.

The district court dismissed several of the NYAG's other claims. It concluded that the SHIELD Act and Red Flags Rule claims are "either preempted or otherwise barred by the Fair Credit Reporting Act." JA321.

23

The court concluded that the Red Flags Rule claim was barred because Congress authorized only the FTC and OCC to enforce the relevant regulation, JA328, and that FCRA's expansive express-preemption provision preempted the SHIELD Act claim. JA324-327. The court also dismissed the Article 4A claim on the ground that some portion of the alleged unauthorized wire and intrabank transfers were governed by EFTA, without reaching other grounds for dismissal. As the court observed, Article 4A's coverage "goes away entirely" if "any part" of a fund transfer is governed by EFTA. JA320.

3.     Citibank (but not the NYAG) moved under 28 U.S.C. § 1292(b) to certify the district court's motion-to-dismiss order for interlocutory review. The district court granted certification. JA457. It acknowledged that the EFTA-interpretation question was "difficult" and that other courts had taken a "contrary view" of EFTA's scope. JA453. And the court noted that Citibank's statutory arguments, which included "decades of legislative and regulatory history," "precise application of interpretive canons," and the "application of persuasive authority," "merit[ed] serious consideration." JA456. The court also granted a stay of the proceedings below because EFTA's newfound applicability to consumer wire transfers would have

24

"immediate and consequential impacts on the banking and financial services industries." JA456.

4.     This Court granted Citibank's petition for an interlocutory appeal. JA458. The NYAG did not file a timely cross-petition with respect to its SHIELD Act and Red Flags Rule claims. Nevertheless, in opposing Citibank's petition, the NYAG asked the Court to allow it to cross-appeal the district court's dismissal of both claims. The Court referred the NYAG's request to the merits panel. JA458-459.

## SUMMARY OF THE ARGUMENT

I.     For nearly 50 years, every stakeholder—Congress, courts, regulators, and industry participants—has operated on the understanding that EFTA does not regulate consumer wire transfers. That is because EFTA's plain text exempts "any transfer of funds" that is "made by a financial institution on behalf of a consumer" through a wire-transfer service. 15 U.S.C. § 1693a(7)(B). The district court departed from this consensus because it read Section 7(B) to cover only the bank-to-bank segment of a wire transfer, leaving EFTA to regulate the consumer-to-bank segments. That decision is incorrect for three reasons.

25

First, the district court's conclusion cannot be squared with EFTA's text. The central dispute here is whether a fund transfer should be analyzed in its entirety or on a segment-by-segment basis. The district court adopted the latter approach. But the ordinary meaning of a "fund transfer"—backed up by decades of technical regulatory usage—refers to a complete transfer of funds from the sender to the ultimate recipient. Section 7 itself makes clear in various ways that a "transfer of funds" refers to an end-to-end transfer. And any contrary conclusion would render the wire-transfer exemption meaningless because it would exempt from EFTA only the one part of a consumer fund transfer—the bank-to-bank segment—that all agree was never covered by EFTA in the first place. The NYAG's interpretation also cannot explain Congress's partial extension of EFTA in 2010 to one subset of consumer wire transfers: cross-border remittance transfers. On the NYAG's view, EFTA already covered all consumer wire transfers, and the amendment was a pointless exercise.

Second, EFTA's history and purposes confirm its plain text. In enacting EFTA, Congress focused on regulating then-novel technologies such as ATMs and point-of-sale systems. Wire transfers, by contrast, were already a familiar technology that consumers and businesses had been using

26

for decades. The legislative record reveals that Congress understood consumer wire transfers as a distinct issue that the States would regulate by adopting Article 4A.

Third, longstanding regulatory and judicial interpretations track EFTA's text. Until this litigation, every federal agency to confront this question, including the two agencies charged over time with administering EFTA (the Federal Reserve Board and then the CFPB), took the view that the statute excludes consumer wire transfers in their entirety. This consensus, which dates back to EFTA's enactment, represents powerful and contemporaneous evidence of the statute's original meaning. And the same holds true for the case law: every court that has substantively reviewed EFTA's coverage exemptions, including at least two courts of appeals, has held that wire transfers like those here fall outside of EFTA's reach.

II. The district court separately concluded that intrabank transfers—in which a consumer's funds are moved between her own accounts—are unauthorized fund transfers under EFTA. That conclusion was wrong too. For a fund transfer to be "unauthorized" within the meaning of EFTA, that particular transfer must provide "no benefit" to the consumer. 15 U.S.C. § 1693a(12). But when an intrabank transfer occurs, the consumer

27

receives a straightforward (even if unrequested) benefit because she receives a timely credit to one of her own accounts, without any costs or losses.

Indeed, EFTA's remedial scheme does not fit intrabank transfers at all. The only loss that the district court identified for intrabank transfers is that they may precede or facilitate a fraudulent *external* wire transfer. But plaintiffs cannot circumvent EFTA's exemption for wire transfers by imputing the loss from external wire transfers to internal preparatory transfers. EFTA's remedial scheme presumes that each particular "unauthorized" fund transfer causes a direct monetary loss that is capable of reimbursement by the bank. Intrabank transfers, however, do not trigger any monetary loss. It follows that they were not meant to fall within the statute's definition of an "unauthorized" fund transfer in the first instance.

This Court should reverse the denial of Citibank's motion to dismiss with respect to all EFTA counts.

## ARGUMENT

The district court erred in failing to dismiss the NYAG's EFTA claims for two reasons. First, EFTA has never governed consumer wire transfers or any artificially isolated component of them. Instead, Article 4A of the UCC governs the entirety of consumer wire transfers. Second, EFTA's

28

unauthorized-transfer framework also does not reach internal, intrabank transfers that may precede external, exempt wire transfers. A bank must refund a consumer for "unauthorized" fund transfers only if the consumer loses funds, but intrabank transfers that simply move funds between a consumer's accounts result in no loss at all. For both reasons, this Court should reverse the decision below in relevant part.

## I. THE DISTRICT COURT ERRED IN HOLDING THAT EFTA COVERS ELECTRONICALLY INITIATED CONSUMER WIRE TRANSFERS.

When Congress enacted EFTA, it expressly exempted consumer wire transfers. It did not leave them unregulated; it instead left their regulation to then-existing Regulation J and later Article 4A. EFTA's text, structure, and history make clear that Congress excluded consumer wire transfers in their entirety—not just an artificial segment of those transfers. Every federal regulator and court to address the issue before this litigation agreed that EFTA excludes consumer wire transfers. Those many decades of unbroken practice and uniform authority are right: by its terms, EFTA does not cover electronically initiated consumer wire transfers.

