# 25-2105

## United States Court of Appeals for the Second Circuit

---

THE PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the State of New York,

*Plaintiff-Appellee,*

v.

CITIBANK, N.A.,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of New York

---

## BRIEF FOR APPELLEE

---

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
ANAGHA SUNDARARAJAN
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellee
28 Liberty Street
New York, New York 10005
(212) 416-8073

Dated: January 9, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................iv

PRELIMINARY STATEMENT.......................................................... 1

ISSUES PRESENTED ....................................................................... 6

STATEMENT OF THE CASE ............................................................ 7

    A.   Statutory Framework ............................................................ 7

        1.   The Electronic Funds Transfer Act.................................. 7

        2.   New York's Uniform Commercial Code article 4A ......... 11

        3.   New York's data security laws ....................................... 12

    B.   Factual Background............................................................ 14

        1.   The mechanics of wire transfers ................................... 14

        2.   The financial industry's promotion to consumers of electronic wire transfers................................................ 16

        3.   The increase in scams targeting online and mobile banking systems ........................................................... 17

        4.   Citibank's inadequate fraud prevention and response ........................................................................ 19

    C.   Procedural History............................................................ 22

STANDARD OF REVIEW................................................................ 25

SUMMARY OF ARGUMENT........................................................... 25

**Page**

ARGUMENT ..................................................................................28

POINT I

THE ACT APPLIES TO ELECTRONIC FUNDS TRANSFERS
ANCILLARY TO INTERBANK WIRE TRANSFERS ......................................28

    A.    The Act's Plain Text Confirms That It Applies
           to the Subject Transfers........................................................30

    B.    The Act's Structure and Purposes Confirm Its
           Application to the Subject Transfers.....................................35

    C.    Citibank's Arguments to the Contrary Lack Merit................41

        1.    Applying the Act to the subject transfers does not
                render subsection (7)(B) superfluous. ............................41

        2.    Regulation E does not compel a
                different interpretation. ...................................................45

        3.    Subsequent statutes likewise do not support
                Citibank's interpretation of the Act. .............................47

        4.    The case law on which Citibank relies is
                distinguishable.................................................................50

        5.    Applying the Act to the subject transfers will not
                upend the banking industry. ..........................................51

POINT II

THE ACT APPLIES TO INTRABANK CONSOLIDATION
TRANSFERS EXECUTED AS PART OF A SCAM...........................................55

ii

**Page**

POINT III

THE SHIELD ACT CLAIM IS NOT PREEMPTED BY THE FAIR CREDIT
REPORTING ACT.................................................................................. 62

    A.   The SHIELD Act Claim Is Not Expressly Preempted. .......... 63

    B.   The SHIELD Act Does Not Conflict with Federal Law. ........ 70

CONCLUSION ................................................................................. 71

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Aargon Agency, Inc. v. O'Laughlin,*
70 F.4th 1224 (9th Cir. 2023) ........................................................ 66

*Aikens v. Portfolio Recover Associates, LLC,*
716 F. App'x 37 (2d Cir. 2017) ...................................................... 61

*Arkansas Best Corp. v. Commissioner,*
485 U.S. 212 (1988) ......................................................................... 41

*Becker v. Genesis Financial Services, Inc.,*
No. 06-cv-5037, 2007 WL 4190473
(E.D. Wash. Nov. 21, 2007) ............................................................ 56

*BedRoc Ltd. v. United States,*
541 U.S. 176 (2004) ......................................................................... 29

*Bodley v. Clark,*
No. 11-cv-8955, 2012 WL 3042175 (S.D.N.Y. July 23, 2012) ............. 51

*California Pub. Emps.' Ret. Sys. v. WorldCom, Inc.,*
368 F.3d 86 (2d Cir. 2004) ...................................................... 27, 62

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992) ......................................................................... 67

*Davenport v. Farmers Ins. Grp.,*
378 F.3d 839 (8th Cir. 2004) .......................................................... 66

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
545 U.S. 546 (2005) ......................................................................... 29

*FCC v. AT&T Inc.,*
562 U.S. 397 (2011) ......................................................................... 34

*Feliciano v. Department of Transp.,*
605 U.S. 38 (2025) ........................................................................... 32

iv

**Cases**                                                               **Page(s)**

*Fischer & Mandell LLP v. Citibank, N.A.,*
No. 09-cv-1160, 2009 WL 176721 (S.D.N.Y. June 22, 2009)..............50

*Galper v. JP Morgan Chase Bank, N.A.,*
802 F.3d 437 (2d Cir. 2015) .......................................................65-66

*Kashanchi v. Texas Comm. Med. Bank,*
703 F.2d 936 (5th Cir. 1983)................................................. 8, 37, 44

*Kiobel v. Royal Dutch Petroleum Co.,*
621 F.3d 111 (2d Cir. 2010) ...............................................................14

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)....................................................................45-46

*Macpherson v. JP Morgan Chase Bank, N.A.,*
665 F.3d 45 (2d Cir. 2011) ...............................................................66

*McClellon v. Bank of Am., N.A.,*
No. 18-cv-829, 2018 WL 4852628 (W.D. Wash. Oct. 5, 2018) ............51

*Moore v. J.P. Morgan Chase Bank, N.A.,*
No. 22-cv-01849, 2022 WL 16856105
(N.D. Cal. Nov. 10, 2022) ...................................................................59

*Nazimuddin v. Wells Fargo Bank, N.A.,*
No. 24-20343, 2025 WL 33471 (5th Cir. Jan. 6, 2025).......................51

*New York Legal Assistance Grp. v. Board of Immig. Appeals,*
987 F.3d 207 (2d Cir. 2021) ......................................................25, 29

*Park v. Webloyalty.com, Inc.,*
685 F. App'x 589 (9th Cir. 2017)......................................................61

*People by Schneiderman v. Credit Suisse Sec. (USA) LLC,*
31 N.Y.3d 622 (2018) ......................................................................22

*Pope v. Wells Fargo Bank, N.A.,*
No. 2:23-cv-86, 2023 WL 9604555 (D. Utah Dec. 27, 2023)..............50

| **Cases** | **Page(s)** |
|---|---|

*Rahimian v. Wells Fargo Bank,*
No. 24-cv-3787, 2024 WL 4818797 (C.D. Cal. Sept. 20, 2024) ........... 51

*Russello v. United States,*
464 U.S. 16 (1983) ....................................................................... 33-34

*Sportsinsurance.com, Inc. v. Hanover Ins. Co., Inc.,*
No. 21-cv-1967, 2022 WL 16706941 (2d Cir. Nov. 4, 2022) .............. 62

*Stepakoff v. IberiaBank Corp.,*
637 F. Supp. 3d 1309 (S.D. Fla. 2022) ........................................... 50

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
566 U.S. 560 (2012) ................................................................. 32, 57

*Time Warner Telecom, Inc. v. FCC,*
507 F.3d 205 (3d Cir. 2007) .......................................................... 44

*Trans Union LLC v. FTC,*
295 F.3d 42 (D.C. Cir. 2002) ......................................................... 13

*United States v. Bedi,*
15 F.4th 222 (2d Cir. 2021) ...................................................... 29, 57

*Wachovia Bank, N.A. v. Burke,*
414 F.3d 305 (2d Cir. 2005) .................................................. 62-63, 70

*Wingard v. TDK Bank, SSB,*
768 F. Supp. 3d 1282 (D. Colo. 2025) ............................................. 60

*Wright v. Citizen's Bank of E. Tenn.,*
640 F. App'x 401 (6th Cir. 2006) ................................................... 50

vi

**Statutes**                                                                   **Page(s)**

*Federal*

15 U.S.C.
- § 1681 ................................................................................ 63, 70
- § 1681m ............................................................................. 64, 67
- § 1681t ..................................................................... 63-64, 66, 69
- § 1693 ............................................................................ 7, 35, 60
- § 1693a ............................................................................... passim
- § 1693d ..................................................................................... 58
- § 1693f ............................................................................. 9-10, 58
- § 1693g ............................................................................... 10, 60
- § 1693m .................................................................................... 58
- § 1693o-1 ................................................................................. 49
- §§ 6801-6809 ........................................................................... 65

*State*

Ch. 208, 1990 N.Y. Laws 2700 ................................................... 11

Executive Law § 63 ..................................................................... 22

General Business Law
- § 899-aa ................................................................................... 12
- § 899-bb ................................................................... 13, 65, 67-68

Uniform Commercial Code
- § 4-A-102 cmt. .................................................................... 11, 48
- § 4-A-104 ........................................................................ 11, 47-48
- § 4-A-104, cmt. 6 ...................................................................... 11
- § 4-A-107 ................................................................................. 48
- § 4-A-108 .......................................................................... 11, 48

**Regulations** **Page(s)**

*Federal*

12 C.F.R.
   § 41.90 ........................................................................................ 64
   § 1005.3 ...................................................................................... 46

16 C.F.R. § 681.1 ............................................................................ 64

42 Fed. Reg. 31763 (June 23, 1977) ........................................... 36

61 Fed. Reg. 19678 (May 2, 1996) ............................................... 47

**Miscellaneous Authorities**

123 Cong. Rec. 27940 .............................................................. 8, 35, 44

123 Cong. Rec. 37010 .................................................................... 60

123 Cong. Rec. 37012 .................................................................... 35

124 Cong. Rec. 25731 .................................................................... 36

124 Cong. Rec. 22602 .................................................................... 41

149 Cong. Rec. E2512 .................................................................... 65

Assurance of Discontinuance, *Matter of Investigation Gov't
   Emps Ins. Co.*, Assurance No. 24-082 (Nov. 21, 2024) ...................... 68

*Black's Law Dictionary* (rev. 4th ed. 1968) .............................. 32-33, 58

H.R. Rep. No. 95-1315 (1978) ...................................................... passim

Bill Jacket for ch. 117 (2019),
   https://digitalcollections.archives.nysed.gov/index.php/Detail/
   objects/85355

   Mem. from D. González, Div. of Consumer Prot., N.Y. Dep't
      of State, to Z. Knaub, Acting Counselor to the Governor .............. 12

**Miscellaneous Authorities** **Page(s)**

Bill Jacket for ch. 117 (2019) (*continued*)

    S. Introducer's Mem...........................................................................12

S. Rep. No. 95-915 (1978) ............................................................. passim

*Webster's New World Dictionary* (1960)......................................32-33, 57

*Webster's Third New International Dictionary* (1961).................32-33, 57

## PRELIMINARY STATEMENT

Defendant-appellant Citibank N.A. is one of the largest banks in the United States and holds more than $400 billion in consumer deposits. The question at the heart of this interlocutory appeal is whether federal consumer protection law requires Citibank to bear the risk of loss associated with fraudulent electronic wire transfers from consumer accounts. The U.S. District Court for the Southern District of New York (Oetken, J.) held that the protections of the Electronic Funds Transfer Act of 1978 (the Act), 15 U.S.C. § 1963 et seq., apply to the unauthorized transfer of funds from consumer accounts prior to wire transfers just as they do to other forms of electronic transfers covered by the Act, such as debit card purchases and ATM withdrawals. This Court should affirm.

