# 25-2105

## In the United States Court of Appeals for the Second Circuit

THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK,
*Plaintiff-Appellee*,

v.

CITIBANK, N.A.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York
Case No. 1:24-cv-659 (The Hon. James Paul Oetken)

## BRIEF OF AMICUS CURIAE NATIONAL CONSUMER LAW CENTER IN SUPPORT OF PLAINTIFF-APPELLEE

CARLA SANCHEZ-ADAMS
NATIONAL CONSUMER LAW CENTER
1001 Connecticut Avenue, NW
Suite 510
Washington, DC 20036
(202) 452-6252
*csanchezadams@nclc.org*

MATTHEW W.H. WESSLER
JESSICA GARLAND
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

January 16, 2026

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A), the National Consumer Law Center is a Massachusetts non-profit corporation that operates as a tax-exempt organization under the provisions of section 501(c)(3) of the Internal Revenue Code. It has no parent corporation, and no publicly held company owns 10 percent or more of its stock.

## TABLE OF CONTENTS

Corporate disclosure statement .................................................................. i

Table of authorities............................................................................ iii

Interest of Amicus Curiae .................................................................... 1

Introduction ..................................................................................... 2

Argument ........................................................................................ 5

    I.    The plain language of Section (7)(B) only excludes from EFTA's coverage a bank-to-bank wire transfer .................................................. 7

    II.   EFTA's historical context and the regulations governing EFTA and wire transfers underscore why Section (7)(B) only exempts bank-to-bank wire transfers............................................................ 12

    III.  Contrary to the bank's amici's assertions, consumers should not be left vulnerable to having their life savings stolen through fraudulent transfers.......................................................................... 21

Conclusion ....................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Jimenez v. Quarterman,*
    555 U.S. 113 (2009) ................................................................................7

*L.S. v. Webloyalty.com, Inc,*
    954 F.3d 110 (2d Cir. 2020) .................................................................12

*New York ex rel. James v. Citibank,*
    763 F. Supp. 3d 496 (S.D.N.Y. 2025) ........................................4, 8, 13

*Widjaja v. JPMorgan Chase Bank, N.A.,*
    21 F.4th 579 (9th Cir. 2021) ...........................................................12, 14

## Statutes

15 U.S.C. § 1693 ...............................................................................6, 12

15 U.S.C. § 1693a............................................................................ passim

15 U.S.C. § 1693g............................................................................... 4

New York Uniform Commercial Code § 4-A-108.................................. 27

Dodd-Frank Act,
    Pub. L. No. 111-203 124 Stat. 1376 (2010)............................................. 10

## Regulations

12 C.F.R. § 210.25 ...................................................................... passim

12 C.F.R. § 1005.1 ........................................................................... 18

12 C.F.R. Part 210, Subpart B .........................................................19, 26

12 C.F.R. Part 1005, Supplement I .......................................................17

12 C.F.R. Appendix A § 4A .............................................................15, 20

Collection of Checks and Other Items,
    41 Fed. Reg. 3097 (proposed Jan. 21, 1976)........................................ 10

Electronic Fund Transfers,
61 Fed. Reg. 19678 (May 2, 1996).........................................................................16, 17

Funds Transfers Through Fedwire,
55 Fed. Reg. 40791 (Oct. 5, 1990)..........................................................................16, 17

Wire Transfers of Funds,
42 Fed. Reg. 31763 (June 23, 1977) ............................................................................. 10

## Other Legislative Materials

H.R. Rep. No. 95-1315 (1978) ........................................................................ 12, 14, 25

S. Rep. No. 95-915 (1978).............................................................................................. 25

*Examining Scams and Fraud in the Banking System and Their Impact on
Consumers: Hearing Before the Senate Comission. on Banking, Housing,
& Urban Affairs,*
118th Congress (2024)..........................................................................................21

*Fraud in Focus: Exposing Financial Threats to American Families: Hearing Before the
Oversight & Investigations Subcommittee of the House Financial Services
Commission,*
119th Congress (2025).........................................................................................20

## Publications

Sumit Arora, *How Has the Pandemic Permanently Reshaped the Payments
Experience and Consumer Behavior in the U.S.?,*
US Faster Payments Council (June 1, 2022) ....................................................... 13

Sara Siegel Bernard, *Tech Support Scammers Stole $85,000 From Him .
His Bank Declined to Refund Him.,*
N.Y. Times (Dec. 12, 2025)..........................................................................22, 23

*Consumer Banking and Payments Law,*
National Consumer Law Center.............................................................1, 15, 28

*Electronic Fund Tranfers and the Public,*
National Commission on Electronic Fund Transfers (1977) ............................ 14

*Federal Reserve Payments Study,*
Board of Governors of Federal Reserve System (2025) .................................... 13

*Fedwire*,
Federal Reserve History (2023) ............................................................................ 13

*Internet Crime Report 2024*,
Federal Bureau of Investigation (Apr. 3, 2025) ......................................... 2, 21, 22

Carter Pape, *Banks Face New Risks as Account Takeover Fraud Spikes 250%*,
American Banker (Dec. 8, 2025) .................................................................... 2, 22

*Protecting Older Consumers 2024–2025*,
Federal Trade Commision, (Dec. 1, 2025) ......................................................... 2

Uniform Commercial Code Article 4A prefatory note,
(A.L.I. & Unif. L. Comm'n 2022) ................................................................... 9

## **INTEREST OF AMICUS CURIAE**[1]

The National Consumer Law Center ("NCLC") is a non-profit organization dedicated to fighting for economic justice for low-income and other vulnerable people who have been abused, deceived, discriminated against, or left behind in our economy. For more than 50 years, NCLC has drawn on its expertise in consumer financial protection to provide information, legal research, policy analyses, and market insights to federal and state legislatures, administrative agencies, and the courts. NCLC also publishes a twenty-two-volume Consumer Credit and Sales Legal Practice Series, which includes *Consumer Banking and Payments Law* (7th ed. 2024).