29

### A.     EFTA's Text Exempts Consumer Wire Transfers.

EFTA regulates certain electronic "transfers of funds," while exempting others. 15 U.S.C. § 1693a(7). The Act applies to "electronic fund transfer[s]," which it defines as "any transfer of funds . . . which is initiated through" electronic means "so as to order, instruct, or authorize a financial institution to debit or credit" a consumer account. *Id.* Congress provided several examples of what that definition covers: "point-of-sale transfers, [ATM] transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone." *Id.*

Congress, however, exempted several types of electronic fund transfers. As relevant here, EFTA does not cover "any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." 15 U.S.C. § 1693a(7)(B). By its plain terms, the Section 7(B) exemption applies to consumer wire transfers. That is because a consumer wire transfer is "made by a financial institution" "on behalf of a consumer" through a service such as Fedwire or CHIPS. The NYAG has never disputed

30

that either Fedwire or CHIPS is "a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." *Id.*

That text should have been enough to foreclose the NYAG's suit. But the NYAG came up with a novel theory: that a consumer wire transfer is not a single transfer but at least three separate ones—from sender to bank, bank to bank, and bank to recipient. In the NYAG's view, the middle segment is governed by Article 4A, while the first and possibly last segments are governed by EFTA. *See* JA26. There is no apparent reason why different regulatory regimes should cover a single consumer wire transfer of funds to a third-party recipient, and the NYAG never offers one. In any event, plain meaning and basic canons of statutory interpretation make clear that the Section 7(B) exemption covers the entire consumer wire transfer, not just a segment of it.

> **1. Both ordinary and specialized usage treat a transfer of funds as the entire end-to-end process.**

a. As a matter of ordinary usage, a "transfer of funds" or "fund transfer" refers to a *complete* transfer of funds from the sender to the recipient, not merely behind-the-scenes movements to make that ultimate transfer happen. *See Feliciano* v. *Department of Transp.*, 605 U.S. 38, 45

31

(2025) (courts must ask "how an ordinary American might approach the law's terms"). In common parlance, one would say that "John wired $100 to Sue" or "John transferred funds to Sue," even though that wire transfer involves passing funds from one intermediary bank account to another rather than directly between John and Sue. No ordinary English speaker would quibble that, in fact, John transferred funds to his bank, which transferred funds to Sue's bank, which transferred funds to Sue. Simply put, the NYAG has never pointed to any ordinary usage of "transfer of funds" that refers only to some segment of a consumer wire transfer.

b.      As a technical matter, too, regulators have long used terms like "transfer of funds" or "fund transfer" (and the subclass of "wire transfers") to mean the movement of money from a sender to the ultimate recipient. Well before EFTA's enactment, it was understood that a transfer of funds sent through a wire network refers to an end-to-end transaction. *See, e.g.*, 1953 Federal Reserve Bank of Clev. Ann. Rep. 19, https://perma.cc/4RTE-D2FF (explaining that a Fedwire "transfer of funds" begins with a customer's request to her bank and concludes with a credit designated for

32

the recipient).[3]   Thus, Congress knew when it used the term "transfer of funds" that both the industry and its regulators would understand that term to encompass a complete, integrated transaction from sender to recipient. *See George* v. *McDonough*, 596 U.S. 740, 752 (2022) ("The real question is . . . what was the 'prevailing understanding' of this term of art" at the time of the statute's enactment.).

That understanding has remained true in the decades since.  Since 1989, Article 4A of the UCC (and the 50 state legislatures that have adopted it) has defined "funds transfer" as the "series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order."   N.Y. U.C.C. § 4-A-104(1).   That transfer is "completed" only when the recipient's bank accepts the payment order for the benefit of the recipient.  *Id.*   Thus, under Article 4A, a fund transfer begins with the consumer's instruction to her bank and ends with final payment.   The Federal Reserve incorporated the same definition into its Regulation J, with one statutorily required exception for wire transfers

---

[3]   *See also, e.g.*, 1919 Federal Reserve Bank of N.Y. Fourth Ann. Rep. 24, https://perma.cc/7VSG-SSLT ("The transfers handled include not only transactions between banks, but also payments through member banks to individuals."); 1975 Federal Reserve Bank of St. Louis Review 4, https://perma.cc/P57G-872J ("electronic transfers of funds" allow banks to transfer funds "for their customers").

33

followed by ACH transfers. *See* 12 C.F.R. pt. 210, subpart B, § 210.25(b) & Appx. A; 46 Fed. Reg. 46,876, 46,879 (Sept. 23, 1981).

Other regulators have said the same. The CFPB, which began administering EFTA in 2011, said just last year that "[a] wire transfer is a common way to electronically move money *from one person to another.*" CFPB, *Money transfer FAQs* (last modified Dec. 12, 2024), https://perma.cc/Z26D-2VAB (emphasis added). The Office of the Comptroller of the Currency, Financial Crimes Enforcement Network, Department of the Treasury, and Federal Trade Commission have made equally clear statements.[4] The NYAG has never pointed to any contrary ordinary or technical understanding.

---

[4] *See* OCC, *Comptroller's Handbook on Payment Systems*, 10 & 11 Fig. 3 (Oct. 2021), https://perma.cc/5VN9-7F9C (a "wire transfer" "begins" with the sender's request and ends when the recipient bank "credits the [recipient's] account"); FinCEN, *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System Under the Bank Secrecy Act* 55 (Oct. 2006) (a "funds transfer" is the "series of payment instruction messages, beginning with" the "sending customer's" instructions, and "including a series of further instructions between the participating institutions, with the purpose of making payment" to the "receiving customer"); *see* 31 C.F.R. § 1010.100 (defining "funds transfer" in Bank Secrecy Act regulations using Article 4A's end-to-end definition); Dept. of the Treasury, *Proposed Amendment to 31 C.F.R. Part 103* 3 (Oct. 15, 1990), https://perma.cc/L85R-6NSM ("funds transfers" are a "series of messages . . . result[ing] in the payment of funds from one person to another" accomplished "through a debit to the [sender's] account" and a "credit to the person receiving the funds");

34

To be sure, some of these regulatory definitions or guidance postdate EFTA's enactment. But the point is that a consumer fund transfer, both before and after EFTA's enactment, has always referred to the complete payment journey from sender to recipient. This Court relied on that understanding, for example, when it explained in *Calderon-Cardona* v. *Bank of New York Mellon* that "electronic fund transfers"—and in that case, "wire transfers" in particular—are "a chained series of debits and credits between" the sender, the sender's bank, any intermediary banks, the recipient's bank, and the recipient. 770 F.3d 993, 1001 (2d Cir. 2014); *see Heiser* v. *Islamic Republic of Iran*, 735 F.3d 934, 935-936 (D.C. Cir. 2013) ("An electronic funds transfer is a series of transactions by which one party . . . transfers money through the banking system to another party" "through a sequence of electronic debits and credits."). For decades, everyone has shared the common-sense view that a consumer wire transfer is the complete payment from a sender to a recipient.

---

William J. Baer, *Reflections on 20 Years of Merger Enforcement*, FTC (Oct. 31, 1996), https://perma.cc/WV6H-KQTB (describing consumer "wire transfers" as "two-party transfers of money between persons" that are completed once "the recipient at the other end" receives the funds).