Over the last decade, financial institutions (including Citibank) have designed and aggressively marketed online and mobile banking systems that allow customers to initiate wire transfer requests remotely from their personal accounts. The industry's promotion to consumers of these electronic transfers has been wildly successful. Although consumers historically did not use wire transfers for routine transactions, by 2018,

wire transfers initiated by consumers constituted 11% of the market and amounted to over $4.3 trillion annually.

Like many other forms of electronic fund transfers (EFTs), remote wire transfers are highly susceptible to fraud and misuse. Most notably, scammers use a variety of techniques to trick customers into providing enough information for them to access the customer's bank accounts through online or mobile platforms, consolidate a customer's funds into a single account, and submit payment orders to steal the consumer's money through an interbank wire, often transferring tens of thousands of dollars within minutes. Customers lose millions of dollars annually through such scams.

Congress passed the Act in 1978 to address the increased risk of fraud associated with EFTs. Unlike traditional transactions, EFTs can be processed by financial institutions without direct customer contact and with limited verification measures. The policy decision reflected in the Act was to place the risk of fraud associated with electronic trans-actions with the sophisticated financial institutions best positioned to detect, prevent, and reverse fraud, rather than with consumers. Accord-ingly, the Act requires banks to investigate consumer reports of

unauthorized EFTs and to reimburse a customer for any such transfers, provided that the customer timely reports the fraud.

Since at least 2020, plaintiff-appellee Office of the New York State Attorney General (OAG) has received repeated complaints from consumers alleging that Citibank fails to respond appropriately to complaints of unauthorized EFTs initiated by scammers. In 2024, OAG brought this civil enforcement action, alleging, among other things, that Citibank has persistently violated the Act. Citibank moved to dismiss. The district court dismissed certain claims in the complaint but denied the motion with respect to OAG's claims under the Act. This Court granted Citibank's petition for interlocutory appeal of the order.

First, this Court should affirm the district court's conclusion that the Act applies to the unauthorized debiting of customer accounts to fulfill payment orders initiated electronically in anticipation of an inter-bank wire transfer. Citibank contends that the Act excludes all EFTs associated with an interbank wire transfer. As support, Citibank points to 15 U.S.C. § 1693a(7)(B), which provides that a transfer "by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository

3

institutions and which is not designed primarily to transfer funds on behalf of a consumer" is not an EFT for purposes of the statute. The district court correctly rejected this argument.

By its terms, the Act's exception for interbank wires applies only to the movement of funds between banks over a wire network. OAG's complaint does not seek relief as to transactions purely between banks; instead, the complaint focuses on electronic transfers of money from the consumer's account to Citibank's account, a transfer that plainly satisfies the Act's definition of EFT. To be sure, the funds withdrawn in this transaction are ultimately paid to Citibank to compensate its own wire transfer to the beneficiary's bank. But from the perspective of the consumer and the Act, the unauthorized EFT is completed when Citibank withdraws the funds to fulfill the fraudulent payment order.

The Act's structure and purpose confirm its application to all consumer-facing EFTs systems, including electronic payment orders submitted on a bank's online or mobile platform. Interpreting the Act to apply to these payment orders does not render any portion of the statute superfluous or contradict either the Act's implementing regulations or subsequent statutory enactments.

Second, this Court should affirm the district court's conclusion that the Act applies to unauthorized EFTs that consolidate a consumer's money into a single account to facilitate fraud. Citibank contends that these transfers do not implicate the Act because a consumer suffers no net loss from the consolidation of funds between accounts. But the district court correctly found that, though these transfers alone do not change a consumer's net wealth, these transfers hurt consumers by allowing scammers to steal larger sums of money in a single interbank transaction while minimizing the risk of detection.

Finally, this Court should exercise its broad discretion under 28 U.S.C. § 1292(b) to review the district court's dismissal of OAG's claims under New York's Stop Hacks and Improve Electronic Data Security (SHIELD) Act, General Business Law § 899-bb. The district court erred in holding that the SHIELD Act claim is preempted by the Fair Credit Reporting Act (FCRA). Unlike the SHIELD Act, the FCRA does not require companies to implement any data security measures to protect against unauthorized access to individual data, so the FCRA does not regulate the same conduct as the SHIELD Act. The FCRA therefore does not preempt OAG's SHIELD Act claim.

5

## ISSUES PRESENTED

1. Whether the district court correctly concluded that an unauthorized transfer of funds from a consumer's bank account to fulfill a payment order submitted on the bank's online or mobile platform is an EFT governed by the Act where the funds are later transmitted through an interbank wire transfer.

2. Whether the district court correctly concluded that an electronic funds transfer between two accounts held by the same consumer initiated by a scammer to facilitate theft constitutes an unauthorized EFT under the Act.

3. Whether the district court erred in dismissing OAG's SHIELD Act claim as preempted by the FCRA.

## STATEMENT OF THE CASE

### A.    Statutory Framework

#### 1.    The Electronic Funds Transfer Act

Congress enacted the Electronic Funds Transfer Act in 1978 to provide "a basic framework establishing the rights, liabilities, and responsibilities of participants" in electronic funds transfer systems. 15 U.S.C. § 1693(b). At the time, Congress was primarily concerned with the proliferation of new technologies like automated teller machines (ATMs) and bank terminals that allowed consumers to quickly and efficiently transfer money. These technologies were significantly more vulnerable to fraud than traditional payment methods because they did not require any face-to-face interaction to verify the consumer's identity. *See* S. Rep. No. 95-915, at 2-3, 5 (1978); H.R. Rep. No. 95-1315, at 2 (1978).

Accordingly, Congress was concerned that, in the absence of clear law governing liability for unauthorized transfers, the proliferation of electronic payment systems left consumers vulnerable to losing substantial funds due to fraud, unauthorized use, or computer error. *See* H.R. Rep. No. 95-1315, at 2-4; S. Rep. No. 95-915, at 5. The Act therefore established a "comprehensive, fair, and uniform" set of consumer safe-

guards, H.R. Rep. No. 95-1315, at 2, to govern all consumer-facing EFT systems that access individual and household bank accounts. *See* S. Rep. No. 95-915, at 4. And because Congress recognized that technologies would continue to evolve, the Act was designed to apply both to existing technologies and to any technology that would be developed in the future. *See* 123 Cong. Rec. 27940; *see also Kashanchi v. Texas Comm. Med. Bank*, 703 F.2d 936, 940 (5th Cir. 1983).

Consistent with Congress's purpose, the Act defines an EFT broadly to include "any transfer of funds, other than a transaction originated by check, draft or similar paper instrument," that is initiated electronically to "order, instruct, or authorize a financial institution to debit or credit" a consumer account. 15 U.S.C. § 1693a(7). The statute provides that five categories of transfers are not intended to be included by this definition including, as relevant here, "any transfer of funds," other than a transfer processed by an automated clearinghouse (ACH),[1] made "by a financial

---

[1] An ACH allows consumers to electronically transfer money directly from the consumer's bank account to a bank account held at another participating financial institution. Like wire networks, ACH systems allow banks to process and settle transfers in batches according to established protocols that participating institutions agree on ahead of

(*continued on the next page*)

institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." *Id.* § 1693a(7)(B). The Act further defines an unauthorized EFT as an EFT "from a consumer's account initiated by a person other than the consumer without actual authority to initiate such a transfer and from which the consumer receives no benefit." *Id.* § 1693a(12).

The Act allocates liability for unauthorized EFTs primarily to the bank, rather than the consumer. If a consumer notifies a bank that the consumer believes an EFT is unauthorized, the bank is required to investigate the allegations within ten business days, report its findings in writing to the consumer, and, if it concludes that the transaction is unauthorized, promptly reimburse the consumer. *Id.* § 1693f(a)-(b), (d). If the bank is unable to complete its investigation within ten business days, it may provisionally recredit the consumer's account with funds

---

time. Citibank does not dispute that ACH transfers and payments made over peer-to-peer payment systems like Venmo and Zelle are protected by the Act.

9

that the consumer can use until the bank's investigation has concluded. *Id.* § 1693f(c).

The amount of money that the bank must reimburse the consumer is tied to when a consumer provides the bank with notice of the unauthorized transfer. If the consumer provides notice of the unauthorized transfer within two business days of receiving a statement from the bank documenting the transfer, the bank is required to reimburse the consumer for any loss above $50. *See id.* § 1693g(a). If the consumer notifies the bank within sixty business days and the bank establishes that the loss would not have occurred "but for" the consumer's failure to notify the bank within two business days, the bank must reimburse the consumer for any loss above $500. *See id.* If the consumer does not notify the bank within sixty business days and the bank can show that the loss would not have occurred but for the consumer's failure to provide timely notice, the bank is not required to reimburse the consumer for any loss. *Id.* In every circumstance, the bank bears the burden of proof as to whether the EFT was authorized and as to whether the loss would have occurred if the consumer provided notice more quickly. *Id.* § 1693g(b).

10

## 2. New York's Uniform Commercial Code article 4A

Article 4A of New York's Uniform Commercial Code (U.C.C.) was enacted in 1990 to establish a comprehensive framework to govern funds transfers. *See* Ch. 208, 1990 N.Y. Laws 2700; *see also* U.C.C. § 4-A-104, cmt. 6. Unlike the Act, U.C.C. article 4A is not a consumer protection statute. Rather, it is designed to assign responsibilities, allocate risks, and establish limits on liability to the various participants in each stage of an end-to-end transaction, and applies regardless of how the transaction is initiated and of whether any party is a consumer, rather than a commercial entity. *See id.* § 4-A-102 cmt.

As relevant here, U.C.C. article 4A defines a "funds transfer" as a "series of transactions, beginning with the originator's payment order," and ending with the acceptance by the beneficiary's bank of the money, "made for the purpose of making payment to the beneficiary." *Id.* § 4-A-104(1). Article 4A expressly exempts from its scope a "funds transfer any part of which is governed by" the Act and a "remittance transfer" governed by amendments to the Act promulgated as part of the Dodd-Frank Wall Street Reform Act. *Id.* § 4-A-108.