A major focus of NCLC's work is to increase public awareness of unfair and deceptive practices perpetrated against low-income and elderly consumers, and to promote access to protections against such practices. NCLC therefore has a compelling interest in seeking robust and effective enforcement of consumer protection laws to protect vulnerable consumers from unauthorized transactions.

---

[1] All parties consent to the filing of this brief, and no counsel for any party authored it in whole or in part. Apart from the amicus curiae, no person, party, or party's counsel contributed money intended to fund the brief's preparation and submission.

## INTRODUCTION

Online financial frauds have dramatically increased in recent years, wreaking havoc on Americans' financial health and retirement savings. In 2024, consumers reported losing $16.6 billion to financial fraud—a 33% increase from the year before. FBI, *Internet Crime Report 2024*, at 4 (Apr. 23, 2025), https://perma.cc/22UF-QJHA. Yet the amount of fraud consumers actually report is just the "tip of the iceberg." FTC, *Protecting Older Consumers 2024–2025*, at 27 (Dec. 1, 2025), https://perma.cc/CMC8-S2SA. Bank fraud is one of the fastest growing types of electronic financial fraud, with $2.1 billion reported lost in bank transfers or payments in 2024—a tenfold increase from the past six years. *Fraud in Focus: Exposing Financial Threats to American Families: Hearing Before the Oversight & Investigations Subcomm. of the H. Fin. Servs. Comm.*, 119th Cong. 21 (2025) (testimony of Carla Sanchez-Adams). And unfortunately, older and retired Americans are especially vulnerable to bank fraud, which can deplete their entire life savings in minutes.

Cybercriminals are increasingly committing bank fraud by using sophisticated social and technological techniques to gain access to an individual's bank account. *See* Carter Pape, *Banks Face New Risks as Account Takeover Fraud Spikes 250%*, Am. Banker (Dec. 8, 2025), https://perma.cc/4ALM-5SHP. Consider, as an example, Consumer A in the Attorney General's complaint who, as a retired senior, had saved

$84,000 in her Citibank accounts. JA-42. In October 2021, she opened a link claiming to be from Citi. *Id.* She suspected a scam, so she did not provide any personal information, but instead called her local Citi branch. After hearing her concerns, a Citibank representative assured her that Citi "had security protocols in place." *Id.* But the scammers nevertheless hacked into her account and sent a $40,000 electronic payment order to Citibank to initiate a wire transfer. JA-42–43. Citibank then executed the payment order, using an electronic fund transfer to remove $40,000 from the consumer's checking account and then sent a wire transfer in that amount. *Id.*

Consumer A did everything she could to recover her money. She immediately called Citi, where she was placed on a long hold. JA-43. She traveled to her local Citi branch, executed an Affidavit of Unauthorized Online Wire Transfer, and followed up diligently for weeks. JA-43–44. She even filed a police report. JA-43. But Citi refused to reimburse her, asserting that she "provid[ed] customer account information" or authorized the fraudulent transactions. JA-44.

Although Citibank has refused to reimburse Consumer A, and many other customers who suffered similar violations, federal law requires banks to protect consumers from liability for unauthorized bank transfers and payments. Almost fifty years ago, Congress enacted the Electronic Fund Transfer Act (EFTA) to protect consumers from electronic fund transfers that are "initiated by a person other than

the consumer without actual authority to initiate such transfer[s] and from which the consumer receives no benefit." 15 U.S.C. § 1693a(12). Subject to only narrow exceptions, EFTA requires banks to reimburse consumers for losses caused by such unauthorized transfers. *See* 15 U.S.C. § 1693g.

One of those narrow exceptions is Section (7)(B), which carves out bank-to-bank wire transfers from EFTA's coverage. *See* 15 U.S.C. § 1693a(7)(B). Wire transfers are never directly connected to any consumer account "since only banks—using their institutional accounts—have access to those networks." *New York ex rel. James v. Citibank*, 763 F. Supp. 3d 496, 509 (S.D.N.Y. 2025). To request a wire transfer, a consumer must send their bank a payment order, which can occur "with cash, check, or a verbal authorization to debit their account when in person, or online through electronic agreements." *Id.* at 505.[2] When a consumer sends a payment order electronically, that electronic agreement both provides the consumer's electronic transfer request for the bank to wire money to another bank, and "act[s] as electronic authorizations for" the consumer's bank to take money from the "consumers' bank accounts to pay for the transfers." *Id.* Such an electronically initiated "wire transfer" necessarily involves an EFTA-covered electronic fund

---

[2] Unless otherwise noted, all internal quotation marks, citations, alternations, brackets and ellipses have been omitted from quotations throughout this brief.

4

transfer from the consumer's account to the consumer's bank before a bank-to-bank wire can take place.