### 2. Canons of statutory interpretation support reading Section 7(B) as an end-to-end exemption.

a. If there were any doubt that a "transfer of funds" in Section 7(B)'s exemption encompasses the entire payment journey, Section 7's general rule would dispel it. It is a fundamental "principle of statutory construction" that "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp.* v. *Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). Applying that principle is "doubly appropriate" when, as here, "Congress employed the same term in multiple places . . . in the same section." *Monsalvo* v. *Bondi*, 604 U.S. 712, 726 (2025). And it may be triply appropriate when the same term is used in both a general rule and an exemption within the same section.

The most natural reading of "transfer of funds" in Section 7's general rule is the entire end-to-end transfer. That is clear from the enumerated examples. Congress explained that the term "electronic fund transfer" includes "point-of-sale transfers, [ATM] transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone." 15 U.S.C. § 1693a(7). The definition treats each of the listed examples as a single, indivisible transfer—even though, much like a wire transfer, they all contain multiple segments. Consider point-of-sale transfers. A point-of-sale transfer

36

starts with a consumer's request to purchase goods, which is processed on a "computer terminal at a retail establishment," followed by a debit of the consumer's account by her bank, and then a bank-to-bank transmission to the retailer's bank. S. Rep. No. 95-915, at 2-3; JA122-125. So too for direct deposits, which involve a debit to the sender's bank and a credit to the recipient's bank (as settled through a clearinghouse network), and a credit to the recipient's account. S. Rep. No. 95-915, at 2; JA108-109. Section 7 plainly treats a point-of-sale transfer or a direct deposit, in its entirety, as a single "electronic fund transfer."

Moreover, Section 7 defines an "electronic fund transfer" as "any transfer of funds . . . which is *initiated* through" electronic means "so as to order, instruct, or authorize a financial institution to debit or credit" a consumer account. 15 U.S.C. § 1693a(7) (emphasis added). In other words, Section 7 says flat-out that the "transfer of funds" starts with the consumer's electronic order. But Section 7 treats that "initiat[ing]" consumer-to-bank segment as part of the overall transfer—not as its own separate transfer. Again, Section 7 applies to "point of sale transfers" or "[ATM] transactions," not merely to the portion of the transfer where a consumer uses a keypad to start the funds moving.

37

Section 7(B) should be understood the same way as Section 7. It exempts from Section 7's scope a "transfer of funds" "made by a financial institution on behalf of a consumer by means of" a wire-transfer service. 15 U.S.C. § 1693a(7)(B). It would be nonsensical if Congress used "electronic fund transfer" or "transfer of funds" to include every part of the payment journey from consumer to recipient when articulating the general rule in Section 7, but then diced up those transfers into isolated segments in Section 7(B)'s exception. To the contrary, Congress's sole focus in Section 7(B) was to preserve the regulatory status quo for when a consumer transfers funds through a wire service such as Fedwire.

b. The traditional understanding of the meaning of a "transfer of funds" is also necessary to avoid significant—and inexplicable—statutory superfluity. To see why, recall that EFTA is a statute aimed at protecting consumers who engage in electronic fund transfers. *See L.S.* v. *Webloyalty.com*, 954 F.3d 110, 115 (2d Cir. 2020) ("[EFTA's] primary purpose was to protect consumers in the then-novel context of electronic payment systems."). Thus, the statute covers only consumer transfers, not transfers among businesses. *See* 15 U.S.C. § 1693a(2), (7) (covering only transfers of funds that "debit or credit" accounts "established primarily for personal,

38

family, or household purposes"). Within that scheme, Section 7(B) exempts a common type of consumer transfer—namely, consumer wire transfers.

But on the NYAG's view, a consumer wire transfer is at least three separate transfers, and Section 7(B) exempts only the middle bank-to-bank transfer. Here is the basic problem with that view: if the bank-to-bank segment is its own fund transfer, EFTA would not apply to that transfer in the first place. Again, EFTA governs only *consumer* fund transfers— moving money into and out of accounts used for "personal, family, or household purposes." 15 U.S.C. § 1693a(2). Once the bank-to-bank portion is somehow divorced from the consumers on either end of the overall transfer, EFTA has nothing to say about it—and there would be no reason for Section 7(B)'s exemption.

That cannot be right. It is a cardinal interpretive principle that courts must strive to construe a statute in a manner that gives effect "to all its provisions," so that no part will be rendered "inoperative or superfluous, void, or insignificant." *Corley* v. *United States*, 556 U.S. 303, 314 (2009). That principle applies with "special force" in a case like this one, where a contrary reading would "render[] an entire subparagraph meaningless" and "the subparagraph is so evidently designed to serve a concrete function."

39

*Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024) (alteration omitted). As the Supreme Court has repeatedly explained, courts should not presume that Congress created an exemption that would "not in fact exempt anyone from anything to which they would otherwise be subject." *Sturgeon* v. *Frost*, 587 U.S. 28, 50-51 (2019); *see United States* v. *Battiste*, 24 F. Cas. 1042, 1045 (C.C.D. Mass. 1835) (Story, J.) ("An exception is always construed to exclude something otherwise within the purview of the enacting clause.").

The district court acknowledged that its construction of Section 7(B) might render the exemption "substantively unnecessary." JA291. It initially sought to avoid this superfluity by suggesting that Section 7(B) could perform some independent "clarifying" work. For instance, perhaps "Congress wrote subsection 7(B) to exclude a bank-to-bank wire originally requested" through an "in-person conversation" at the bank. JA292. But that hypothesis fails because EFTA expressly does not cover any transfer of funds initiated orally at a bank (*i.e.*, non-electronically). *See* 15 U.S.C. § 1693a(7). To her credit, the NYAG candidly admitted before the district court that her interpretation of the statute would make Section 7(B) "technically redundant." NYAG MTD Opp., ECF No. 25, at 21.

40

In the end, the district court shrugged off this superfluity because Congress may have been "engaged in the ill-conceived but lamentably common belt-and-suspenders approach." JA292 (quoting *United States* v. *Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017)). But belt-and-suspenders cases like *Bronstein* typically involve a far milder surplusage: Congress's common practice of deploying "synonyms and near-synonyms" in sequence. 849 F.3d at 1110. Here, by contrast, the NYAG's reading would wipe out an entire 53-word subsection of EFTA. It is exceedingly unlikely that Congress dropped in a purely clarifying exemption that could be "[r]emove[d] . . . from [EFTA] and everything would be precisely the same." *Sturgeon*, 587 U.S. at 51.

The implausibility of Congress's enacting Section 7(B) as mere clarifying surplusage is underscored by its four neighboring exemptions. The NYAG has not disputed that every other carve-out from Section 7's general rule performs meaningful work. For example, although Section 7 covers "transfers initiated by telephone," Section 7(E) exempts any one-off transfer made by a consumer on a telephone call with a bank employee. *See* 12 C.F.R. pt. 1005, supp. I, § 3(c)(3), cmt. 2 (confirming that Article 4A, rather than EFTA, applies to telephone-initiated consumer wire transfers). The

41

other exemptions for check guarantee or authorization services (7(A)), transactions to purchase securities (7(C)), and certain automatic transfers (7(D)) also do real work. There is no conceivable reason why Congress would draft four operative exemptions and then place an entirely redundant, "just-in-case" provision about bank-to-bank transfers in the middle of that list.