11

### 3. New York's data security laws

New York's Stop Hacks and Improve Electronic Data Security Act was enacted in 2019 to update New York's data breach notification law in response to new technology and to require businesses to implement reasonable data security measures to protect the privacy, security, and integrity of personal data. *See* S. Introducer's Mem., *in* Bill Jacket for Ch. 117 (2019), at 7-8. The SHIELD Act imposes affirmative obligations on companies holding private information to prevent that information from being compromised or corrupted. *See id.* at 7-8; Mem. from D. González, Div. of Consumer Prot., N.Y. Dep't of State, to Z. Knaub, Acting Counselor to the Governor, *in* Bill Jacket, *supra*, at 13. And its requirements apply regardless of whether a company falls victim to a data breach or an individual's identity is stolen.

As relevant here, the term "private information" includes an individual's account number, or credit or debit card number; any security or access code to access an individual's financial account; and an individual's username and email address in combination with a password or security question and answer that would permit access to an online account. N.Y. General Business Law (G.B.L.) § 899-aa(1)(b). A company

12

that holds or has access to private information is required to "develop, implement and maintain reasonable safeguards to protect the security, confidentiality and integrity of the private information." *Id.* § 899-bb(2). These safeguards include, but are not limited to, technical and physical safeguards to prevent unauthorized access to private data; protocols governing data storage and disposal; and, systems designed to assess risk, detect unauthorized access, and respond to system failures. *Id.* § 899-bb(2)(b)(ii).

A financial institution like Citibank can comply with the SHIELD Act by complying with all regulations promulgated pursuant to the federal Gramm-Leach-Bliley Act, which establishes a prudential data security framework to protect personal financial information held by banks, securities firms, and other financial services providers. *See id.* § 899-bb(1)(a)(i), (2)(b)(i). *See generally Trans Union LLC v. FTC*, 295 F.3d 42, 46-47 (D.C. Cir. 2002) (discussing the scope of the Gramm-Leach-Bliley Act).

## B. Factual Background[2]

### 1. The mechanics of wire transfers

This case focuses on transactions initiated electronically by an accountholder (or someone purporting to be the accountholder) through an online or mobile banking platform and effectuated in part using an interbank wire network. Interbank wire networks connect financial institutions and reduce certain transaction costs by allowing participating institutions to send money and settle accounts based on a set of predetermined rules and processes. (Joint Appendix (J.A.) 21, 23.) Individual consumers cannot send or receive money directly over interbank wire networks and instead must request their bank to send money over a wire network on their behalf.

The most basic form of this transaction (commonly called a wire transfer) involves at least four parties: (i) the sender initiating payment; (ii) the sender's bank; (iii) the beneficiary receiving the payment; and (iv) the beneficiary's bank. (J.A. 22.) These transactions are effectuated

---

[2] The following facts are drawn from the allegations in the complaint and are assumed to be true for purposes of this appeal. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013).

through at least three distinct funds transfers. First, the sender creates a payment order, which instructs the sender's bank to "pay or cause another bank to pay" the beneficiary a set amount and includes the necessary information to complete the transaction. (J.A. 22.) A payment order can be created orally (e.g., by giving direction to a teller at a local bank branch), in writing (e.g., by writing a check), or, electronically through a bank's online or mobile platform. (J.A. 22.) The sender's bank debits the sender's account for the payment order, plus any fees it may charge. (J.A. 23-25.)

The bank then sends the amount specified in the payment order to the beneficiary's bank through one or more interbank wire networks. (J.A. 22-23.) When this transaction is initiated through the consumer's online or mobile account, the sender's bank typically sends money from its own account to the beneficiary's bank over an interbank wire network and then debits the customer's account to reimburse itself for the cost of the interbank wire. (*See* J.A. 22-25.) Once the beneficiary's bank has received the money, the beneficiary's bank will credit the beneficiary's account in the amount of the payment order. (J.A. 22-23.)

15

### 2. The financial industry's promotion to consumers of electronic wire transfers

Prior to the last fifteen years, consumers who used wire transfer services typically submitted payment orders by visiting a physical bank branch and talking to a teller, by calling the bank and providing instructions over the phone, or by writing a check or signing a debit or credit card authorization form. (J.A. 21, 24-25.) Consumers did not, therefore, typically use wire transfers on a routine basis. (*See* J.A. 17.)

After internet access and smartphones became widely accessible, banks and their customers shifted to online and mobile banking. (J.A. 12, 17.) As a result, banks designed systems to offer a variety of electronic payment options, including by payment order and subsequent interbank wire, directly to consumers through their online and mobile platforms. (J.A. 17-18.) Many banks, including Citibank, now effectively allow consumers to submit payment orders entirely online, without any personal interaction with a bank employee or even a signature to verify the consumer's identity.

Banks have aggressively promoted these services to consumers, promising that wire transfers would allow customers to send money electronically quickly, safely, and conveniently. The promotional efforts

16

have been wildly successful. Between 2015 and 2018, for example, consumers' wire transfer volume increased by over 20%. By 2018, wire transfers initiated by consumers amounted to more than $4.3 trillion annually and constituted approximately 11% of all wire transfers by transaction. (J.A. 17-18.)

### 3. The increase in scams targeting online and mobile banking systems

The rising prevalence of online and mobile banking has been accompanied by a corresponding rise in scams and frauds designed to infiltrate online or mobile banking platforms to steal consumers' money. Scammers typically use a variety of techniques to accomplish these frauds. For example, scammers will call consumers or send emails or text messages impersonating the consumer's bank, a well-known business, or the government to trick consumers into providing personal information that can be used to access the consumer's online or mobile account. Scammers may also use a consumer's personal information to activate a new phone with the consumer's mobile number and then use that new device to reset a consumer's account passwords using text message authentication. (J.A. 18-19.)

17

Once a scammer has access to a consumer's online or mobile bank account, scammers initiate transfers to consolidate money from a consumer's various checking and savings accounts into a single account. (J.A. 35, 37.) A scammer then uses the payment systems available on a bank's online or mobile platform to transfer money out of a consumer's account and into the scammer's account without any authorization. (*See* J.A. 19.) These transactions can occur within just minutes, often without the customer even knowing that a transfer was initiated and tens of thousands of dollars have been stolen from their account. (J.A. 36-37.)

Consumer losses from such scams have been significant and life altering. In 2022 alone, scammers stole hundreds of millions of dollars from consumers, including Citibank's customers. (J.A. 19.) For many individuals, the transfers out of their accounts constitute the transfer of all or nearly all of their savings. (*See* J.A. 41-42, 47-48, 53-54, 56-57.)

### 4. Citibank's inadequate fraud prevention and response

Notwithstanding the fact that Citibank is one of the nation's largest banks and holds over $400 billion in consumer deposits (J.A. 16), it has failed to implement measures to prevent scammers from accessing consumer accounts (*E.g.*, J.A. 35-39, 73). For example, Citibank has not implemented or consistently required robust consumer verification processes, such as multifactor authentication or simultaneous text message and email verification for unusual transaction activity. (*See* J.A. 38-39; *see also* J.A. 30-31 (describing multifactor security measures).) Citibank also has not implemented protocols to monitor accounts for suspicious activity or to consistently apply its most robust verification procedures if suspicious activity is detected—for example, if a customer initiates a payment order within minutes of changing their password or enrolling in online wire transfer services. (*See* J.A. 37.) And Citibank has failed to implement layered security protocols to prevent scammers who have a consumer's username and password from also accessing sensitive financial information, such as account or routing numbers, or personal information like birth dates, addresses, and credit reports that may be

19

linked to a consumer's online bank accounts. (*See* J.A. 14, 37-39; *see also* J.A. 30-31.)

Citibank's failures have had devastating consequences. (*See* J.A. 41-63.) For example, one consumer who had an account with Citibank that did not permit online payment orders nevertheless lost $40,000 after Citibank approved a fraudulent transaction by a scammer who had changed the consumer's password, entered into a new account agreement on her behalf, and tried but failed to first execute a $39,999 payment order. (J.A. 42-44.) Another consumer lost her life savings when a scammer gained access to her accounts by impersonating Citibank, transferred money from her savings accounts into her checking account, and, after Citibank tried to call the consumer but failed to reach her, created a payment order to transfer the entire amount out of her account moments later. (J.A. 56-58.)

Citibank has also failed to remedy the harms caused by the unauthorized transfers it blindly permits. (*See* J.A. 38-41.) When Citibank is notified by a customer of a potentially fraudulent transfer, including after a customer is victimized by a scammer, Citibank's representatives instruct the customer to visit a local branch to report the activity and

initiate an investigation. (J.A. 40-41.) Citibank does not secure the customer's accounts until the customer is physically able to visit their local brank. Nor does Citibank investigate the potentially fraudulent transfer or contact beneficiary banks to request that the stolen funds be frozen or returned. (J.A. 39-40.)

When a customer visits their local branch to report a fraudulent transfer, they are required to complete, execute, and notarize an affidavit detailing the scam and explaining how the scammers were able to infiltrate the account before Citibank will take further action. (J.A. 27, 41.) Once Citibank receives the affidavit, it performs a perfunctory investigation, often concluding with a form letter denying the claim without providing any details about the scope of the investigation or the evidence supporting Citibank's conclusion that a transfer was in fact authorized. (J.A. 27-28.) Consequently, Citibank routinely fails to reimburse customers for unauthorized transfers initiated by scammers, causing individual customers to lose thousands of dollars. (J.A. 41.) Even when Citibank does reimburse customers for the amount transferred, it does not credit customers for lost interest. (J.A. 41.)

21

## C.   Procedural History

In January 2024, the Office of the Attorney General filed this civil enforcement action against Citibank in the U.S. District Court for the Southern District of New York.

As relevant here, OAG alleged that Citibank violated New York Executive Law § 63(12) by repeatedly and persistently violating the Act.[3] (J.A. 11-81.) Specifically, OAG alleged that Citibank failed to properly investigate reports of unauthorized EFTs and to credit consumers for unauthorized payment orders initiated by scammers to steal money using interbank wires. (J.A. 64-66.) OAG further alleged that Citibank failed to properly respond to unauthorized intrabank transfers between two consumer accounts, which helped scammers steal more money while reducing the risk of detection. (J.A. 66-68.) OAG alleged in the alternative that Citibank's actions violated New York's U.C.C. article 4A. (J.A. 69-

---

[3] Executive Law § 63(12) gives the Attorney General a cause of action against any person or business that engages in "repeated fraudulent or illegal acts or otherwise demonstrate[s] persistent fraud or illegality in the carrying on, conducting or transaction of business." A claim under this section may be predicated on persistent violations of any state, local, or federal law. *See, e.g., People by Schneiderman v. Credit Suisse Sec. (USA) LLC*, 31 N.Y.3d 622, 633 (2018).