EFTA therefore applied to the unauthorized electronic fund transfer that criminals used to drain Consumer A's account to initiate a wire transfer—and should have required Citi to reimburse the consumer. The bank, however, has steadfastly refused, defending its disregard of EFTA's statutory requirements by arguing that Section (7)(B) exempts EFTA coverage not just from bank-to-bank wire transfers but from any electronic fund transfers that precede a wire transfer as well. *See* 15 U.S.C. § 1693a(7)(B). But as we explain below, the text of Section (7)(B) only exempts the portion of a transaction that moves money on a wire service between two banks. And the regulations governing EFTA and wire transfers explicitly confirm that Section (7)(B) does not carve out an electronic fund transfer that precedes a wire transfer from EFTA's coverage.

## ARGUMENT

The first problem with Citi's argument—that Section (7)(B) removes electronic fund transfers that precede a wire transfer from EFTA's coverage—is that it's not what the text of Section (7)(B) says. The text of Section (7)(B) only excludes the portion of a transaction "made by a financial institution on behalf of a consumer" over a wire "service." 15 U.S.C. § 1693a(7)(B). It does not say anything about excluding the

portion of a transaction made by a consumer that is *not* over a wire "service," but rather precedes a transfer over a wire "service."

Nor is there any reason to accept Citi's invitation to ignore EFTA's plain language. Congress enacted EFTA with the "primary objective" of protecting consumers, 15 U.S.C. § 1693(b), but in 1978, wire transfers were predominantly used for commercial, not consumer purposes. So Congress had good reason to exclude wire transfers from the coverage of EFTA but no reason to exclude electronic fund transfers that were initiated by consumers. And the regulations implementing EFTA are explicit that Section (7)(B) does not exclude from EFTA's coverage a consumer's electronic fund transfer preceding a wire transfer.

It is also clear what happens when banks refuse to apply EFTA to electronic fund transfers preceding wire transfers: cybercriminals can steal consumers' entire life savings through fraudulent transfers, and consumers will be left with no recourse. Citi and its amici nevertheless assert that if they were liable under EFTA, banks would add security measures that would be inconvenient for consumers, leading to more consumer harm and a bad policy outcome. But any additional inconvenience of added security does not outweigh the very real and current harm to consumers of not applying EFTA exactly as its text instructs.

## I. The plain language of Section (7)(B) only excludes from EFTA's coverage a bank-to-bank wire transfer.

**A.** This Court should, as the district below did, begin its analysis with the "plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). Section 1693a(7) covers "electronic fund transfer[s]," meaning "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). Section (7)(B) then excludes the portion of a transaction that occurs when a financial institution sends money to another financial institution on a wire "service." *Id.* § 1693a(7)(B). Yet Citibank and its amici assert that Section (7)(B) should be read to exclude not just a bank-to-bank wire transfer, but also an electronic payment order to a consumer's bank that requests the bank send a wire transfer to another bank.

The plain text of Section (7)(B) contradicts that interpretive theory. In relevant part, Section (7)(B) states:

> [T]he term "electronic fund transfer" … does not include … any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer.

These exclusions are deliberately cabined. The exclusion is limited to transfers "made by a financial institution" "on behalf of a consumer." *Id.* Dictionaries concurrent with the passage of EFTA note that "on behalf of" means "in the interest of," "as the representative of," or "for the benefit of." *Citibank*, 763 F. Supp. 3d at 512 (citing Behalf, *Third New International Dictionary Unabridged* (1961)). That language therefore does not cover an electronic fund transfer that *a consumer himself makes* to a bank that precedes the bank-to-bank wire transfer. Congress intended to exclude from EFTA at most only the portion of a wire transfer completed by a bank, rather than the portion initiated by a consumer (or someone purporting to act on behalf of a customer) in which the consumer asks their bank to make a wire transfer "on [their] behalf."

The fact that Section (7)(B) is limited to a bank-to-bank wire transfer is further confirmed by the clause's use of the term "service." As even Citibank recognizes (at 11), this term refers to a wire transfer service over a wire network. And, as the district court explained, "[t]he movement of funds within a wire network does not involve consumer funds or a consumer's account, since only banks—using their institutional accounts—have access to those networks." *Citibank*, 763 F. Supp. 3d at 509. Instead, only funds from one bank's institutional account are transferred to another bank's institutional account over a wire "service." *Id.* So when banks transfer funds over a wire service, "no money or property right of [the consumer] is actually

8

transferred." U.C.C. Art. 4A prefatory note (A.L.I. & Unif. L. Comm'n 2022). A movement of funds "by means of a service" therefore does not include the movement of funds made online from consumer accounts to Citibank's institutional account to request and pay for wire transfers that the bank subsequently initiates on a wire service.

**B.** Citibank tries to avoid this plain reading of Section (7)(B) by asserting (at 39) that it renders Section (7)(B) superfluous. According to the bank, Section (7)(B) cannot only exempt "the bank-to-bank segment," because "EFTA would not apply to that [bank-to-bank] transfer in the first place." Br. for Appellant at 39. That's so, Citi argues, because "EFTA governs only *consumer* fund transfers—moving money into and out of accounts used for 'personal, family, or household purposes,'" and a bank-to-bank transfer does not move money out of a consumer's account. *Id.* (quoting 15 U.S.C. § 1693a(2)'s definition of the term "account"). But that is an incomplete description of EFTA's coverage. By its terms, EFTA *does* cover a bank-to-bank wire transfer.