> ### 3. Subsequent amendments also support reading Section 7(B) as an end-to-end exemption.

Subsequent EFTA amendments make sense only if Congress has been acting against the backdrop of an end-to-end Section 7(B) exemption. In 2010, Congress in the Dodd-Frank Act extended certain parts of the EFTA framework to reach one category of consumer wire transfers—cross-border remittance transfers. *See* Pub. L. 111-203 § 1073 (2010). Congress believed that it was broadening EFTA's scope to add further protections for particular vulnerable populations. *See* 77 Fed. Reg. 6,194, 6,199, 6,272-6,273.

This statutory amendment makes no sense if the NYAG's interpretation of EFTA is correct. *See Texas Dep't of Housing & Cmty. Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519, 537 (2015) (finding later statutory amendments to be "convincing confirmation of Congress's understanding" because they "presupposed" that the statute had a certain scope). In the NYAG's view, since EFTA was enacted in 1978, it has

42

covered consumer wire transfers; it excludes only the technical bank-to-bank portion of such transfers. If that were true, then Congress did not need to extend (part of) EFTA in 2010 to a discrete subset of consumer wire transfers. The NYAG's view of the statute would thus render superfluous not just Section 7(B) but the entire Dodd-Frank amendment for remittance transfers. This goes far beyond any tolerable "belt and suspenders" superfluity.

The Dodd-Frank amendments are informative in other ways, too. When Congress amended EFTA to extend certain protections to remittance transfers, it also defined this type of fund transfer. A "remittance transfer" is a "transfer of funds requested by a sender" that is "initiated by a remittance transfer provider," and a "sender" is "a consumer who requests a remittance provider to send a remittance transfer for the consumer to a designated recipient." 15 U.S.C. § 1693*o*-1(g). Thus, in Congress's view, a remittance transfer—a type of wire transfer—plainly *includes* the initial consumer-to-provider segment, along with the steps that come thereafter. There is no reason to interpret Section 7(B)'s exemption for "transfer[s] of funds" carried out over a wire network any differently. Indeed, these two provisions should be read *in pari materia* under the presumption that laws

43

addressing the same subject matter—here, a statute and its own amendment—should be given consistent meanings. *See Wachovia Bank* v. *Schmidt*, 546 U.S. 303, 315-316 (2006).

### 4. The district court's contrary interpretation is inconsistent with the statutory text.

The district court did not offer any persuasive response to the superfluity in the NYAG's approach or to Congress's subsequent amendment in the Dodd-Frank Act. But the court did grapple with Section 7(B)'s text. The problem is that it did not focus on the right statutory text.

a. The district court began its analysis with the word "transfer" in isolation. JA283. The relevant text of Section (7)(B), however, refers to "any *transfer of funds*," as part of a definition of "electronic *fund transfer*." By looking only at the word "transfer," the court missed that the key statutory phrase—"transfer of funds" or "fund transfer"—assumes "a more particular meaning than those words in isolation." *FCC* v. *AT&T Inc.*, 562 U.S. 397, 406 (2011); *see United States* v. *Scott*, 990 F.3d 94, 129 (2d Cir. 2021) (Menashi, J., concurring) (noting that the phrase "'American flag' could literally encompass a flag made in America, but that is not the ordinary meaning of the phrase").

44

Although the bare term "transfer" could conceivably mean either a single step in the payment journey or the end-to-end transfer, a "transfer of funds" or "fund transfer" clearly indicates the latter.[5]  Including the noun tells us in ordinary English that Congress cared about both who is sending the money and who is ultimately ending up with it.  After all, no one would dispute that a "fund transfer" is incomplete unless and until the money ends up with the intended recipient.  That grammatical and common-sense point is not unique to transfers of funds between bank accounts.  If Congress enacted a statute governing "transfers of patient files between hospitals," or "transfers of hazardous waste between sites," it would naturally be referring to the *entire* transfer—even if there were intermediaries between the hospitals or sites.

As explained earlier, Section 7 backs that up.  It makes clear that the phrase "transfer of funds" describes an end-to-end transfer from sender to recipient, which begins with the consumer's initiation to debit or credit a

---

[5]  Even the bare term "transfer" should be construed to encompass the ultimate conveyance of an asset from one party to another, not just one step along that journey.  *See, e.g.*, Black's Law Dictionary (4th ed. 1968) (defining "[t]ransfer" as "[a]n act of the parties, or of the law, by which the title to property is conveyed from one person to another"); Webster's Third New International Dictionary (1961) (defining "transfer" as "the conveyance of right, title, or interest in either real or personal property, from one person to another by sale, gift, or other process").

consumer account. *See supra* pp. 36-42. The district court, however, failed to read Section 7's "basic definition . . . together with [its] exclusion[s]." *Lowe* v. *SEC*, 472 U.S. 181, 207 n.53 (1985). In other words, it ignored that Section 7 sets out the statute's "general definition" of which consumer-initiated "transfer[s] of funds" are covered by EFTA, while Section 7(B) "takes out" one category of such "transfer[s] of funds." *Arkansas Best Corp.* v. *C.I.R.*, 485 U.S. 212, 218 (1988).

b.     The district court also looked to the wrong source of statutory support for its definition of "transfer." The obvious choice was Section 7's parallel use of "transfer of funds."  But the court looked instead to Section 7(B)'s use of "transfer" as a verb within the phrase "a service that *transfers* funds held at either Federal Reserve banks or other depository institutions." JA284-285. That choice sent the court down the wrong path. The court reasoned that the verb "transfers," as it is used in that context, must refer only to an exchange "between banks" because only banks have access to wire networks. JA284. That is true enough, but the court then took the unjustified leap of concluding that Section 7(B)'s "first usage" of "transfer" must also refer to the same thing. JA284.

46

That comparison is inapt. As this Court has made clear, a court "should not assume that similar words used as different parts of speech have identical meanings." *Bacher for Bacher* v. *Boehringer Ingelheim Pharms.*, 110 F.4th 95, 102 (2d Cir. 2024). After all, "in ordinary usage, a noun and its adjective form may have meanings as disparate as any two unrelated words." *AT&T*, 562 U.S. at 403. So too for a noun and its verb form. Within Section 7(B), Congress used the verb form of "transfers" to describe a wire-transfer service that, by its nature, must be one not designed primarily for use by consumers. That meaning does not control Section 7(B)'s earlier use of the noun phrase "transfer of funds."

c. Finally, the district court bolstered its construction by reasoning that Congress could have used the term "wire transfer" rather than "transfer" to confirm that EFTA exempted all of the "integrated" components of consumer wire transfers. JA283. But the "mere possibility of clearer phrasing cannot defeat the most natural reading of a statute." *Caraco Pharm. Labs.* v. *Novo Nordisk*, 566 U.S. 399, 416 (2012). That is because courts may "not demand (or in truth expect) that Congress draft in the most translucent way possible." *Pulsifer*, 601 U.S. at 137.