72). OAG separately alleged that Citibank violated New York's SHIELD Act by failing to implement reasonable safeguards to protect consumer information, including information like usernames, account numbers, and passwords.[4] (J.A. 72-74.)

Citibank moved to dismiss the complaint in its entirety. The district court (Oetken, J.) granted the motion in part and denied it in part in a thorough 61-page decision and order. (Special Appendix (S.A.) 1-62.)

First, the district court held that the complaint adequately alleged that Citibank's practices violated the Act. (*See* S.A. 8-40, 59-60.) The court recognized that the Act does not apply to interbank transfers sent through a common wire network such as FedWire (S.A. 24), but concluded that the plain text of the Act does not extend this exclusion to all other ancillary transfers (S.A. 33; *see also* S.A. 33-38). Because a payment order is a transfer of funds that authorizes a bank to debit a consumer account, and because this payment order is not "made by a financial institution on

---

[4] OAG also asserted state-law fraud claims and claims under federal Red Flag regulations (J.A. 74-78), but those claims are not at issue in this interlocutory appeal.

behalf of a consumer" by means of a wire service (§ 1693a(7)(B)), it is subject to the Act's protections. (S.A. 33; *see also* S.A. 21-38.)

The court separately concluded that intrabank transfers initiated by scammers to consolidate funds from multiple accounts are also subject to the Act. Though these transfers themselves did not change the consumer's net wealth, the court explained, they ultimately harmed consumers by making it easier for scammers to steal most or all of a consumer's money, and therefore constituted "unauthorized" EFTs under 15 U.S.C. § 1693a(12). (S.A. 48-52.) Because the district court found that the transfers at issue on OAG's complaint are covered by the Act, it dismissed OAG's alternative claim under U.C.C. article 4A. (S.A. 48-49.)

Finally, the district court dismissed OAG's claim under the SHIELD Act, holding that it was preempted because it concerned the same conduct prescribed by the FCRA: namely, the development of procedures to detect and respond to identity theft. (S.A. 49-56.)

The district court granted Citibank's motion to certify the order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and stayed the district court action pending appeal. (S.A. 71-73.) This Court granted Citibank's petition for permission to appeal the certified order and

24

referred OAG's request that this Court exercise its discretion to review the dismissal of its SHIELD Act claim to the merits panel. Order (Sept. 3, 2025), 2d Cir. ECF No. 3.

## STANDARD OF REVIEW

This Court reviews the district court's resolution of a motion to dismiss de novo, "accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *New York Legal Assistance Grp. v. Board of Immig. Appeals*, 987 F.3d 207, 213 (2d Cir. 2021) (quotation marks omitted).

## SUMMARY OF ARGUMENT

The only question raised in Citibank's interlocutory appeal is whether the Act applies to the payment transfers alleged in the complaint. If this Court affirms the district court's holding that the Act applies here, the case will be remanded to the district court to determine whether Citibank in fact violated the Act, and if so, what the appropriate remedies may be. If this Court reverses, the case will be remanded to the district court to proceed on OAG's alternative claims under U.C.C. article 4A, because the district court dismissed OAG's U.C.C. claim on the sole

ground that the transfers on which it was based are covered by the Act. Consequently, if the claims under the Act are dismissed, then the U.C.C. claims should be reinstated.

The district court correctly found that the complaint identified two categories of transfers subject to the Act. First, the district court correctly held that the Act applies to payment orders—electronic funds transfers made by a consumer to their bank to move money from the consumer's account to the bank's own account to reimburse the bank for an interbank wire sent on the consumer's behalf. These payment orders fall within the Act's broad definition of an EFT and are not excluded from coverage by the Act's exception for funds transfers made by a financial institution on behalf of a consumer by means of an interbank wire service. *See* 15 U.S.C. § 1693a(7)(B).

The Act's structure, context, and purpose support the conclusion that payment orders are subject to the Act's protections. The Act was designed to apply uniformly to all EFT systems that are directed at consumers and allow consumers to transfer money to pay for daily expenses. And it is undisputed here that the Act does apply to EFT systems like an automated clearinghouse that, to consumers, look

26

identical to a payment order. That banks have recently developed a market for consumer wire transactions by integrating wire transfer services with their online platforms and marketing these services directly to consumers does not somehow exclude these payment orders from the Act's protections. Nor do the various subsequent legislative and regulatory developments on which Citibank relies.

Second, the district court also correctly concluded that the Act applies to intrabank transfers between accounts held by the same consumer to facilitate fraud while reducing the risk of detection. These intrabank consolidation transfers are initiated by scammers, not by the account holder, and are designed to help scammers steal larger amounts of money using a single payment. The transfer itself does not change the consumer's net wealth or otherwise improve the consumer's position, so they provide no benefit to the consumer. Indeed, these transfers harm consumers by making it easier for scammers to steal most or all of a consumer's money in a single interbank transaction.

Finally, because this interlocutory appeal has been certified pursuant to 28 U.S.C. § 1292(b), this Court has broad discretion to reach any legal issue presented in the order on appeal. *See California Pub. Emps.' Ret.*

27

*Sys. v. WorldCom, Inc.*, 368 F.3d 86, 95 (2d Cir. 2004). It should exercise that discretion to review the district court's dismissal of OAG's SHIELD Law claims, and upon such review, to reverse. The SHIELD Act does not impose obligations on institutions like Citibank related to the detection of and response to the unauthorized use of a consumer's personal information. Rather, the SHIELD Act requires companies to implement data security safeguards to prevent unauthorized access to private data, an obligation that is not addressed by the FCRA.

## ARGUMENT

## POINT I

### THE ACT APPLIES TO ELECTRONIC FUNDS TRANSFERS ANCILLARY TO INTERBANK WIRE TRANSFERS

The district court correctly held that the Act applies to electronic funds transfers that are ancillary to an interbank wire transfer; specifically, the Act applies to the transfer of funds between a consumer and her bank to facilitate a payment order made in anticipation of an interbank wire.

When resolving a question of statutory interpretation, this Court's "principal task is to afford the law's terms their ordinary meaning at the

28

time Congress adopted them." *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021) (quotation marks omitted). This Court's analysis begins with the statutory text, and the Court relies on "'all the textual and structural clues' bearing on its meaning and construing each word 'in its context and in light of the terms surrounding it.'" *Id.* (footnotes omitted) (quoting, inter alia, *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004)). If the text is unambiguous, this Court's inquiry ends, and it enforces the text according to its terms. *Id.*; *see also BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). If the text of the statute remains unclear, this Court will consider the "broader statutory context," including its purpose. *New York Legal Assistance Grp.*, 987 F.3d at 216 (quotation marks omitted). This Court considers extraneous materials only if the statute remains ambiguous and, even then, "only to the extent they shed a reliable light on the *enacting* Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (emphasis added).

## A. The Act's Plain Text Confirms That It Applies to the Subject Transfers.

The Act broadly defines an EFT as "any transfer of funds" initiated electronically to "order, instruct, or authorize a financial institution debit or credit" a consumer account. 15 U.S.C. § 1693a(7). Citibank does not, and cannot, dispute that a transfer from a customer to her bank to fulfill a payment order, standing alone, would satisfy this definition. Instead, Citibank contends that the Act excludes this transfer because it occurs as part of a transaction that includes an interbank wire transfer, and interbank wire transfers are excluded from the Act pursuant to § 1693a(7)(B).[5] *See* Br. for Appellant (Br.) at 29-48. Citibank is incorrect.

The statutory exclusion on which Citibank relies applies only to a "transfer of funds" that satisfies three requirements: (i) the transfer is "made by a financial institution"; (ii) on behalf of a consumer; (iii) "by means of a service that transfers funds held at either Federal Reserve

---

[5] The Act does not use the phrase "wire," "wire network, or "wire transfer," though these phrases were in common use at the time of its enactment. The Act also does not use or define the term "consumer wire." *Contra* Br. at 30-31.

banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." § 1693a(7)(B).

It is undisputed that, for a transfer to be excluded by subsection (7)(B), it must be made using an interbank wire network like FedWire or CHIPS. Consumers cannot directly access those networks and must instead create a payment order to instruct their bank to send money over an interbank wire network. When a consumer creates a payment order electronically, that payment order authorizes the bank to move money from the consumer's account to the bank's own account to reimburse the bank for the interbank wire sent on the consumer's behalf. Though the transfer from a consumer's account to the bank's own account is made in connection with an interbank wire transfer, it is not itself an interbank wire transfer. It is made by the consumer, not "by a financial institution," and does not use a wire network. (*See* J.A. 22-25.)

Consequently, Citibank's argument that a payment order is excluded from the Act pursuant to subsection (7)(B) requires a court to interpret the phrase "transfer of funds" to apply to the entire chain events that ordinarily accompany a wire transaction, conflating the three distinct transfers described above (at 14-15). But, the statute's plain text confirms

31

that that the phrase "transfer of funds" in subsection (7)(B) is properly read to apply to each of the subsidiary transfers separately.

Because the Act does not define the term "transfer", this Court's analysis begins with that word's "most common meaning" and usage at the time the Act was enacted.[6] *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012); *see also Feliciano v. Department of Transp.*, 605 U.S. 38, 45-46 (2025). Several dictionaries in use at the time of the Act's enactment defined the word "transfer" to mean the act of conveying, carrying, or moving someone or something (or the right or title to something) from one person, position, or place to another. *See, e.g.*, *Webster's New World Dictionary*, "transfer" (vb., defs. 1-2) (1960); *see also* *Black's Law Dictionary*, "transfer" (vb.) (rev. 4th ed. 1968); *Webster's Third New International Dictionary*, "transfer" (vb., defs. 1(a), 2) (1961). Indeed, in defining the word "transfer," Webster's New World Dictionary illustrates the word's common usage by referring to person's movement

---

[6] There is no evidence in the Act's plain text that the word "transfer" was intended to carry a specialized meaning or to be used as a term of art. *Contra* Br. at 32-35. In the absence of any such indication, this Court will give the word "transfer" its "plain, everyday meaning." *See Feliciano v. Department of Transp.*, 605 U.S. 38, 45 (2025) (quotation marks omitted).

32

from one bus, streetcar, or train to another as part of a single journey. *Webster's New World Dictionary*, "transfer" (vb., def. 3).