For starters, EFTA's Section 1693a(7) defines a covered "electronic fund transfer" broadly as "any transfer of funds … initiated through an electronic terminal … so as to order, instruct, or authorize a financial institution to debit or credit an account." An "account" in turn is defined as one used for "personal, family, or household purposes." 15 U.S.C. § 1693a(2). When a consumer initiates a wire

9

transfer by sending a payment order with an electronic fund transfer, the consumer is using an "electronic terminal" to instruct a financial institution to debit their "personal" account and make the transfer of funds over the wire service. That wire transfer therefore was "initiated through an electronic terminal" that "instruct[ed]" the "financial institution to debit [the consumer's] account." 15 U.S.C. § 1693a(7). Without the exemption in Section 1693a(7)(B), EFTA would apply to wire transfers. That Section (7)(B) only exempts a bank-to-bank wire transfer from EFTA's coverage does not make it superfluous.

In fact, right before EFTA's enactment, regulators referred to wire transfers as electronic fund transfers. Absent the exclusion in Section (7)(B), there would have been reasonable uncertainty as to whether a bank-to-bank wire transfer was governed by the new EFTA. For example, in 1976, while amending regulations governing wire transfers, the Federal Reserve Board called wire transfers "electronic fund transfers." Collection of Checks and Other Items, 41 Fed. Reg. 3097, 3098 (proposed Jan. 21, 1976. And again in 1977, the Board referred to wire transfers as "electronic payments." 42 Fed. Reg. 31763 (June 23, 1977).

**C.** The bank's second "superfluous" argument (at 26) fares no better. In 2010, through the Dodd-Frank Act, Congress extended EFTA's protections to cover all parts of a cross-border remittance transaction conducted in part via a wire service. *See* Pub. L. No. 111-203, § 1073, 124 Stat. 2060 (2010). The bank argues (at 26) that, "[o]n

10

the NYAG's view, EFTA already covered all consumer wire transfers," including remittance transfers, so under the "NYAG's view" the "amendment was a pointless exercise." The bank thus asserts that the Attorney General's view must be wrong because it would render the entire remittance amendment surplusage.

That misstates New York's view. EFTA applies where there is an electronic fund transfer that precedes a wire transfer, but it does not apply to a bank-to-bank wire transfer that is not connected to an electronic fund transfer. For example, if a consumer initiates a remittance wire transfer through Western Union or MoneyGram using cash or a check, EFTA, in its original form, would not apply as the covered transfer would not be electronic. Additionally, the 1978 version of EFTA wouldn't apply to international remittance transfers for yet another reason; EFTA only applies to transfers "to debit or credit a[ consumer's] account." 15 U.S.C. § 1693a(7); *see* 15 U.S.C. § 1693a(2) (defining a covered account as "a demand deposit, savings deposit, or other asset account"). But when a consumer initiates a remittance at Western Union or MoneyGram with cash or a check, there is no account at issue. By applying EFTA's protections to even those remittance transfers, the remittance amendments did provide a substantial additional protection.

11

## II.   EFTA's historical context and the regulations governing EFTA and wire transfers underscore why Section (7)(B) only exempts bank-to-bank wire transfers.

**A.** Congress's choice to exclude only wire transfers from EFTA's coverage, but not any preceding electronic fund transfers, is explained by EFTA's purpose and historical context. In the 1970s, Congress grew concerned about the "increasing prevalence" of banking transfers "processed through computer networks without human interaction." *Widjaja v. JPMorgan Chase Bank, N.A.*, 21 F.4th 579, 581 (9th Cir. 2021). Unlike with transactions that involve some human interaction, Congress recognized that these electronic transactions were "much more vulnerable to fraud, embezzlement, and unauthorized use than the traditional payment methods." H.R. Rep. No. 95-1315, at 2 (1978). In 1978, after studying the new "development" of "electronic fund transfer systems" and "the need to protect the legal rights of users and consumers," 12 U.S.C. § 2403, Congress enacted EFTA. In doing so, Congress made clear that EFTA's "primary purpose was to protect consumers in the then-novel context of electronic payment systems." *L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 115 (2d Cir. 2020); *see* 15 U.S.C. § 1693(b).

Given that EFTA's "primary purpose" is consumer protection, it makes sense that Congress excluded wire transfers from EFTA's coverage. Since the beginning of their widespread use in the 1900s, wire transfers have been primarily used to send large fast transfers of money for commercial, not consumer, reasons. *See* Fed. Rsrv.

12

Hist., *Fedwire* (2023), https://www.federalreservehistory.org/essays/fedwire. In 1978, the vast majority of wire transfers remained for commercial, not consumer, purposes. In fact, despite increasing consumer use of wire transfers over the last century, wire transfers still remain "predominantly used for commercial transactions." Br. for Appellant at 8; *see* Bd. of Governors of Fed. Rsrv. Sys., *Federal Reserve Payments Study* (2025), https://perma.cc/KD6G-TXJK.