47

If anything, the Congress-could-have-been-clearer argument cuts the other way here. Using the phrase "transfer of funds" is a perfectly natural way to refer to an entire end-to-end transfer. It is not at all a natural way to refer only to the bank-to-bank segment of a wire transfer. Congress would have said something more specific to accomplish that (unusual) goal, or it would have amended EFTA anytime in the last 47 years if it were dissatisfied with the prevailing construction of Section 7(B).

## B. EFTA's History And Purposes Confirm That It Exempts Consumer Wire Transfers.

EFTA's history and purposes underscore that Section 7(B) exempts consumer-initiated wire transfers.

1. In enacting EFTA, Congress took aim at novel technologies rather than well-established payment mechanisms like wire transfers. The Senate Report, for instance, explains that EFTA was focused on providing consumers with protections for "four common" and "relatively new" electronic consumer services, including ATMs and point-of-sale systems. S. Rep. No. 95-915, at 2-3 (1978). Congress chose not to regulate wire transfers—even though they "might otherwise be considered electronic fund transfers"—because wire-transfer services were not among the new technologies that "motivated passage" of the law and were "already

48

governed by rules established by the Federal Reserve." Roland E. Brandel & Eustace A. Olliff III, *The Electronic Fund Transfer Act: A Primer*, 40 Ohio St. L. J. 531, 543-544 (1979); *see* JA107 (noting that the Federal Reserve's wire service dates back to 1918).

Congress's focus on emerging systems reflects the guidance it had received from the National Commission on Electronic Fund Transfers, a task force commissioned by Congress in 1974 to produce a "thorough study and investigation" on the "legislation necessary in connection with the possible development of public or private electronic fund transfer systems." Pub. L. 93-495, § 203(a) (1974). The NCEFT's resulting report to Congress "form[ed] the basis" for EFTA. JA298 n.9. Senator Thomas McIntyre introduced EFTA in the Senate, and he explained that the proposed legislation was "designed to implement" and intended to "capture certain key recommendations of [NCEFT]." 123 Cong. Rec. S18884, 18885-18886 (Nov. 4, 1977).

The NCEFT Report contained numerous recommendations regarding the regulation of "new and dynamic" electronic transfer systems such as point-of-sale transfers and debit cards. JA85-101. Importantly, however, the report did not recommend that Congress regulate electronic consumer wire

49

transfers, even though the report expressly noted that consumers can "send funds" through wire systems.  JA106-107.  To the contrary, the NCEFT Report warned Congress that interruption of the Fedwire "wire transfer network" could have a "serious destabilizing effect" on U.S. markets.  JA103.

2.  EFTA's legislative history confirms that Congress intended to exclude consumer-initiated wire transfers.  When the bill was first introduced in committee, it did not contain the exemptions in Section 7(A)-(E).  *See* S. 2293, 95th Cong., 1st Sess. (1977).  Shortly thereafter, the Senate proposed an amendment that contained the wire-transfer exemption, among others.  124 Cong. Rec. S11756, 11758 (July 25, 1978).  The amendment was justified on the ground that the original bill was perceived to be "overly broad."  *Id.*  The exemptions were thus added "to narrow coverage of the bill" and to give the States leeway to "regulate [the exempted] electronic funds transfer transactions" "by amending the [UCC]."  *Id.*  From then on, it was understood that "[w]ire transfers" were "excluded from [the] scope" of the bill.  S. Rep. No. 95-1273, at 52 (1978).

As the Senate Report reveals, Congress was keenly aware of the parallel development of Article 4A of the UCC, which would soon comprehensively govern electronic wire transfers.  *See*  JA105  n.10

50

(explaining that NCEFT had been in contact with the UCC subcommittee that was concurrently "studying many of the same consumer issues"). Indeed, the NCEFT Report informed Congress of ongoing efforts by States and the American Law Institute to amend UCC Article 4 to govern electronic consumer wire transfers. *NCEFT Interim Report* 16-17 (Feb. 1977), https://hdl.handle.net/2027/mdp.39015011426585; *see* JA298 n.9 (noting that "the 1978 Congress knew" of Article 4A's ongoing development).

The congressional record further establishes that Senator McIntyre and Robert Haydock, the chairman of the UCC subcommittee on Article 4, were in direct communication regarding Article 4A's development. 95th Cong. 124, 518-521 (1977) (statement of Robert Haydock). Mr. Haydock informed Senator McIntyre that the Article 4 subcommittee had "already recommended" amendments to Article 4, including to govern electronic fund transfers. *Id.* at 519. He further shared that the subcommittee was "speed[ing] up the drafting process" to assuage NCEFT's concern that Article 4's revisions would take too long. *Id.* Congress thus drafted the wire-transfer exemption to allow the UCC process to govern—a decision that was vindicated when the ALI approved Article 4A and all 50 States and the District of Columbia swiftly adopted it.

51

## C. EFTA's Uniform Interpretation By Regulators And Courts Further Confirms That It Exempts Consumer Wire Transfers.

Decades of uniform regulatory practice and case law lend strong additional support to the plain-text reading of EFTA. Although no agency gets formal deference here, the Supreme Court has recognized that an administering agency's contemporaneous construction of a federal statute may be "entitled to very great respect," especially where that construction "remained consistent over time." *Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 386 (2024); *see Skidmore* v. *Swift & Co.*, 323 U.S. 134, 139-140 (1944). Before this litigation, every regulator to discuss EFTA's wire-transfer exemption—including the CFPB, the Federal Reserve, the FDIC, the OCC, and FinCEN—agreed that EFTA does not regulate consumer wire transfers.

Likewise, the consistent decisions of other federal courts represent "persuasive authority" for this Court to guide its statutory interpretation. *See, e.g.*, *Aetna Life Ins. Co.* v. *Big Y Foods, Inc.*, 52 F.4th 66, 76 (2d Cir. 2022). The district court's ruling below split from every federal court that had previously been tasked with evaluating EFTA's wire-transfer exemption. That includes the decisions of two courts of appeals and of other district

52

courts within this Circuit. Taken together, this widespread regulatory and judicial consensus represents weighty evidence of the statute's clear meaning.