The dictionaries in use at the time also distinguish between the word "transfer" and the word "transaction." The word "transaction" is not listed as a synonym or used in any definition of the word "transfer" from these dictionaries. *See, e.g.*, *Webster's New World Dictionary*, "transfer"; *Black's Law Dictionary*, "transfer"; *Webster's Third New International Dictionary*, "transfer." Instead, each dictionary defines "transaction" separately to connote the entire end-to-end "deal" or "piece of business." *See Webster's New World Dictionary*, "transaction" (def. 2(a)); *Webster's Third New International Dictionary*, "transaction" (def. 2(a)); *Black's Law Dictionary*, "transaction" (stating that "transaction" refers to an agreement or conducting of business between two or more parties through which their legal relations are altered).

The Act's text distinguishes between "transfer" and "transaction," and its use of both terms in the definition of an EFT supports the inference that the two words carry different meanings. *See Russello v. United States*, 464 U.S. 16, 22-23 (1983). For example, subsection (7)(C) excludes any "transaction" aimed at the purchase or sale of securities or

commodities through a registered broker-dealer. *See* § 1693a(7)(C). Put differently, subsection (7)(C) is naturally read to exclude from coverage the entire end-to-end transmission of funds that results in the consumer purchasing or selling securities or commodities, even if that end-to-end transmission is effectuated through a series of discrete "transfers." The Act draws a similar distinction by excluding from its definition of EFT any "transaction originated by check, draft, or similar paper instrument," even if that transaction is effectuated through a series of discrete transfers, some of which occur electronically. *See* § 1693a(7).

In contrast, subsection (7)(B) excludes only the "transfer of funds" by a financial institution over an interbank wire network, not a "transaction" involving an interbank wire network, though Congress used that construction elsewhere in the same subsection. *See Russello*, 464 U.S. at 22-23. Had Congress intended for subsection (7)(B) to exclude an end-to-end transaction where any portion of the transaction used an interbank wire network, it could have said so. *See FCC v. AT&T Inc.*, 562 U.S. 397, 404-05 (2011). Consequently, subsection (7)(B) is best read to exclude only the interbank wire transfer from the Act's coverage and not

34

the predicate payment order, which results in the electronic transfer of money from the consumer to their bank.

## B. The Act's Structure and Purposes Confirm Its Application to the Subject Transfers.

As explained above (at 7-8), the Act was designed to establish a comprehensive, fair, and uniform set of consumer safeguards to govern all consumer-facing EFT systems that accessed traditional consumer accounts. *See* 15 U.S.C. § 1693; S. Rep. No. 95-915, at 4; *see also* H.R. Rep. No. 95-1315, at 2-4. Congress recognized that EFT systems have the potential to provide significant benefits to consumers: These systems made it faster and easier for consumers to purchase goods, pay their bills, and access their money. *See* S. Rep. No. 95-915, at 2. But even at the time of enactment in the late 1970s, Congress recognized that EFT systems posed significant risks to consumers, who could lose their life savings in minutes without warning or notification because of fraud or computer glitches. *See* H.R. Rep. No. 95-1315, at 2; *see also* 123 Cong. Rec. 27940; 123 Cong. Rec. 37012.

Congress was particularly concerned about these risks because, at the time of the Act's passage, there was no federal law and little state law

35

to protect consumers using EFT systems. *See* H.R. Rep. No. 95-1315, at 2. By contrast, there were federal and state law protections in place for more traditional payment methods like checks, money orders, and cash. Then, as now, consumers were generally unaware that EFTs carried greater risks and fewer protections as compared to traditional payment methods. *Id.* Consequently, Congress created a consumer protection framework for EFTs that mirrored existing protections governing payment methods like credit cards, *see* 124 Cong. Rec. 25731, to ensure that all equivalent, consumer-facing payment systems were subject to the same standards. *See* S. Rep. No. 95-915, at 4-6. By contrast, Congress did not see the same need to regulate EFTs as between commercial entities or others with the requisite sophistication to understand and mitigate the risk of fraud. *Cf. id.*, at 4 (exclusion applied to "traditional 'wire' transfers between banks").[7]

---

[7] This conclusion is further supported by the fact that interbank wire transfers are regulated by Regulation J, which, at the time the Act was passed, did not address consumers' rights and instead regulated only the relationship between banks and the Federal Reserve. *See* 42 Fed. Reg. 31763, 31763-765 (June 23, 1977); *contra* Br. at 9.

Accordingly, the Act focused on consumer-facing technology that allowed consumers to transfer money without any personal interaction or other traditional form of verification. *See* H.R. Rep. No. 95-1315, at 2. Congress recognized that these systems would continue to develop, so it purposely defined the coverage of the Act broadly to ensure that any legal framework regulating EFT systems remain sufficiently flexible to cover electronic services that did not exist at the time of the Act's enactment. *See Kashanchi*, 703 F.2d at 939-40.

These legislative purposes are reflected in the Act's structure. As explained above (at 7-8), the Act is primarily focused on the movement of money into and out of bank accounts held by individuals or households to pay for household expenses or to receive payments for labor or services. *See, e.g.*, 15 U.S.C. § 1693a(1)-(2). The Act defines an EFT broadly, *see id.* § 1693a(7), and its exceptions to this definition reflect the statute's focus on consumer-facing transfer systems that are used for daily expenses and do not require any traditional form of verification. *See id.* § 1693a(7)(A) (excluding transfers that "do not directly result in a debit or credit to a consumer account"), (C) (excluding investments), (E) (excluding transfer initiated by telephone conversation). Given the Act's focus on consumer

37

protection, it made sense for Congress to also exclude the movement of money purely between two banks over a wire network because those transfers were already governed by standard rules. (*See* J.A. 23.) Nothing in the Act precludes the possibility that different transfers within an end-to-end transaction might be governed by different regulatory frameworks.

Reading the Act to apply to a payment order, but not to the subsequent interbank wire transfer, is therefore entirely consistent with the Act's framework. *Contra* Br. at 35-40, 44-48. From the consumer's perspective, the process to submit a payment order electronically through Citibank's online or mobile platform looks similar, if not identical, to the process to transfer money using other EFT systems which are covered by the Act (such as ACH, Zelle, or Venmo). (*See* J.A. 19.) Consumers submitting a payment order electronically can do so without any interaction with a bank teller or any identity verification (*see* J.A. 12, 17-18): All the consumer needs to do is log on to Citibank's online platform with their username and password, information that is easily compromised by scams, and create a payment order. (*See* J.A. 17-19, 25, 35-37.) These payment orders result in a debit to a consumer account and can cause the consumer to lose their life savings within seconds. (*See, e.g.,* J.A. 41.) As

38

OAG alleges, these payment orders have become vulnerable to fraud because of their recent integration with electronic and mobile banking platforms. (J.A. 18-19.) Put another way, the payment orders at issue here are precisely the kind of transfers that Congress intended the Act to cover.

The fact that interbank wire networks existed when the Act was enacted does not change this conclusion. *Contra* Br. at 32-33, 48-49. As explained above (at 14-17), until recently, consumers could request an interbank wire transfer only by interacting with a bank employee, in person at a bank branch or over the phone, or signing a check or authorization form. (J.A. 21, 24-25.) These payment orders therefore required the kinds of traditional verification methods that Congress believed were sufficient to protect consumers from a heightened risk of fraud. *See* H.R. Rep. No. 95-1315, at 2.

Had Congress known at the time of the Act's enactment that technology would allow consumers to create payment orders for wire transactions without these forms of verification, it would have understood the Act to apply to such transfers because these transfers look identical to other kinds of transfers, like ACH, that are protected. That under-

39

standing of congressional intent is particularly compelling in view of the increased size and number of wire transfers initiated by consumers in the past decade. Historically, consumers did not use wire transfers for routine transactions and instead relied on other EFT systems like ACH transfers, which are protected by the Act. But, such wire transactions have become widely adopted thanks to financial institutions aggressively marketing remote wire services directly to consumers. (*See* J.A. 17-18.) And consumers use wire transactions to transfer significant sums of money, with the average transfer totaling more than $100,000, compared to an average of $1,500 for transfers via ACH. *See* Br. for Amici Curiae Bank Pol'y Inst. et al. (Amicus Br.) at 25. Given Congress's focus on consumer protection, it would be illogical for Congress to have excluded from the Act's scope EFT services that allow consumers to transfer hundreds of thousands of dollars without any in-person verification procedures while protecting EFT services that allow consumers to send a

few hundred dollars, even though both services use the same online platform and look identical to the consumer.[8]

## C. Citibank's Arguments to the Contrary Lack Merit

### 1. Applying the Act to the subject transfers does not render subsection (7)(B) superfluous.

Contrary to Citibank's assertion (Br. at 38-42), interpreting the Act to apply to payment orders initiated electronically by consumers in anticipation of a wire transfer does not render any portion of the statute superfluous. *Cf. Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 218 (1988) (courts will avoid reading a statute in a way that makes a provision superfluous).

As explained above (at 8-9, 30-31), the Act generally applies to any movement of money, initiated electronically, into or out of a consumer's personal or household account. *See* 15 U.S.C. § 1693a(7). Subsection

---

[8] This conclusion is further supported by the fact that, in 1978 when subsection (7)(B) was adopted, Congress understood that provision to apply to "traditional 'wire' transfers between banks," not to transfers involving consumers. *See* S. Rep. No. 95-915, at 4. Contrary to Citibank's assertions (Br. at 50), efforts by certain members of Congress months later to narrow the Act did not concern this exception and instead focused on other proposed exemptions from the Act's scope, *see* 124 Cong. Rec. 22602-03, most of which were not included in the final statute.

(7)(B) therefore serves an important function in excluding from the Act's coverage potential interbank wires made on behalf of a consumer. For example, at the time the Act was drafted, a consumer could go to a bank branch in person, speak to a teller, and instruct the teller to send money via interbank wire. (*See* J.A. 21, 24-25.) Based on those instructions, the bank could debit the consumer's account and send that money electronically over an interbank wire network to the beneficiary's bank. That interbank wire transfer would be conducted electronically by the bank, could authorize the financial institution to debit the consumer's account, and could move money directly from the consumer's account over an interbank wire network to the beneficiary's bank. *See* 15 U.S.C. § 1693a(7). On its face, the Act would apply to these kinds of transfers but for subsection (7)(B)'s carve-out for interbank wires initiated by a bank on the consumer's behalf.