Moreover, even when consumers did infrequently initiate wire transfers in 1978, consumers did not initiate them electronically, so there was no reason to include them in EFTA's coverage. The common use of electronic fund transfers to initiate consumer wire transfers is a relatively new phenomenon due to the increase in use of digital banking, and in particular, has been "driven by changes in customer behavior due to the pandemic." Sumit Arora, *How Has the Pandemic Permanently Reshaped the Payments Experience and Consumer Behavior in the U.S.?*, US Faster Payments Council (June 1, 2022) ("Almost overnight, people who were used to going into a branch for sending wire transfers or for making a down payment on a house, moved to completing these transactions digitally."). As Judge Oetken explained, "the type of 'consumer wire' that Congress would have known about in 1978" occurred when "a consumer 'walk[ed] into a bank office and request[ed] that bank to wire money on their behalf.'" *Citibank*, 763 F. Supp. 3d at 514. A consumer's use of a wire transfer in 1978 was therefore unlike the types of electronic fund transfers "processed through

13

computer networks without human interaction" that drove Congress to enact EFTA. *Widjaja*, 21 F.4th at 581; *see* H.R. Rep. No. 95-1315 at 2 (1978).

**B.** The plain text reading is also supported by the regulations governing EFTA and wire transfers. Since EFTA's passage, the relevant regulatory bodies and regulations have explicitly stated that the non-wire-transfer portions of transactions that constitute electronic fund transfers are covered by EFTA even when the transaction also includes a wire transfer.

Although Congress drafted EFTA to provide a governing framework just for electronic consumer transactions, Congress didn't intend for wire transfers to be unregulated. Congress was aware that the Uniform Commercial Code, which "provide[d] uniform standards governing" the "rights and responsibilities of participants in commercial transactions," was adding a section to govern wire transfers. Nat'l Comm'n on Elec. Fund Transfers, *EFT and the Public Interest* 15–17 (1977). When those rules were finalized in 1989 into UCC Article 4A, they were swiftly incorporated into "federal law." 12 C.F.R. § 210.25(a) (2022). The Federal Reserve Board, (which Congress authorized to implement both EFTA through Regulation E, and the rules "govern[ing] funds transfers through the Fedwire Funds Service" through Regulation J), amended Regulation J to "incorporate[] the provisions of Article 4A." *Id.* § 210.25(a)–(b).

14

Through Regulation J, the Federal Reserve specified exactly how the two frameworks governing consumer (EFTA) and commercial (Article 4A) transactions would work together. Whether a particular part of a transaction is governed by Article 4A or EFTA can have a material impact on the involved parties. As a consumer protection statute, EFTA has far stricter protections than Article 4A, which was intended to provide liability rules for more sophisticated commercial actors. Where Article 4A's framework applies, consumers face considerable liability for unauthorized transfers, while EFTA places the burden on financial institutions to prove consumer liability. For example, unlike EFTA's cap on consumer losses for unauthorized transfers, Article 4A holds a consumer liable for the full amount of an unauthorized transfer if the parties agreed to a "commercially reasonable" security procedure that was utilized in good faith by the bank. *See* 12 C.F.R. pt. 210, app. A § 4A-202(b).[3]

Faced with determining how electronic transactions that included wire transfers would be governed, the Board rejected the banking industry's view that Article 4A would govern the entire transaction. The Board explained that this view would risk "subjecting consumers to full liability for unauthorized transfers merely

---

[3] NCLC, *Consumer Banking and Payments Law* §§ 7.7.4–7.7.5, https://perma.cc/RZ5P-V3HG (explaining that under EFTA a consumer has $0 liability for the first unauthorized transfer, and liability for subsequent transfers is capped at $50).

because some part of the transfer, which would ordinarily be covered by [EFTA], is made via Fedwire." Electronic Fund Transfers, 61 Fed. Reg. 19678, 19679–80 (May 2, 1996). Instead, the Board guaranteed that any part of a transaction that was covered by EFTA's text remained covered by EFTA's framework, not Article 4A's. To that end, Regulation J applied Article 4A to a "funds transfer any part of which is carried out through the Fedwire Funds Service," but made explicit that "in the event of an inconsistency between" Article 4 and EFTA, EFTA "shall prevail." 12 C.F.R. § 210.25(b). Article 4A therefore only applies to "any part of" a funds transfers which is not covered by EFTA. *See id.*

One complication remained. As the Board recognized, the UCC "states that Article 4A does not apply to a funds transfer if any part of the transfer is governed by the EFT Act." Funds Transfers Through Fedwire, 55 Fed. Reg. 40791, 40798–99 (Oct. 5, 1990). So, without further regulation, any bank-to-bank wire transfer that was part of a transaction that also included an EFTA-covered electronic fund transfer would not be covered by Article 4A (nor would it be covered by EFTA because of the exclusion in Section (7)(B)). To prevent such a loophole in coverage over a bank-to-bank wire transfer, the Board extended the rules of Article 4 to have a "broader" "scope" than anticipated by the UCC. 55 Fed. Reg. at 40798–99. In incorporating Section 4A into federal law, Regulation J states that the rules of Article 4A "govern[] a funds transfer that is sent through the Fedwire Funds

16

Service … even though a portion of the funds transfer is governed by the Electronic Fund Transfer Act." 12 C.F.R. § 210.25(b)(3).

Regulation J therefore anticipated the exact situation presented in this case, and recognized that EFTA can apply to an electronic fund transfer preceding a wire transfer. It explains that, when consumers make a transaction "through Fedwire," there could be "a portion of the funds transfer [that] is governed by [EFTA]," although "Article 4A as incorporated therein [applies] with respect to the Fedwire portion of the transfer." 55 Fed. Reg. at 40793–99; *see* 12 C.F.R. § 210.25(b). As an example of this "dual coverage," the Board opined in 1996 that "if an institution offers consumers the ability to initiate Fedwire transfers pursuant to a telephone transfer agreement"—a method of initiating fund transfers that generally falls under EFTA—"the transfer could be covered by both [EFTA] and Article 4A." 61 Fed. Reg. at 19680.