1. Start with the CFPB—the regulator currently tasked with enforcing EFTA. When implementing the Dodd-Frank Act's provisions concerning cross-border remittance transfers, the CFPB explained that "wire transfers are entirely exempt from the EFTA and Regulation E and instead are governed by . . . Article 4A" until "the Dodd-Frank Act [remittance] provisions become effective." 77 Fed. Reg. 6,194, 6,211-6,212 (Feb. 7, 2012); *see id.* at 6,195 ("[P]rior to the new Dodd-Frank Amendments, Congress had specifically structured the EFTA to exclude wire transfers."). The CFPB further acknowledged that the 2010 amendment meant only that "Article 4A will no longer apply to . . . international consumer wire transfers." *Id.* at 6,212.[6]

---

[6] The CFPB expressly recognized that consumers receive "protections under UCC Article 4A" for unauthorized wire transfers—but noted that EFTA's expansion would create "regulatory gaps" for wire-based remittances because (i) EFTA's unauthorized-transfer framework does not apply to such transfers under Section 7(B), and (ii) extending other parts of EFTA would foreclose Article 4A's coverage to such transfers. *Id.* at 6,212, 6,277-6,278; *see* N.Y. U.C.C. § 4-A-108. The CFPB thus encouraged the States to amend Article 4A to clarify that Article 4A's unauthorized-transfer

The Federal Reserve, which was the original agency charged with administering EFTA, has made equally clear pronouncements. In connection with the adoption of Regulation E just months after EFTA was signed into law, the Board construed Section 7(B) as an "exemption" for any "transfer of funds for a consumer" through the wire networks. 44 Fed. Reg. 18,468, 18,471, 18,481 (Mar. 28, 1979) ("This regulation does not apply to . . . *Wire transfers*."). In its 1990 amendment to Regulation J, the Board likewise explained that "Fedwire funds transfers *to or from consumer accounts* are exempt from the EFTA and Regulation E." 12 C.F.R. pt. 210, subpart B, Appx. A (commentary to § 210.25(b)(4)) (emphasis added). And when the Board incorporated Article 4A into Regulation J, it observed that Article 4A and Regulation J would govern a wire where the "originator's or beneficiary's account [was] a consumer account" because EFTA and Regulation E "do not apply to funds transfers through Fedwire." 55 Fed. Reg. 40,791, 40,804 (Oct. 5, 1990).

To Citibank's knowledge, the Board and the CFPB have never initiated an enforcement action against any bank for failing to provide consumer wire-transfer services in compliance with EFTA's requirements. As the Supreme

---

provisions would still govern wire-based remittances, even though EFTA's error-resolution provisions now applied. 77 Fed. Reg. 6,194, 6,211-6,212.

54

Court has explained in a related context, although it is "possible for an entire industry to be in violation of [federal law] for a long time without" regulatory notice, the far "more plausible hypothesis" is that this "conspicuous [regulatory] inaction" reflects the regulators' view that the industry was acting lawfully all along. *Christopher* v. *SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012). After nearly half a century of inaction, that shared historical reading of the statute provides "powerful weight." *Bankamerica Corp.* v. *United States*, 462 U.S. 122, 132 (1983).

Other federal agencies that also regulate the financial-services industry have consistently adopted the same view. The OCC, FDIC, FinCEN, and National Credit Union Administration have each expressed that wire transfers are governed by Article 4A, not EFTA.[7] As noted above,

---

[7] *See, e.g.*, OCC, *Message from the Director—Wire Transfer Scams and Ways to Protect Yourself* (July 2023), https://perma.cc/YUY7-G3RJ ("Wire transactions are covered under [Article] 4A of the [UCC]."); FDIC, *Interpretive Letter: Users' Rights Under EFTA in the Event of Bank Error Regarding an Electronic Wire Transfer*, 1994 WL 393720, at *1 (Apr. 26, 1994) (EFTA is "inapplicable" to consumer-initiated wire transfers); FDIC, *EFT Risk Assessment* (Oct. 2020), https://perma.cc/K7NF-8V9K (instructing FDIC examiners to review customer agreements concerning "funds transfer[s]" to ensure they contain "[s]ecurity procedures as defined by . . . Article 4A"); 78 Fed. Reg. 72,813, 72,814 (Dec. 4, 2013) (FinCEN regulation explaining that "[w]ire . . . transfers conducted through Fedwire" or similar systems are "specifically excluded from [EFTA's] definition of 'electronic fund transfer'"); NCUA, *Examiner's Guide* (2019), https://perma.cc/3VX9-

55

several agencies have also stated in official guidance that fund transfers begin with a consumer's initiation and end with payment to the recipient. *See supra* pp. 32-35 & n.4.

The single blip in this otherwise unbroken regulatory record is the CFPB's flip-flop in this case. After treating consumer wire transfers as exempt from EFTA for over 12 years, the CFPB reversed course in 2024 and briefly supported the NYAG's suit. JA190-213. After the district court's decision, however, the CFPB quickly returned to its traditional view. It explained that the NYAG's interpretation "upend[s] the long-held understanding of regulation E" and "has never previously been articulated by the Bureau or by the Federal Reserve." JA443-444.

2. As the district court acknowledged, its decision also broke from every other court to consider whether consumer wire transfers are covered under EFTA. *See* JA453; *see also, e.g.*, *Rahimian* v. *Wells Fargo Bank*, 2024 WL 4818797, at *7 (C.D. Cal. Sept. 20, 2024); *Bakhtiari* v. *Comerica Bank*, 2024 WL 3405340, at *1 (N.D. Cal. July 12, 2024); *Stepakoff* v. *IberiaBank Corp.*, 637 F. Supp. 3d 1309, 1313 (S.D. Fla. 2022); *Trivedi* v. *Wells Fargo Bank*, 609 F. Supp. 3d 628, 633 (N.D. Ill. 2022); *Kanji* v. *Bank of*

WQ3R (wire transfers carried out by credit unions on behalf of members are subject to Article 4A).

*Am.*, 2020 WL 8175548, at *3 (C.D. Cal. Aug. 25, 2020); *McClellon* v. *Bank of Am.*, 2018 WL 4852628, at *6 (W.D. Wash. Oct. 5, 2018); *Bodley* v. *Clark*, 2012 WL 3042175, at *4 (S.D.N.Y. July 23, 2012); *Fischer & Mandell LLP* v. *Citibank, N.A.*, 2009 WL 1767621, at *4 (S.D.N.Y. June 22, 2009).

The judicial consensus includes two rulings from other courts of appeals. In *Nazimuddin* v. *Wells Fargo Bank, N.A.*, the Fifth Circuit assessed a consumer EFTA claim that was premised on unauthorized wire transfers like those alleged here. 2025 WL 33471, at *1 (Jan. 6, 2025). The court held that the "EFTA regulations explicitly exclude wire transfers from the definition of an electronic fund transfer," and the alleged unauthorized wire transfers were thus "outside the scope of the EFTA." *Id.* at *2. In *Wright* v. *Citizen's Bank of East Tennessee*, the Sixth Circuit confronted a "threshold issue" about whether EFTA or Article 4A applied to a married couple's claim that their bank had bungled a wire transfer. 640 Fed. Appx. 401, 402-404 (2016). The court found that "EFTA does not apply" because the consumers' "funds transfers . . . were made through Fedwire." *Id.* at 404.