Moreover, it made sense for Congress to exclude an interbank wire that is initiated in person from the Act's scope: As explained above (at 35-37), Congress was primarily concerned with EFTs that did not require any kind of traditional verification of a consumer's identity. A consumer who initiated a payment order in person at a bank branch would have to

42

verify their identity by interacting with a bank teller. The EFT therefore would be initiated by a bank and would occur over an interbank wire network that was already governed by predetermined rules and processes to which the financial institutions had already agreed. (*See* J.A. 21, 23.) These kinds of transfers were therefore less susceptible to the kinds of fraud that Congress was concerned about. And subsection (7)(B) is necessary to ensure that interbank wire transfers initiated by the kind of in-person interactions described above are excluded from the Act's coverage.

The payment orders at issue in this litigation are different: As OAG has alleged, when a consumer initiates a payment order electronically via Citibank's online or mobile platform, the consumer does not have to interact with a bank employee or even provide a signature to verify their identity. (*See* J.A. 12, 17-18.) The initial payment order functions as a separate transfer that authorizes Citibank to debit the consumer's account and transfer the amount of the payment order to Citibank's own account to reimburse Citibank for the interbank wire. And Citibank sends its own money over an interbank wire network to the beneficiary's bank in a distinct transfer. (J.A. 22-25.)

43

In any event, even if reading the definition of an EFT to include the kinds of payment orders alleged here introduces some surplusage, as Citibank asserts (Br. at 38-42), that kind of surplusage is consistent with the statutory framework. As explained above (at 7-8), the Act was designed to provide a framework both for existing technology and for new consumer technology that may develop in the future. *See Kashanchi*, 703 F.2d at 940; *see also* 123 Cong. Rec. 27940. It is understandable, then, for Congress to define the scope of the Act coverage broadly, with the understanding that certain sections of the statute may become superfluous as technology evolves. *Cf. Time Warner Telecom, Inc. v. FCC*, 507 F.3d 205, 221 (3d Cir. 2007) (1996 Telecommunications Act recognized that new technology may make provisions of the statute obsolete and regulated accordingly). Indeed, Congress adopted a similar form of surplusage elsewhere in subsection (7). For example, subsection (7)(A) excludes from the Act's scope check guarantee services that do not result in a "debit or credit" from the consumer's account, though such a transfer would not constitute an EFT under subsection (7)'s broad definition. *See* 15 U.S.C. § 1693a(7)(A).

44

### 2. Regulation E does not compel a different interpretation.

Contrary to Citibank's assertion (Br. at 54-56), Regulation E, which was promulgated by the Federal Reserve after the Act, does not support the conclusion that subsection (7)(B) applies to an entire transaction where any portion of that transaction is completed over an interbank wire network.

*First*, it is well established that an agency's interpretation of a statute, however longstanding, cannot override or vary the statute's "single, best meaning" at the time of enactment. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). Even if the text of subsection (7)(B) were ambiguous, which it is not (see *supra* at 30-35), this Court would have an obligation to exercise "independent legal judgment" to resolve that ambiguity using the ordinary tools of statutory construction and to "impose its own construction on the statute." *Id*. at 401 (quotation marks omitted). Here, these tools support interpreting the Act to apply to the payment orders at issue, as explained above. See *supra* at 30-41. This Court's inquiry is therefore at an end, and this Court need not consider an agency's interpretation of the Act's statutory language. *See Loper Bright Enters.*, 603 U.S. at 400-01. Moreover, unlike Regulation E,

45

subsection (7)(B) does not use the term "wire transfer," so it can fairly be read to apply more broadly than the regulation. *Compare* 15 U.S.C. § 1693a(7)(B), *with* 12 C.F.R. § 1005.3.

*Second*, Regulation E does not reflect the unique expertise or informed judgment of either the Federal Reserve or the Consumer Financial Protection Board (which has been tasked with enforcing the Act since 2010) on the current practices of fisnancial institutions. *Cf. Loper Bright Enters.*, 603 U.S. at 402 (discussing agency's judgment based on factual premises). Regulation E was most recently revised in 2013, before the proliferation of online banking and the integration of EFT systems, including wires, into online banking platforms. (*See* J.A. 17-18, 21, 24-25.) Regulation E therefore does not reflect any agency's "informed judgment" with respect to the kinds of consumer-facing technology that are now broadly available and that have resulted in the proliferation of the kinds of scams alleged in OAG's complaint.

*Third*, to the extent Regulation E sheds any light on the correct reading of the Act, it supports the decision below. Regulation E acknowlededges that different transfers within a single transaction may be subject to different regulatory frameworks. For example, as part of a 1996

46

revision to Regulation E, the Federal Reserve acknowledged that if an institution allowed consumers to "initiate Fedwire transfers pursuant to a telephone transfer agreement," that transaction could be covered by both the Act and U.C.C. article 4A. *See* Electronic Fund Transfers, 61 Fed. Reg. 19678, 19680 (May 2, 1996). This approach supports the conclusion that the Act's definitional use of the word "transfer" applies only to the discrete movement of money from one party to another as part of a broader transaction, rather than to the transaction as a whole.

### 3. Subsequent statutes likewise do not support Citibank's interpretation of the Act.

Citibank also contends that its interpretation of the Act is supported by the States' subsequent adoption of U.C.C. article 4A and certain amendments to the Act made in the Dodd-Frank Wall Street Reform Act of 2010. *See* Br. at 33-34, 42-44, 52-56. These arguments likewise miss the mark.

As explained above (at 11), New York's U.C.C. article 4A defines the phrase "funds transfer" to apply to the full end-to-end transaction of a wire transfer, rather than each discrete step. *See* U.C.C. § 4-A-104. But, there is no evidence in the Act's text or history that Congress intended to

incorporate the same definition to EFTs subject to the Act. Though U.C.C. article 4A was in development at the time of the Act's enactment (*see* Br. at 50-51), Congress expressly found that the Act was necessary because there were no comprehensive state-law consumer protections in place. *See* H.R. Rep. No. 95-1315, at 2. U.C.C. article 4A was independently enacted by each of the fifty States *after* the Act was enacted. The U.C.C. established a comprehensive state-law framework for all funds transfers, and it recognizes that an end-to-end transaction consists of several discrete steps, each of which may be governed by different rules and procedures. *See id.* § 4-A-104(1). And the U.C.C. expressly excludes from its coverage transactions that are governed at least in part by federal law to avoid a circumstance where conflicting rules govern the same transaction. *See* U.C.C. § 4-A-102 cmt.; *see also id.* §§ 4-A-104 (article 4A does not depend on means used to transmit instructions for a funds transfer); 4-A-108 (article 4A does not apply to a transaction where any part of that transaction is governed by the Act or the Dodd-Frank Act); 4-A-107 (U.C.C. gives way to contrary federal banking regulations). The U.C.C. and the Act therefore serve different purposes.

Citibank's reliance on the Dodd-Frank Wall Street Reform Act's addition of protections for remittance transfers, *see* 15 U.S.C. § 1693o-1, does not inform the proper reading of subsection (7)(B) for a similar reason. Like U.C.C. article 4A, the Dodd-Frank Act was promulgated after the fact and did not amend *the Act*'s definitional provisions. To be sure, the Dodd-Frank Act added protections for certain kinds of transactions—money sent by an individual in the United States to someone outside the United States through a remittance transfer provider, regardless of whether that transfer is initiated electronically—that were not regulated by other statutes. 15 U.S.C. § 1693o-1(g)(2). In establishing a consumer protection framework for these kinds of transactions, the Dodd-Frank Act made clear that such protections operated independently of the Act. *See id.* § 1693o-1(e)(1), (g)(2). Consequently, by its terms, the amendments made by the Dodd-Frank Act cannot be read to inform this Court's interpretation of subsection (7)(B).

49

### 4. The case law on which Citibank relies is distinguishable.

Citibank also misplaces its reliance on various cases interpreting the definitional provisions of the Act. *Contra* Br. at 57-59. As the district court correctly concluded, these cases are distinguishable. (*See* S.A. 29-33.)

As an initial matter, many of these cases involved payment orders that were not made electronically from a consumer account, so they would fall outside the scope of the Act for that reason alone. *See, e.g.*, *Wright v. Citizen's Bank of E. Tenn.*, 640 F. App'x 401 (6th Cir. 2006) (payment order made in person and by phone); *Pope v. Wells Fargo Bank, N.A.*, No. 2:23-cv-86, 2023 WL 9604555 (D. Utah Dec. 27, 2023) (R. & R.) (payment order made in person), adopted, 2025 WL 539593 (D. Utah Feb. 18, 2025); *Stepakoff v. IberiaBank Corp.*, 637 F. Supp. 3d 1309 (S.D. Fla. 2022) (payment order by phone call); *see also Fischer & Mandell LLP v. Citibank, N.A.*, No. 09-cv-1160, 2009 WL 176721 (S.D.N.Y. June 22, 2009) (transfer from a business account). Other cases involved cursory allegations, largely filed by pro se litigants, with no allegations regarding the mechanics of the underlying transactions; thus, the courts in those cases had no factual basis to engage in the kind of analysis that the district

50

court engaged in here. *See, e.g., Nazimuddin v. Wells Fargo Bank, N.A.*, No. 24-20343, 2025 WL 33471 (5th Cir. Jan. 6, 2025) (pleading by pro se litigant); *McClellon v. Bank of Am., N.A.*, No. 18-cv-829, 2018 WL 4852628 (W.D. Wash. Oct. 5, 2018) (same); *Bodley v. Clark*, No. 11-cv-8955, 2012 WL 3042175 (S.D.N.Y. July 23, 2012) (same); *Rahimian v. Wells Fargo Bank*, No. 24-cv-3787, 2024 WL 4818797 (C.D. Cal. Sept. 20, 2024) (cursory pleadings)

These cases therefore do not control the outcome here; nor do they support the contention that the weight of precedent in this area supports the conclusion that the payment orders at issue here are excluded from the Act's provisions.

### 5. Applying the Act to the subject transfers will not upend the banking industry.

Finally, Citibank (*see* Br. at 2-4, 58-59) and amici (*see* Amicus Br. at 7-24) are both wrong to assert that applying the Act to payment orders initiated through a bank's online or mobile platform in anticipation of an interbank wire will fundamentally upend or alter how banks do business or provide services to their customers.

51

*First*, as explained above (at 16-17), consumers historically did not use interbank wires for routine transactions. Rather, the primary users of services of wire transfers were commercial entities who, as sophisticated repeat players in the market, were well positioned to negotiate preexisting rules allocate risk and liability and to understand and mitigate the risk of fraud. (*See* J.A. 21, 23.) However, in the past decade, banks like Citibank have designed and aggressively marketed online and mobile banking systems to consumers with the promise that these systems would allow consumers to send and receive money quickly without any need to verify the consumer's identity. (*See* J.A. 17-18.)