The Federal Reserve then provided a similar explanation of how EFTA's coverage applies to transactions that are in part sent over a wire service in Regulation E, the implementing regulation for EFTA. Regulation E's commentary clarifies that when "fund transfers through Fedwire" are sent, it is possible to have a "portion of the fund transfer [that] is governed by the EFTA." 12 C.F.R. pt. 1005, supp. I, cmt. 3(c)(3)(2). And the Consumer Financial Protection Bureau did not modify that

understanding when it was given the authority for administering, interpreting, and enforcing EFTA in 2010. *See* 12 C.F.R. §§ 1005.1–1005.20.

In fact, earlier in this litigation, the CFPB filed a statement of interest confirming that it continued to share the view the Federal Reserve had stated for over "three decades of regulatory history." CFPB Statement of Interest, ECF 28-1 at 1. As the CFPB summarized: "[W]hen a transaction that otherwise qualifies as an 'electronic fund transfer' includes a fund transfer by wire, only the wire portion of the transfer is excluded from EFTA and Regulation E coverage. The remaining electronic fund transfer is subject to EFTA and Regulation E." *Id.*

Although following the presidential administration change in 2025, the CFPB systematically withdrew its statements of interest from various cases nationwide, the CFPB did not "flip" its view in this case. *Contra* Br. for Appellant at 56. The CFPB did not provide any substantive disagreement with its prior legal conclusion, rather it explained the withdrawal was based on procedural concerns about administrative rulemaking. CFPB Mot. to Withdraw, ECF 69 at 2. The fact that the CFPB withdrew its statement pursuant to a new administration's directive on how the CFPB should express its views does not undercut the almost four decades of regulatory statements reading EFTA exactly as New York does.

18

**C.** Ignoring the extensive regulatory record, the bank's amici cherry-pick a few lines of commentary to support their position. These stray comments cannot override the plain text of Section (7)(B) or the supporting regulatory record.

The amici start (at 16) by isolating a line of Regulation J's commentary stating that "Fedwire funds transfers *to or from consumer accounts* are exempt from the Electronic Fund Transfer Act and Regulation E." Amici at 16 (quoting 12 C.F.R. pt. 210, subpt. B, app. A, cmt. 210.25(b)(4)). They assert that the Board "cannot have meant anything other than that an end-to-end wire transfer is entirely exempt from EFTA." *Id.* But, in context, that is not what the commentary says. The very next line of the commentary (which the amici leave out) makes clear that the Federal Reserve only understands the bank-to-bank portion of a transfer over Fedwire, and not any preceding electronic fund transfer, to be exempt from EFTA. As the Board explained: "A funds transfer from a consumer originator … could be carried out in part through the Fedwire Funds Service and in part through a … means that is subject to the EFTA," in which case that "portion of the funds transfer [] is governed by EFTA." 12 C.F.R. pt. 210, subpt. B, app. A, cmt. 210.25(b)(4).

And if there were any doubt about the meaning of one line of Regulation J's commentary, the language of the regulation itself makes clear that an electronic fund transfer that initiates a wire transfer is covered by EFTA. *See supra* Part II.B (discussing 12 C.F.R. § 210.25(b)).

The amici then quote (at 15–16) a few secondary sources from the 1990s to support the proposition that "EFTA did not cover consumer wire transfers." But those sources do not address the specific issue here: whether EFTA applies to an electronic fund transfer that immediately precedes a bank-to-bank wire transfer. And the fact that the sources broadly refer to a "*consumer* transaction sent through a wire service system," without specifying whether they are also referencing an initiating electronic fund transfer, is likely just reflective of their era. *See* Amici at 15. Since the use of electronic fund transfers to initiate consumer wire transfers didn't catch on until relatively recently, *see supra* Part II.A, it makes sense that the sources would not have discussed those types of transfers.

Finally, the bank's amici misconstrue statements from the National Consumer Law Center and its advocates in an attempt to find support for its view. The amici cite (at 18–19) congressional testimony from a few years ago that, the amici assert, shows consumer advocates' "understanding" that "wire transfers are exempted from the EFTA." These statements do not support the bank's view. They only reflect what the text of EFTA's exemption states, that a bank-to-bank wire transfer is exempted. *Fraud in Focus: Exposing Financial Threats to American Families: Hearing Before the Oversight & Investigations Subcomm. of the H. Fin. Servs. Comm.*, 119th Cong. 24–26 (2025) (testimony of Carla Sanchez-Adams). In fact, the testimony argues for "interpret[ing]" the bank-to-bank wire transfer "exemption" "narrowly" in the specific way that New

20

York is advancing. *Id.* at 26; *Examining Scams and Fraud in the Banking System and Their Impact on Consumers: Hearing Before the S. Comm. on Banking, Hous., & Urb. Affs.*, 118th Cong. 21 (2024) (testimony of Carla Sanchez-Adams).

## III. Contrary to the bank's amici's assertions, consumers should not be left vulnerable to having their life savings stolen through fraudulent transfers.