The district court downplayed those contrary decisions because, in its view, "none considered the precise statutory interpretation question at issue." JA301. What it meant is that, although other courts had considered

whether EFTA or Article 4A governs wire transfers, they had not considered the NYAG's exact proposal of breaking down a wire transfer into constituent parts and subjecting only some of those parts to regulation under EFTA.[8] But that merely underscores the contrived nature of the NYAG's position. Courts, including this one, have long been aware of how wire transfers work: they are a "chained series of debits and credits between the originator, the originator's bank, . . . the beneficiary's bank, and the beneficiary." *Calderon-Cardona*, 770 F.3d at 1001. Yet no court has seen that as any reason to doubt whether EFTA excludes an end-to-end wire transfer.

*    *    *

For nearly 50 years, EFTA has not governed consumer wire transfers because its plain text excludes them. The NYAG wants to upend this settled understanding by artificially breaking up a single fund transfer into its component parts. That move wins points for creativity, but cannot be reconciled with the statutory text, context, and history. Each of those guideposts confirms that a "fund transfer" encompasses the end-to-end

---

[8] That premise was incorrect. At least one district court has rejected a theory similar to the NYAG's. *See Pope* v. *Wells Fargo Bank*, 2023 WL 9604555, at *3 (D. Utah Dec. 27, 2023) (rejecting consumer's argument that a wire transfer contains multiple transfers: "[o]ne initiated by her," and "another by Wells Fargo to JP Morgan Chase").

58

movement of funds from the sender to the recipient. This Court should therefore reject the NYAG's novel theory as "bad wine of recent vintage." *Rotkiske* v. *Klemm*, 589 U.S. 8, 14 (2019).

## II. THE DISTRICT COURT ERRED IN HOLDING THAT EFTA COVERS INTRABANK TRANSFERS.

The district court also should have dismissed the NYAG's separate claim that intrabank transfers that precede a fraudulent external wire transfer are independently subject to EFTA's remedial provisions. JA67-68. The court reasoned that intrabank transfers—from, say, a single consumer's savings account to her checking account—constitute unauthorized electronic fund transfers under EFTA because such transfers help "facilitate[] a subsequent fraud." JA311. But that bootstrapping does not satisfy the statute. Without the external wire transfers, which are exempt from EFTA for the reasons discussed above, the internal preparatory transfers do not fall within EFTA's definition of an "unauthorized electronic fund transfer." The court's contrary holding creates a loophole whereby litigants could recover for losses from fraudulent fund transfers that are exempt from EFTA, by targeting preparatory transfers instead of the actual transfers where a consumer lost money.

59

The NYAG's position here also reveals a fundamental inconsistency in her proposed treatment of fund transfers under EFTA. When it comes to her main wire-transfer claim, the NYAG seeks to *break apart* a single wire transfer into multiple segments so as to subject certain of those segments to EFTA. But when it comes to her intrabank-transfer claim, the NYAG seeks to *lump together* multiple distinct transfers of funds so as to impute the loss from one to the other. Both theories fail because they distort the basic unit of measurement under EFTA: a particular "transfer of funds," which begins with an electronic request to debit or credit a consumer account. 15 U.S.C. § 1693a(7), (12).

### A. EFTA's Definition Of An Unauthorized Electronic Fund Transfer Does Not Cover Intrabank Transfers.

1. EFTA defines an "unauthorized electronic fund transfer," in relevant part, as "an electronic fund transfer from a consumer's account" (1) that is "initiated by a person other than the consumer without actual authority" and (2) "from which the consumer receives no benefit." 15 U.S.C. § 1693a(12). An intrabank transfer between multiple accounts of one consumer does not meet the second part of that definition. That is because the consumer receives a simple benefit: the *crediting* of the consumer's own recipient account. And that is enough for EFTA's purposes. As this Court

and others have recognized, a transfer provides consumers with a statutory "benefit" if it moves funds without diminishing the consumer's overall balance. *See, e.g.*, *Aikens* v. *Portfolio Recovery Assoc.*, 716 Fed. Appx. 37 (2d Cir. 2027); *Becker* v. *Genesis Fin. Servs.*, 2007 WL 4190473 (E.D. Wash. Nov. 21, 2007).

The NYAG does not really contest that for the intrabank transfer itself. Instead, the NYAG hangs her hat on the contention that intrabank transfers harm consumers by virtue of subsequent *external* wire transfers that follow the *intrabank* transfer. The NYAG alleges, for example, that intrabank transfers facilitate "larger" external fraudulent wires and reduce the number of such wires so as to avoid "additional scrutiny." JA35, 37, 67, 309. But the harm comes from the external wire transfer—which, as discussed above, falls under Article 4A rather than EFTA. The NYAG never pleaded—and the district court failed to identify—*any* independently cognizable harm from intrabank transfers.[9] And for EFTA to apply, the particular transfer at issue must meet the Act's "unauthorized" transfer definition; it is not enough if it

---

[9] The only conceivable harm from intrabank transfers themselves—the potential loss of interest if funds move from an interest-bearing account to a non-interest-bearing account—was not pleaded. *See* JA309 n.15. That was no accident, as the NYAG does not seek to recover for any lost interest. The NYAG seeks only damages arising from the subsequent external wire transfer. *E.g.*, JA26, 36.

has some tangential relation to a subsequent unauthorized-but-exempted transfer. *See* 15 U.S.C. § 1693a(12) (defining an "unauthorized" transfer as one where the consumer receives "no benefit" from "*such transfer*") (emphasis added). To put it simply, it must be the immediate transfer of funds "from a consumer's account . . . from which the consumer receives no benefit," not some *other* transfer that occurs later and causes harm. *Id.*

Regulation E's official interpretation of Section 7(12) provides further evidence that an intrabank transfer is not "unauthorized" within the meaning of EFTA. There, the Federal Reserve highlights several types of fund transfers that fall outside the Act's purview, including transfers effected by a bank to undo a "credit" made "to the wrong consumer's account" or "in the wrong amount." 12 C.F.R. pt. 1005, supp. I, 2(m), cmt. 5. If such a deduction from a consumer's account without her knowledge is not an "unauthorized electronic fund transfer," then it follows that an internal transfer with no net effect on a consumer's balance is not "unauthorized" either.