By integrating wire transfer systems into these online platforms, banks created a market for what Citibank calls a "consumer wire" (*see* J.A. 17-18), while charging significant fees to consumers to use these services. These platforms allow a consumer to initiate a payment order in the same way and using the same process that the consumer would use to initiate an ACH transfer or peer-to-peer platform like Zelle (*see* J.A. 17-19), but without the same protections, such as transaction limits. And they give rise to a consumer-facing interface where consumers are presented with a variety of options to transfer money electronically

52

without verification, only some of which, in Citibank's view, are protected by the Act. This is precisely the scenario that the Act was designed to prevent.

In passing the Act, Congress was clear that the Act's protections were designed to ensure that all EFT systems that looked the same to a consumer would be treated the same and be subject to the same protections.[9] *See* S. Rep. No. 95-915, at 4; *see also* H.R. Rep. No. 95-1315, at 2. Banks were well aware of the Act's requirements when developing their online platforms and advertising wire services to consumers, and they cannot now claim that the Act's application to all EFT systems integrated onto these platforms was unforeseen.

*Second*, and relatedly, banks have already created and implemented several security measures into their online platforms to mitigate the risk of significant losses from unauthorized EFTs. For example, payment systems like ACH and Zelle limit the amount of money that can be transferred in a single transaction and in a single day. (*See* J.A. 143, 175

---

[9] Indeed, Congress expressly rejected recommendations from the National Center for Electronic Funds Transfers that would have limited protections for consumers, and instead, adopted a more robust consumer protection framework. *See* S. Rep. No. 95-915, at 22.

(detailing transfer limits).) Citibank also could implement more robust security measures to verify a consumer's identity and block suspicious payment orders before a wire is initiated. (*See* J.A. 30-31, 35-38.) Many of these safeguards are readily available and are already in use with other forms of EFT systems that have been integrated into Citibank's online and mobile platforms, and neither Citibank nor amici provide any reason why these same protections cannot be applied to payment orders that are initiated through online and mobile platforms that banks themselves develop, control, and market to consumers.

*Third*, and relatedly, while adding these measures may result in fewer consumers initiating wire transactions (*see* Amicus Br. at 24-27), it would also have the effect of reducing fraud while furthering Congress's stated goal of protecting unwary consumers from the significant risks associated with EFT systems. It would not affect the vast majority of wire transactions. (*See* J.A. 18 (wire transactions initiated by consumers represent 11% of all wire transactions).) At most, it could incentivize consumers who want to send money over a wire network to visit a bank branch or write a check to do so, thereby reducing the risk of fraud.

54

## POINT II

### THE ACT APPLIES TO INTRABANK CONSOLIDATION TRANSFERS EXECUTED AS PART OF A SCAM

The district court also properly concluded that the Act applies to unauthorized transfers between two accounts held by the same consumer that are intended to consolidate a consumer's wealth into a single account to facilitate theft or fraud. (*See* S.A. 36-40.)

As explained above (at 8-9), the Act defines an "unauthorized" EFT to include any EFT "from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit," subject to certain narrow exceptions. 15 U.S.C. § 1693a(12). Here, it is undisputed that the intra-bank consolidation transfers at issue are (i) EFTs, as that phrase is defined in § 1693a(7); (ii) initiated by a person other than the consumer without actual authority to do so; and (iii) are not subject to the narrow exceptions set forth in the statute. It is also undisputed that these transfers help scammers steal larger amounts of money in a single payment order. (*See* J.A. 35, 37.)

Instead, Citibank argues that the Act is inapplicable because OAG cannot show that the "consumer receives no benefit" from an intrabank

consolidation transfer. *See* Br. at 59-68. According to Citibank, the consumer receives a benefit in the form of a credit to their checking account from this transfer, and therefore the Act is inapplicable. This argument is wrong for several reasons.

*First*, Citibank's argument lacks merit because any credit to the consumer's account is accompanied by a corresponding debit from a different account held at Citibank. It is illogical to consider the credit standing alone to be a benefit to the consumer, without taking the corresponding debit into account. At most, an intrabank transfer causes no change to the consumer's net wealth. Such a transfer certainly does not improve the consumer's position so as to create a benefit. For that reason, Citibank misplaces its reliance (*id.* at 63-64) on *Becker v. Genesis Financial Services, Inc.*, No. 06-cv-5037, 2007 WL 4190473 (E.D. Wash. Nov. 21, 2007). In *Becker*, the district court found that the consumer received a minimal benefit from an unauthorized balance transfer between two credit cards in that she did not have to pay fees that would normally be charged for a balance transfer. *See id.* at *12-13. No such benefit exists here.

56

*Second*, Citibank is wrong to suggest (Br. at 62) that an unauthorized "internal transfer with no net effect on a consumer's balance" falls outside the textual scope of the Act. Notably, Congress did not define an unauthorized EFT as requiring "injury" or "harm" to the consumer; instead, it provided that the definition would apply only to those transactions from which "a consumer receives no benefit." In other words, the textual language reflects a concern that a consumer whose status affirmatively *improves* from an otherwise unauthorized EFT could be unjustly enriched if the Act applied.

Because the Act does not define what it means for a consumer to receive no "benefit" from an EFT, this Court affords that phrase its ordinary meaning at the time of the Act's enactment, including by reference to dictionaries that were in use at the time. *See Bedi*, 15 F.4th at 226; *Taniguchi*, 566 U.S. at 567-68. These dictionaries consistently define "benefit" as a showing of improvement rather than the mere absence of harm. Webster's Dictionary, for example, defined the term "benefit" broadly, to include anything that advances or improves a person's wellbeing, whether directly or indirectly. *See Webster's Third New International Dictionary*, "benefit" (n. def. 2(a)); *see also Webster's New*

*World Dictionary*, "benefit" (n., def. 2) (benefit means "anything contributing to an improvement in condition"). Black's Law reflects a similar understanding of the scope of the term "benefit." *See Black's Law Dictionary*, "benefit" (n.).

*Third*, applying the Act to the kinds of intrabank consolidation transfers at issue here is consistent with the Act's broader framework. *Contra* Br. at 66-68. The Act does not require an EFT to change a consumer's net wealth before it triggers a bank's obligations to provide timely notice to consumers, to investigate an error, or to timely correct that error to return a consumer's account balances to their pre-transfer status quo. *See* 15 U.S.C. §§ 1693d, 1693f. Likewise, the Act's remedial scheme does not require a consumer to suffer a monetary loss: the Act allows a consumer to seek relief based on any violation of the statute's protections and allows a court to award statutory damages and costs, even if the consumer does not suffer monetary loss. *See id*. § 1693m. Indeed, the Act's civil remedial provision reflects Congress's understanding that a violation of the Act may not result in a loss to the consumer but may still require some form of relief.

58

*Finally*, these intrabank transfers are covered by the Act for the additional (and independent) reason that they result in concrete injury to the consumer. As explained above (at 17-18), scammers who gain access to a consumer's online or mobile Citibank platform initiate these transfers to make it easier for them to initiate a single payment order to steal most or all of a consumer's wealth. (*See* J.A. 35-37, 64-66.) A scammer will generally pull money out of a consumer's interest-bearing savings account without authorization, depriving the consumer of any benefit they may receive from that interest.[10] (*See* J.A. 66-68.) And it becomes easier for the scammer to avoid detection, because they are able to initiate a single payment order, rather than having to use multiple payment orders, to steal a consumer's money. (*See* J.A. 35-37.) These transfers leave the consumer in a worse position than they otherwise would have been and are therefore covered the Act. *See, e.g.*, *Moore v. J.P. Morgan Chase Bank, N.A.*, No. 22-cv-01849, 2022 WL 16856105, at *1-2

---

[10] Contrary to Citibank's assertion (Br. at 61), OAG adequately preserved the argument that these consolidation transfers also deprived consumers of the benefit of any interest they would have earned. *See* Mem. of Law in Opp'n to Mot. to Dismiss at 29-30 (May 17, 2024), ECF No. 25.

(N.D. Cal. Nov. 10, 2022); *Wingard v. TDK Bank, SSB*, 768 F. Supp. 3d 1282, 1287-88 (D. Colo. 2025).

Contrary to Citibank's assertion (Br. at 66-68), considering the downstream consequences of a particular transfer, including the result of the entire transaction, is entirely consistent with the Act's application to payment orders that are ancillary to an interbank wire. As explained above (at 7-8, 35-37), the Act's "primary objective" is the provision of robust consumer protections. *See* 15 U.S.C. § 1693. To that end, Congress expressly allocated the risk of fraud or misuse of EFT systems to banks, rather than to consumers, recognizing that banks are better positioned to recognize and prevent fraud even in circumstances where the consumer was negligent or careless. *See id.* § 1693g(e) *see also* S. Rep. No. 95-915, at 6-7; 123 Cong. Rec. 37010. Indeed, as explained above (at 19-21), banks, unlike consumers, have a variety of tools at their disposal to prevent unauthorized transfers, to detect fraud quickly when it occurs, and to mitigate the consequences of that fraud even after an authorized transfer has been initiated. To that end, it makes sense for Congress to define the word "transfer" broadly for purpose of coverage by the Act's protections, but to also understand the term "benefit" as allowing

60

consideration of the downstream consequences for the consumer of a particular transfer.

For that reason, case law uniformly considers the downstream consequences of an EFT when determining whether that EFT is covered by the Act. For example, the Ninth Circuit in *Park v. Webloyalty.com, Inc.* allowed a plaintiff's claim under the Act to move forward based on allegations that the plaintiff was unaware that he had been paying for a subscription program that provided discounts. 685 F. App'x 589, 591-92 (9th Cir. 2017) Because the plaintiff in that case was unaware that he was paying for the program, the court held, the plaintiff could not, and did not receive any downstream benefit as a result of his monthly subscription fees.[11] *Id*.

---

[11] This Court's decision in *Aikens v. Portfolio Recover Associates, LLC*, 716 F. App'x 37 (2d Cir. 2017), is not to the contrary. *Contra* Br. at 62-63. In *Aikins*, this Court explained that the plaintiff had orally authorized the defendant to transfer money from the plaintiff's account to repay debt that she owed, that the plaintiff provided the defendant with the necessary account information to initiate these transfers, and that the transfers at issue followed the agreed-upon repayment schedule. 716 F. App'x at 40. The transfers therefore fell within one of the exceptions to the definition of an unauthorized EFT that is not at issue in this case. *See id*.