**A.** Citibank's refusal to apply EFTA's protections to fraudulent electronic fund transfers preceding a wire transfer has left consumers vulnerable to having their life savings stolen. Although cybercriminals use sophisticated technologies to hack into consumers' accounts and initiate unauthorized payment orders, Citibank has not implemented security protocols sufficient to protect consumers because Citibank asserts it is not liable for those unauthorized electronic fund transfers. Yet the court should ensure that EFTA functions to protect consumers as Congress intended. The court should therefore enforce EFTA's coverage of electronic transfers that precede a wire transfer because it is what the plain text demands and because doing so is necessary to protect consumers from the financial ruin caused by unauthorized transfers.

One way in which criminals are increasingly perpetuating bank fraud is through a personal data breach. FBI, *Internet Crime Report 2024*, at 31. Consumer C's experience, as detailed in the complaint, is all too typical. In December 2021, a security breach with a mortgage servicing firm caused Consumer C's personal

21

information to be compromised. JA-47. Three months later, a scammer used data from that breach to send Citibank an electronic payment order from Consumer C's account requesting a wire transfer of nearly $38,000. *Id.* Citibank then executed the electronic fund transfer, but Consumer C did not even become aware that his data was compromised in this breach until after his accounts were emptied. *Id.* Nevertheless, Citi denied his fraud claim on the grounds that he did not take steps to protect his account information, which "allow[ed] the transaction(s) in question to take place." *Id.*

Another concerning trend is the use of misrepresentative advertisements on search engines, where cybercriminals pose as legitimate businesses, to hack into consumers' accounts and initiate unauthorized payment orders. Carter Pape, *Banks Face New Risks as Account Takeover Fraud Spikes 250%*, Am. Banker (Dec. 8, 2025). Pretending to be tech support companies, cybercriminals ask consumers to download remote access software that secretly mines personal information and passwords. These tech support scams caused older adults to lose $982 million in 2024. FBI, *Internet Crime Report 2024*, at 29.

David Welles, a retired lawyer, was one such victim. Sara Siegel Bernard, *Tech Support Scammers Stole $85,000 From Him. His Bank Declined to Refund Him.*, N.Y. Times (Dec. 12, 2025), https://perma.cc/L345-F7GJ. He used Google to find a tech support number for Microsoft, but instead was connected with cybercriminals who told him

22

to download remote access software to fix his issue with Microsoft. *Id.* The criminals then kept Mr. Welles on the phone for hours while using the software "to burrow deep inside" his computer and retrieve his banking passwords from his hard drive. *Id.* Mr. Welles suspected a scam and that same evening contacted Citibank to put his accounts on hold. *Id.* Citibank, however, failed to flag anything unusual—despite the fact that the criminals had already taken over his account and sent an electronic payment order of $85,000 to Citi to initiate a wire transfer. *Id.* Citibank nevertheless denied Welles's subsequent fraud claim because the transfer had been initiated with his online credentials. *Id.*

Some criminals go an extra step and actually steal consumers' mobile phones' subscriber identity modules, or SIMs, and then contact mobile providers to activate new phones with consumers' stolen SIMs. JA-18. Once in control of all the data on a consumer's cell phone, scammers can reset mobile banking applications using text message authentication. JA-18–19. Consumer G was victimized by one of these "SIM swaps," when he was sent a text message that purported to be from Citi that asked him to click a link to review recent activity. JA-53. That single click deprived Consumer G of access to his phone and instead gave the scammer access to his SIM. Within a few hours the scammer activated a new phone with the stolen SIM, got into his Citibank account, and electronically sent payment orders to Citi requesting a

23

wire transfer. JA-53–54. Citi executed two payment orders totaling $102,000, emptying almost the entirety of Consumer G's checking account. *Id.*

Realizing the scam, Consumer G went to his mobile carrier's store and obtained a letter carrier confirming the "SIM swap." JA-55. But when he submitted his fraud claim to Citibank, Citi denied the claim. JA-56. Even after New York got involved, Citibank still refused to reimburse the majority of what was stolen. JA-56.

Sadly, these examples are just the tip of the iceberg. *See* JA-41–63. Citibank's disregard of its statutory requirements under EFTA to protect consumers from fraudulent electronic fund transfers that preceded a wire transfer has left Citi's consumers without any recourse. But Congress enacted EFTA to protect consumers from such unauthorized electronic fund transfers.

**B.** With the plain text of the statute and governing regulations cutting against the bank's position, its amici advance (at 19–27) their own policy argument. They suggest that this Court should reject the plain text reading because the "likely result" would hurt consumers. But as detailed above, we already know the result of adopting the bank's view: criminals can steal consumers' life savings through wire transfers and consumers will be left with no recourse. *See supra* Part III.A. The bank's amici nevertheless warn that putting the liability on banks will lead banks to implement more security measures that will make sending wire transfers harder and less convenient. *See* Amici at 26. But if banks decide more security measures are necessary

24

to prevent fraud, even if that makes wire transfers less convenient, that would be exactly what Congress intended.