2. This Court's unpublished decision in *Aikens* is instructive. There, a debt collection agency deducted funds on a monthly basis from a consumer's bank account, allegedly without proper authorization, to repay a credit-card debt the consumer had incurred. 716 Fed. Appx. at 39. The

62

plaintiff claimed she had been the victim of an unauthorized fund transfer, and that she "would [have been] better off" without the transfers because she ended up with "less money in her account." Pl. Reply Br., 2017 WL 3382828, at *8. This Court rejected her claim, holding that she received a "benefit" from the fund transfer because her debt was "reduc[ed]." 716 Fed. Appx. at 40. The Court thus looked no further than the straightforward "benefit" from the fund transfers themselves—a debt reduction in the equal amount of the funds debited—without considering any theoretical injury associated with the unwanted reduction of funds or other knock-on effects. *Id.*

*Becker* also illustrates the point. There, although the consumer did not "authorize a balance transfer," Discover transferred $2,488.34 from one of her credit-card accounts to another. 2007 WL 4190473, at *2. The court rejected the consumer's claim that this was an "unauthorized electronic fund transfer" under EFTA. The court explained that "[e]ven assuming that [the consumer] did not give permission" for the balance transfer, she "received a $2,488.34 credit to her [other] account" and thus "received a 'benefit' from the transaction." *Id.* at *12. The court added that the consumer "did not have to pay any balance transfer fees," and thus "the transfer was not

63

'unauthorized'" as statutorily defined. *Id.* at \*12-13. In other words, the court looked only at the "benefit" of the immediate intrabank transfer, without taking into account any subsequent harms that the consumer allegedly experienced downstream. *Id.* at \*3-5 (chronicling accrual of increased debt and denial of a car loan following the intrabank transfer).

The district court here implausibly distinguished both decisions. First, it held that *Aikens*'s conception of a benefit "*requires* consideration of downstream effects" because "the consumer benefited not from the transfer itself, but from its effect on her . . . debt." JA311 (emphasis in original). But that distinction rests on semantics, not substance. The debt reduction in *Aikens* was a direct result of the movement of funds itself (just a credit that reduced a negative account, rather than a credit that added to a positive one), not of any distinct "downstream" fund transfer. Second, the court concluded that *Becker* was "not on point" largely because the fund transfer there did not "result in subsequent fraud." JA311. That misses the point. The precise downstream harm does not matter; the question is whether the statute looks to such harms beyond the contested fund transfer. And there is no justification in the statute for the district court's approach of "look[ing] past

64

the immediate transfer for consideration of whether the consumer received 'no benefit.'" JA310.

3. The district court cited one contrary decision, *Moore* v. *JPMorgan Chase Bank*, 2022 WL 16856105 (N.D. Cal. Nov. 10, 2022), that reveals exactly why this "look beyond" test is improper. The *Moore* plaintiffs brought an EFTA claim for intrabank transfers that preceded an unauthorized consumer wire transfer *and* an Article 4A claim for the external wire transfer itself (because they at least recognized that consumer wire transfers are governed by Article 4A). *Moore* First Amended Compl. ¶ 48, No. 3:22-cv-01849. The district court there found that the intrabank transfers were subject to EFTA purely because of their association with the subsequent external wire transfer. 2022 WL 16856105, at *1-2. But that allows a plaintiff to bootstrap the injury from an EFTA-*exempt* wire transfer as the qualifying harm for a preceding intrabank transfer—which is a straightforward end-run around EFTA's statutory limits. It also invites plaintiffs to seek recovery for the same harm twice: (1) one bite at the apple under EFTA for any preparatory transfers, which are associated with no independent loss, and (2) another bite under Article 4A for the actual loss from the external wire. *But see Phelan* v. *Local 305*, 973 F.2d

65

1050, 1063 (2d Cir. 1992) (noting the age-old principle that a "plaintiff may not recover twice for the same injury").

If the district court's decision here stands, the basic limits that Congress placed on EFTA—from the wire-transfer exemption to the exclusion of fund transfers originated by non-electronic instruments—will be easily circumvented. Indeed, that circumvention is already underway. Another district court recently relied on the decision below to hold that intrabank transfers that preceded an unauthorized external withdrawal by *paper check* were actionable under EFTA, even though all parties agreed that the subsequent, non-electronic transfer was facially exempt from EFTA. *See Wingard* v. *TBK Bank*, 768 F. Supp. 3d 1282, 1287-1288 (D. Colo. 2025). That result makes no sense as a matter of logic or statutory text.

## B. EFTA's Reimbursement Framework Does Not Fit Intrabank Transfers.

The structure of EFTA buttresses the conclusion that intrabank transfers are not unauthorized fund transfers within the meaning of the statute. EFTA provides that banks must "reimburse[]" the "consumer for losses" from unauthorized fund transfers, and expresses those losses in dollar amounts. 15 U.S.C. § 1693g(a), (2); *see id.* § 1693f(c), (f)(1) (describing provisional "recredit," with interest, for the loss alleged from the

66

"unauthorized electronic fund transfer"). That is the only remedy available under EFTA for unauthorized fund transfers. Put differently, the Act presumes that the unauthorized fund transfer results in a specific monetary loss to the consumer that can be reimbursed. But intrabank transfers do not trigger any monetary loss whatsoever. Instead, the debit of money from one account corresponds to an equal credit to the consumer in another. EFTA simply does not provide any remedy for moving $10,000 from a consumer's savings account to the same consumer's checking account—which is a good sign that the statute does not regulate such transfers under Section 1693a(12) in the first place.

New York's Executive Law cannot broaden EFTA's substantive scope. Regardless, the NYAG pleads no facts to establish its entitlement to "restitution and damages" or any other remedy under N.Y. Exec. L. § 63(12) with respect to intrabank transfers. That is because, again, there are no damages to recover or activities to enjoin for those transfers. As the Sixth Circuit has aptly explained in the EFTA context, "[a] consumer is injured only if, and only when, funds are *withdrawn* from her account." *Wike* v. *Vertrue, Inc.*, 566 F.3d 590, 593 (6th Cir. 2009) (emphasis added). The only plausible loss, if any, is caused not by the intrabank transfer, but by the

67

subsequent exempt wire transfer out of the accounts controlled by the consumer. *See supra* pp. 61-62. If wire transfers are exempt from EFTA's scope, the NYAG cannot seek to recover for any losses from such fund transfers by targeting some preparatory step.

## CONCLUSION

For the foregoing reasons, Citibank respectfully requests that the Court reverse the portions of the district court's order denying Citibank's motion to dismiss with respect to the NYAG's EFTA claims, including Counts 1-3 and portions of Counts 7-8.

Respectfully submitted,

/s/ *Jeffrey B. Wall*

Charles Michael
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900

Julia B. Strickland
STEPTOE LLP
2029 Century Park East
Suite 980
Los Angeles, CA 90067
(213) 439-9400

Jeffrey B. Wall
Morgan L. Ratner
Rishabh Bhandari
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

Miles H. Greene
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Appellant*

November 10, 2025

69

# CERTIFICATE OF COMPLIANCE

This Brief complies with Second Circuit Local Rule 32.1(a)(4)(A) because it contains 13,996 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type styles requirements of Fed. R. App. P. 32(a)(6). It has been prepared in 14-point font using a proportionally spaced typeface.

/s/ *Jeffrey B. Wall*
Jeffrey B. Wall

Dated: November 10, 2025

**CERTIFICATE OF SERVICE**

I certify that on November 10, 2025, the foregoing was filed with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit through the ACMS system. I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ *Jeffrey B. Wall*
Jeffrey B. Wall

Dated: November 10, 2025