## POINT III

### THE SHIELD ACT CLAIM IS NOT PREEMPTED BY THE FAIR CREDIT REPORTING ACT

This Court should also reverse the district court's dismissal of OAG's claim under New York's SHIELD Act because that claim is not preempted by the FCRA.[12]

The doctrine of preemption is "always a matter of congressional intent," and courts generally will presume that Congress does not intend to preempt state law absent a clear indication to the contrary in the text of the federal statute at issue. *See Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005). A federal statute may preempt state law if one of three conditions is met: (i) Congress expressly preempts a state law's application to a particular area or industry; (ii) the state law stands as an impediment to the accomplishment of the federal statute's purpose,

---

[12] As explained in OAG's opposition to Citibank's petition for permission to appeal, this Court has jurisdiction to review the district court's dismissal of the SHIELD Act claim because this issue is "fairly included within the certified order." *California Pub. Emps.' Ret. Sys.*, 368 F.3d at 95 (quotation marks omitted). This Court should exercise its discretion to resolve this issue because doing so would promote judicial and litigant efficiency by allowing full review of OAG's complaint as part of a single appeal without prejudicing any party. *See, e.g., Sportsinsurance.com, Inc. v. Hanover Ins. Co., Inc.*, No. 21-cv-1967, 2022 WL 16706941, at \*2 (2d Cir. Nov. 4, 2022) (summary order).

so is implicitly preempted; or (iii) Congress has legislated so compre-hensively that the federal framework occupies the field. *Id.* at 313.

The FCRA does not reflect Congress's intent to occupy the field, and OAG's SHIELD Act claim is neither expressly preempted by the FCRA's preemption provision nor in conflict with the FCRA's purpose. This Court should therefore reinstate OAG's SHIELD Act claim and remand to allow the district court to consider the merits of that claim in the first instance.

## A.   The SHIELD Act Claim Is Not Expressly Preempted.

The FCRA establishes certain requirements for both credit reporting agencies and commercial entities that use consumer credit information, including financial institutions, to ensure that consumer information is confidential, accurate, relevant, and properly utilized. *See* 15 U.S.C. § 1681. As part of its framework, the FCRA expressly defines its preemptive scope. Generally, the FCRA will preempt state law only where "those laws are inconsistent with any provision of [the FCRA], and then only to the extent of the inconsistency." *Id.* § 1681t(a). This general principle is subject to several enumerated exceptions, *see id.* § 1681t(b), including, as relevant here, preemption of any state-law "requirement or prohibition"

63

concerning the conduct regulated by "subsections (e), (f), and (g) of section 1681m," *id.* § 1681t(b)(5)(F).

Section § 1681m, in turn, imposes various obligations on the users of consumer credit reports, including financial institutions, and subsection (e) requires federal banking agencies to promulgate regulations requiring users of consumer credit reports to "establish reasonable policies and procedures" to identify and respond to identity theft. *Id.* § 1681m(e)(1)(B).[13] Pursuant to the statute's requirement, the Federal Trade Commission and Office of the Comptroller of the Currency promulgated the federal Red Flag Rule, which requires financial institutions to develop and implement a program to identify and respond to activity that indicates the possible existence of identity theft. *See* 16 C.F.R. § 681.1 (FTC); 12 C.F.R. § 41.90 (OCC). These regulations do not require regulated institutions to take prophylactic steps to protect the privacy and security of consumer data or to prevent unauthorized access to consumer data;

---

[13] Subsections (f) and (g) prohibit the sale, transfer, or placement into collection of any debt that resulted from identity theft and impose certain obligations on creditors who are notified that a debt may be fraudulent. *See* 15 U.S.C. § 1681m(f), (g). Because neither the SHIELD Act nor OAG's allegations concern the sale or transfer of consumer debt, these subsections are not implicated here.

64

rather, they require only that financial institutions create reasonable policies and procedures to respond to the unauthorized *use* of that data, typically after it has been compromised. *See* 149 Cong. Rec. E2512-13. This focus makes sense. A different federal statute, the Gramm-Leach-Bliley Act, governs a financial institution's obligations to implement appropriate safeguards to protect against unauthorized access to customer records held by those institutions.[14] *See* 15 U.S.C. §§ 6801-6809.

This Court and others have held that the FCRA's preemption provision must be interpreted "fairly but narrowly," to only preempt claims based on the conduct or subject matter governed by the FCRA provision at issue. *See Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 445-46 (2d Cir. 2015). For example, in *Galper*, this Court held that provisions of the FCRA that imposed specific responsibilities on entities that provided information to credit reporting agencies would not preempt

---

[14] As explained above (at 13), the SHIELD Act accounts for federal obligations imposed pursuant to the Gramm-Leach-Bliley Act and does not impose any requirements on financial institutions beyond those imposed by this federal regime. *See* G.B.L. § 899-bb(1)(a)(i), (2)(b)(i). The SHIELD Act is therefore not preempted by the Gramm-Leach-Bliley Act.

state law claims against those entities if the claim does not rest on the entity's "legal responsibilities as a furnisher of information under the FCRA." *Id.* at 446. An entity regulated by the FCRA may still be subject to a state tort claim based on fraudulent misuse of consumer information that would be protected under the FCRA, because such a claim does concern the entity's obligations under the FCRA. *See id.* at 442, 446. This Court reached a similar conclusion in *Macpherson v. JP Morgan Chase Bank, N.A.*, where this Court held that the FCRA does not preempt state tort claims unless they rely on allegations that the defendant failed to comply with obligations specifically imposed on the defendant by the FCRA.[15] 665 F.3d 45, 47-48 (2d Cir. 2011) (citing *Purcell v. Bank of America*, 659 F.3d 622, 625 (7th Cir. 2011)).

Properly construed, then, the FCRA will only preempt a state law claim that imposes requirements on a creditor or financial institution to

---

[15] This Court's narrow construction of 15 U.S.C. § 1681t(b) is consistent with case law from the other courts of appeals. *See, e.g.*, *Aargon Agency, Inc. v. O'Laughlin*, 70 F.4th 1224, 1234-36 (9th Cir. 2023) (state law requiring written notification before collection on medical debt is not preempted); *Davenport v. Farmers Ins. Grp.*, 378 F.3d 839, 843 (8th Cir. 2004) (state law requiring notice before insurance companies obtain credit reports is not preempted).

identify, detect, and respond to signs of possible identity theft. *See* 15 U.S.C. § 1681t(b)(5)(F); *see also id.* § 1681m(e). It will not preempt state laws that impose obligations on institutions like Citibank that are not related to the detection of and response to the unauthorized use of certain types of consumer information. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517-18 (1992) (matters that fall outside a statute's express preemption provision are not preempted).

OAG's SHIELD Act claim is not preempted under this standard. As explained above (at 12-13), the SHIELD Act imposes various requirements on companies that own or license personal data to implement procedures and safeguards to prevent unauthorized access to private data, with the goal of ensuring that personal data remains accurate, secure, and confidential. *See* G.B.L. § 899-bb(2). In addition to preventing data breaches, the SHIELD Act is also intended to ensure that the private information a company holds (whether from its consumers or its own employees) is not corrupted, copied, or otherwise accessed without authorization. *See id.*

To be sure, a data security program that complies with the SHIELD Act may ultimately mitigate the risk of identity theft. But the SHIELD

67

Act does not require companies to implement a program designed to detect, prevent, or mitigate the risk of identity theft. Rather, the SHIELD Act, unlike the FCRA, requires companies to take prophylactic steps to protect data privacy and prevent unauthorized *access* to individual data, rather than to respond to the unauthorized *use* of that data after a consumer's information has been compromised. And a company may violate the SHIELD Act by failing to implement reasonable security measures even if no data breach occurs and no consumer's identity is stolen.[16] *See id.*

OAG's SHIELD Act claim reflects this focus on Citibank's obligations to secure consumer information to prevent unauthorized access before a scammer gains access to a consumer's online or mobile account. (*See* J.A. 72-74.) As explained above (at 19-20), OAG's SHIELD Act claim focused on Citibank's failure to develop and consistently implement more robust technical safeguards, such as multi-step consumer verification

---

[16] Indeed, OAG has enforced the SHIELD Act against companies for failing to adequately protect consumer data even though there was no data breach or signs of identity theft. *See, e.g.*, Assurance of Discontinuance, *Matter of Investigation Gov't Emps. Ins. Co.*, Assurance No. 24-082 (Nov. 21, 2024); Compl., *People v. National Gen. Holdings Corp.*, Index No. 450917/2025 (Sup. Ct. N.Y. County Mar.10, 2025), NYSCEF No. 2.

processes and layered security protocols, to prevent scammers from accessing consumer data. (*See* J.A. 30, 37-39.) Citibank also failed to implement similar safeguards to prevent scammers from accessing sensitive information that may be linked to a consumer's bank account, including addresses, account numbers, and credit reports. (*See* J.A. 14, 30-31, 37-39.) And, Citibank failed to develop procedures to secure connected accounts in the event that a consumer account was compromised. (J.A. 37-40.)

These allegations all focus on Citibank's failure to take any prophylactic measures to prevent consumer data from being compromised and would give rise to liability under the SHIELD Act even if Citibank fully complied with the FCRA's requirements once a consumer's identity had been stolen. The SHIELD Act claim is therefore not preempted by the FCRA's express preemption provision, 15 U.S.C. § 1681t(2).

## B. The SHIELD Act Does Not Conflict with Federal Law.

OAG's SHIELD Act claim is also not implicitly preempted by the FCRA because it is not in conflict with the FCRA and does not otherwise stand as an impediment to the accomplishment of the FCRA's purpose. *See Wachovia Bank, N.A.*, 414 F.3d at 313.

As explained above (at 63), the FCRA is designed to ensure that the information reported on consumer credit reports is accurate, confidential, relevant, and properly utilized. *See* 15 U.S.C. § 1681(b). The SHIELD Act's stated goal of protecting the integrity and security of consumer data is entirely consistent with the FCRA's statutory purpose. And the SHIELD Act is not inconsistent with any provision of the FCRA, which does not address a company's data privacy and data security obligations. OAG's SHIELD Act claim is therefore not preempted by the FCRA and should have been allowed to move forward.

70

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's denial of Citibank's motion to dismiss OAG's claims under the Act, reverse the district court's dismissal of the SHIELD Act claim, and remand for further proceedings.

Dated:  New York, New York
        January 9, 2026

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellee


By:  */s/ Anagha Sundararajan*
ANAGHA SUNDARARAJAN
Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
ANAGHA SUNDARARAJAN
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-8073

71

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Ava Mortier, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,714 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.


_/s/ Ava Mortier_