Congress made the policy choice that banks should bear the liability for unauthorized transfers because they are best able to implement the security measures necessary to prevent them. *See* H.R. Rep. No. 95-1315, at 10–11 (explaining Congress's choice not to adopt "a negligence standard" and instead have banks "bear liability"); S. Rep. No. 95-915, at 6 (1978) (similar). If the amici are right that the current way banks "[p]rocess[]" electronic fund transfers that are connected to a wire transfer carries too much "risk to financial institutions" for courts to impose liability, the current system is certainly too risky for consumers. Amici at 25. Consumers are far less able to withstand the financial cost of unauthorized transfers, and they can do little to add security measures to their accounts to prevent unauthorized wire transfers. Congress was therefore wise to put the liability on banks to incentivize them to change the current "process" to add necessary security measures.

And we know banks can implement sufficient security to protect themselves from liability because they comply with EFTA for electronic transfers that don't precede a wire transfer. Moreover, the considerable number of banking opportunities that consumers have and competition between banks will help ensure that banks implement innovative fraud protections without unnecessarily inconveniencing a consumer. Finally, complying with EFTA will not even require

25

banks to change their procedures for most wire transfers. EFTA only applies to consumer, not commercial transfers. And EFTA does not apply to a wire transfer initiated in person, so large wire transfers made in person could still be processed without additional limitations.

**C.** The bank's amici makes one more attempt to assert that the practical benefit of New York's position is outweighed by other policy considerations. Although it is hard to imagine what policy considerations would outweigh protecting vulnerable consumers' life savings, the amici's assertion (at 19) that New York's reading would "threaten[] uncertainty and instability for wire transfers" has no basis. According to the amici, upholding the decision below would take "consumer wire transfers out of the Article 4A framework" because the UCC states that Article 4A "does not apply to a funds transfer any part of which is governed by [EFTA]." Amici at 19–20. But, as detailed above, by incorporating Article 4A into federal law, the Federal Reserve applied Article 4A more expansively than the UCC. *See supra* Part II.B. Regulation J is explicit that the rules of Article 4A "govern[] a funds transfer that is sent through the Fedwire Funds Service" "even though a portion of the funds transfer is governed by the Electronic Fund Transfer Act." 12 C.F.R. § 210.25(b)(3). Applying EFTA to an electronic transfer that initiates a FedWire transfer will not take consumer FedWire transfers "out of the Article 4A framework." *Contra* Amici at 20.

Falling back, the amici argue that regardless of how Regulation J governs Fedwire transfers, New York's reading would still upend the governing structure for the CHIPS network, a private wire-transfer service. But state and private contract law ensures that the bank-to-bank portion of a CHIPS transfer is covered by Article 4A—in just the same way that Regulation J ensures that Article 4A still governs Fedwire transfers.

UCC Article 4A applies to wire transfers over the CHIPs network because states have enacted it in their state laws. In doing so, New York also adopted the UCC's official comment. That comment instructs courts that despite the language of the UCC stating that "Article 4A does not apply to any part of [a] transfer" that EFTA also applies to, courts can "apply appropriate principles from Article 4A by analogy" to "the part of the funds transfer that is not subject to EFTA." N.Y. U.C.C. Law § 4-A-108 off. cmt. State law therefore permits the Article 4A framework to be applied just as Regulation J does: to cover a bank-to-bank portion of a wire transfer even if part of the transaction is covered by EFTA.

Moreover, as the bank's amici admit (at 22), "the CHIPS network can bind its own participants by agreement to rules that mimic Article 4A." The amici nevertheless argue that the CHIPS network is unable to ensure Article 4A applies to its wire transfers because CHIPS cannot contractually bind "nonparticipant banks, originators, and beneficiaries." *Id.* But they offer no explanation for why

27

nonparticipant banks and parties that are not on either end of the bank-to-bank wire transfer would need to be contractually bound for CHIPS to effectively apply Article 4A. If an electronic fund transfer precedes a wire transfer, the electronic fund transfer is covered by EFTA, so only the actual bank-to-bank wire transfer would need to be covered by Article 4A. And since the two banks on either end of the wire transfer would be participants in the transfer, as the amici admit, that portion of the transaction can be covered by Article 4A. On the other hand, if a wire transfer is made without an ancillary electronic fund transfer, then the entire transaction would already be covered by Article 4A.[4]

At bottom, it's not just that these policy concerns are speculative; it's that they don't outweigh the very concrete harm that vulnerable consumers are currently facing under the bank's reading of EFTA—which affords them no recourse if their life savings are stolen through a wire transfer.

## CONCLUSION

For the foregoing reasons, the decision below should be affirmed.

Respectfully submitted,

---

[4] Nor is it uncommon for different portions of a transaction to be governed by different sets of rules. *See, e.g.*, 12 CFR § 210.40(b)(4) (noting that a "funds transfer that is sent through the FedNow Service" can have "a portion of the funds transfer [that] is governed by the Electronic Fund Transfer Act"). In fact, ACH transactions are covered by EFTA and also by Nacha's operating rules. *See* 15 U.S.C. § 1693a(7); NCLC, *Consumer Banking and Payments Law* § 1.3.3, https://perma.cc/7VU9-BZQH.

/s/ Matthew W.H. Wessler
MATTHEW W.H. WESSLER
JESSICA GARLAND
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

CARLA SANCHEZ-ADAMS
NATIONAL CONSUMER LAW CENTER
1001 Connecticut Avenue, NW
Suite 510
Washington, DC 20036
(202) 452-6252
*csanchezadams@nclc.org*

January 16, 2026

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 29.1(c) because this brief contains 6614 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

January 16, 2026

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the ACMS system. All participants are registered ACMS users and will be served by the ACMS system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler