# 25-2105

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

◆◆◆

THE PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES,
ATTORNEY GENERAL OF THE STATE OF NEW YORK

*Plaintiff-Appellee,*

–v.–

CITIBANK, N.A.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:24-cv-659-JPO) (Hon. J. Paul Oetken)

## RESPONSE AND REPLY BRIEF
## FOR APPELLANT-CROSS-APPELLEE

| | |
|---|---|
| Charles Michael<br>STEPTOE LLP<br>1114 Avenue of the Americas<br>New York, NY 10036<br>(212) 506-3900 | Jeffrey B. Wall<br>Morgan L. Ratner<br>Rishabh Bhandari<br>SULLIVAN & CROMWELL LLP<br>1700 New York Avenue, N.W.<br>Washington, DC 20006<br>(202) 956-7500 |
| Julia B. Strickland<br>STEPTOE LLP<br>2029 Century Park East<br>Suite 980<br>Los Angeles, CA 90067<br>(213) 439-9400 | Miles H. Greene<br>SULLIVAN & CROMWELL LLP<br>125 Broad Street<br>New York, NY 10004<br>(212) 558-4000 |

*Counsel for Appellant-Cross-Appellee*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

ARGUMENT ..............................................................................................6

I.  EFTA DOES NOT COVER ELECTRONICALLY INITIATED CONSUMER WIRE TRANSFERS...........................................................6

    A.  The NYAG Misconstrues EFTA's Text ...........................................7

        1.  The ordinary and specialized meaning of "transfer of funds" controls .....................................................................7

        2.  The statute's reference to "transactions" does not change that result ...................................................................13

        3.  The NYAG's interpretation creates multiple superfluities.....................................................................18

        4.  The NYAG's interpretation creates significant irregularities for ACH transfers...........................................22

    B.  EFTA's History And Context Track Its Plain Text ......................25

    C.  The NYAG's Appeals To Policy Fail...............................................29

II.  EFTA DOES NOT COVER INTRABANK TRANSFERS .................34

    A.  Intrabank Transfers Do Not Meet EFTA's Definition Of Unauthorized Electronic Fund Transfers .....................................35

    B.  Even If Intrabank Transfers Are "Unauthorized," They Result In No Recoverable Damages Here...........................39

III.  THE NYAG'S PROPOSED CROSS-APPEAL CLAIM FAILS..........45

    A.  The Court Should Decline To Hear The NYAG's Proposed Cross-Appeal ...................................................................46

i

B.    Alternatively, The Court Should Affirm The District Court's Dismissal Of The NYAG's SHIELD Act Claim ............................49

    1.    FCRA's text, structure, and purpose establish a broad preemptive scope ..........................................................49

    2.    The NYAG's SHIELD Act claim is preempted ..................55

CONCLUSION ..................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski* v. *United States*,
514 U.S. 169 (2014) ..........................................................................9

*Aikens* v. *Portfolio Recovery Assocs.*,
716 Fed. Appx. 37 (2d Cir. 2017) ..............................................36, 44

*Bacher for Bacher* v. *Boehringer Ingelheim Pharms.*,
110 F.4th 95 (2d Cir. 2024) ............................................................10

*Becker* v. *Genesis Fin. Servs.*,
2007 WL 4190473 (E.D. Wash. Nov. 21, 2007) ........................... 36-37

*Bodley* v. *Clark*,
2012 WL 3042175 (S.D.N.Y. July 23, 2012) ...................................29

*Buono* v. *Tyco Fire Prods., LP*,
78 F.4th 490 (2d Cir. 2023) ............................................................62

*Clubside, Inc.* v. *Valentin*,
468 F.3d 144 (2d Cir. 2006) ...........................................................47

*Council for Responsible Nutrition* v. *James*,
159 F.4th 155 (2d Cir. 2025) ..........................................................63

*Day* v. *First National Fin. Corp.*,
2026 WL 413308 (E.D. Ky. Feb. 13, 2026) ............................... 41-44

*Degtiarova* v. *JPMorgan Chase Bank N.A.*,
2026 WL 482300 (D. Colo. Feb. 20, 2026) ......................................29

*Doe* v. *Columbia Univ.*,
831 F.3d 46 (2d Cir. 2016) .............................................................42

*Doe* v. *Trump Corp.*,
6 F.4th 400 (2d Cir. 2021) ..............................................................59

*El Paso Nat. Gas Co.* v. *Neztsosie*,
526 U.S. 473 (1999).................................................................47

*Farricielli* v. *Holbrook*,
215 F.3d 241 (2d Cir. 2000) ...............................................64

*FCC* v. *AT&T Inc.*,
562 U.S. 397 (2011)...................................................................9

*Fischer & Mandell LLP* v. *Citibank, N.A.*,
2009 WL 1767621 (S.D.N.Y. June 22, 2009)....................29

*Galper* v. *JP Morgan Chase Bank, N.A.*,
802 F.3d 437 (2d Cir. 2015) ....................................*passim*

*Garland* v. *Cargill*,
602 U.S. 406 (2024)................................................................30

*Greenlaw* v. *United States*,
554 U.S. 237 (2008)................................................................47

*Hakala* v. *Deutsche Bank AG*,
343 F.3d 111 (2d Cir. 2003) ...............................................18

*In re Johns-Manville Corp.*,
476 F.3d 118 (2d Cir. 2007) ......................................... 47-48

*Loper Bright Enters.* v. *Raimondo*,
603 U.S. 369 (2024)................................................................26

*Lorillard Tobacco Co.* v. *Reilly*,
533 U.S. 525 (2001)................................................................52

*Loughrin* v. *United States*,
573 U.S. 351 (2014)................................................................12

*Luna Perez* v. *Sturgis Pub. Schools*,
598 U.S. 142 (2023)................................................................32

*Lynch* v. *Turrish*,
247 U.S. 226 (1918)................................................................14

iv

*Macpherson* v. *JPMorgan Chase Bank, N.A.*,
665 F.3d 45 (2d Cir. 2011) ..............................................................52, 62

*Maslenjak* v. *United States*,
582 U.S. 335 (2017)........................................................................12

*Nazimuddin* v. *Wells Fargo Bank, N.A.*,
2025 WL 33471 (5th Cir. Jan 6, 2025)............................................29

*Park* v. *Webloyalty.com, Inc.*,
685 Fed. Appx. 589 (9th Cir. 2017)................................................38

*Pierce Cnty., Wash.* v. *Guillen*,
537 U.S. 129 (2003)................................................................ 21-22

*Puerto Rico* v. *Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016).......................................................................62

*Pulse Network, L.L.C.* v. *Visa, Inc.*,
30 F.4th 480 (5th Cir. 2022) ............................................................9

*Pulsifer* v. *United States*,
601 U.S. 124 (2024)........................................................................14

*Pyett* v. *Pennsylvania Bldg. Co.*,
498 F.3d 88 (2d Cir. 2007) .............................................................37

*Rangolan* v. *County of Nassau*,
370 F.3d 239 (2d Cir. 2004) ...........................................................47

*Reese* v. *BP Expl. (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011)..........................................................48

*Reiter* v. *Sonotone Corp.*,
442 U.S. 330 (1979)........................................................................30

*Rodriguez* v. *United States*,
480 U.S. 522 (1987)........................................................................32

*Roth* v. *King*,
449 F.3d 1272 (D.C. Cir. 2006)................................................ 48-49

*Sanchez* v. *Navy Fed. Credit Union,*
2023 WL 6370235 (C.D. Cal. Aug. 14, 2023) ...............................................39

*Sebelius* v. *Auburn Reg'l Med. Ctr.,*
568 U.S. 145 (2013)........................................................................................17

*Sikes* v. *Teleline, Inc.,*
281 F.3d 1350 (11th Cir. 2002)......................................................................48

*Southwest Airlines Co.* v. *Saxon,*
596 U.S. 450 (2022)........................................................................................14

*Spokeo, Inc.* v. *Robins,*
578 U.S. 330 (2016)........................................................................................44

*Texport Oil Co.* v. *M/V AMOLYNTOS,*
11 F.3d 361 (2d Cir. 1993) .............................................................................48

*Town of Southold* v. *Wheeler,*
48 F.4th 67 (2d Cir. 2022)..............................................................................59

*Tranello* v. *Frey,*
962 F.2d 244 (2d Cir. 1992) ...........................................................................47

*United States* v. *An Antique Platter of Gold,*
184 F.3d 131 (2d Cir. 1999) ...........................................................................13

*United States* v. *Bedi,*
15 F.4th 222 (2d Cir. 2021)..............................................................................8

*United Tel. Workers, AFL-CIO* v. *FCC,*
436 F.2d 920 (D.C. Cir. 1970).........................................................................21

*Vitalis* v. *cPort Credit Union,*
2026 WL 207156 (D. Me. Jan. 27, 2026)............................................. 40-41, 44

*Wike* v. *Vertrue, Inc.,*
566 F.3d 590 (6th Cir. 2009).........................................................................40

*Woods* v. *Interstate Realty Co.,*
337 U.S. 535 (1949)........................................................................................37

vi

*Wos* v. *E.M.A. ex rel. Johnson*,
  568 U.S. 627 (2013) ..................................................................60

*Wright* v. *Citizen's Bank of E. Tenn.*,
  640 Fed. Appx. 401 (6th Cir. 2016) ........................................29

*Wright* v. *Ernst & Young LLP*,
  152 F.3d 169 (2d Cir. 1998) .....................................................42

**Statutes**

15 U.S.C. § 1681a ........................................................................56

15 U.S.C. § 1681m .................................................................*passim*

15 U.S.C. § 1681s ........................................................................60

15 U.S.C. § 1681t ..................................................................*passim*

15 U.S.C. § 1693a(2) ...................................................................19

15 U.S.C. § 1693a(7) .............................................................*passim*

15 U.S.C. § 1693a(12) ...........................................................*passim*

15 U.S.C. § 1693b ........................................................................15

15 U.S.C. § 1693f ........................................................................39

15 U.S.C. § 1693g ..........................................................33, 39, 43

15 U.S.C. § 1693m .......................................................................39

15 U.S.C. § 1693*o*-1 ....................................................................11

Consumer Credit Reporting Reform Act,
  Pub. L. No. 104-208, 110 Stat. 3009 (1996) ...................... 53-54

Fair and Accurate Credit Transactions Act,
  Pub. L. No. 108-159, 117 Stat. 1952 (2003) ..........................54

N.Y. U.C.C. § 4-A-202 .................................................................31

N.Y. U.C.C. § 4-A-204 ........................................................................31

N.Y. U.C.C. § 4-A-303 ........................................................................31

N.Y. U.C.C. § 4-A-305 ........................................................................31

**Regulatory Materials**

12 C.F.R. pt. 1005, supp. I..........................................................19, 27

12 C.F.R. § 41.90 ................................................................................51

12 C.F.R. § 1005.3 ........................................................................16, 27

16 C.F.R. pt. 681, Appx. A ...........................................................56, 58

16 C.F.R. § 681.1 .......................................................................... *passim*

12 C.F.R. § 1022.3 ........................................................................51, 56

41 Fed. Reg. 3,097 (Jan. 21, 1976).....................................................15

44 Fed. Reg. 18,468 (Mar. 28, 1979).............................................16, 27

46 Fed. Reg. 46,876 (Sept. 23, 1981) ............................................21, 28

55 Fed. Reg. 40,791 (Oct. 5, 1990) .....................................................28

77 Fed. Reg. 6,194 (Feb. 7, 2012) .............................................6, 22, 30

**Other Authorities**

124 Cong. Rec. S11756 (July 25, 1978)...............................................25

A. Scalia & B. Garner, *Reading Law:*
*The Interpretation of Legal Texts* (2012) .....................................15

Black's Law Dictionary (4th ed. 1951)................................................37

CFPB, *Electronic Fund Transfers*
*(Regulation E); Amendments* (July 1, 2021) ...............................27

Fed. R. App. P. 5................................................................................46

Federal Reserve Bank of Boston, *Communities and Banking* (1999) ................................................................27

Federal Reserve Bank of Dallas, Circular No. 79-179, *Regulation E: EFT Proposed and Final Amendments* (Nov. 2, 1979).........................36

Federal Reserve Board, *Minutes and Recommendations of the Federal Advisory Council* (Feb. 1, 2002) .....................................27

Federal Reserve History, *Automated Clearing House Payments* (Sept. 28, 2023) .............................................................24

H.R. Rep. No. 108-263 (2003) .................................................55

*Home Banking by Computer*, N.Y. Times, Mar. 29, 1983 ...............................21

Kevin V. Tu, *Regulating the New Cashless World*, 65 Ala. L. Rev. 77 (2013) .........................................................26

*Matter of Investigation of GEICO*, Assurance No. 24-082 (Nov. 21, 2024) ..........................................63

S. Rep. No. 95-915 (1978) .....................................................6, 15, 33, 36

S. Rep. No. 95-1273 (1978) ...................................................25

S. Rep. No. 104-185 (1995) ...................................................54

S. Rep. No. 108-166 (2003) ...................................................54

Webster's New Collegiate Dictionary (1977) ......................................14

Webster's Third New International Dictionary (1961) ...............................10

ix

## INTRODUCTION

In the NYAG's telling, if EFTA does not apply, then banks will make no effort to prevent consumer fraud and consumers will be left unprotected. None of that is true, and it has not been true for the nearly half-century that EFTA has been in place and has uniformly been understood to exclude consumer wire transfers. Regulated parties, consumer-protection groups, federal regulators, the federal courts, and Congress have recognized for decades that such transfers are regulated under Article 4A of the Uniform Commercial Code, which provides robust protections that include the requirement that banks maintain commercially reasonable security procedures to protect consumers from unauthorized wire transfers. Thus, the operative question is not whether consumer wire transfers will be regulated at all, but whether they are regulated under Article 4A's reasonableness standards or EFTA's strict-liability regime.

The text, structure, and history of EFTA provide a clear answer. When Congress enacted EFTA in 1978, it required banks to insure virtually all losses for a variety of novel, small-dollar electronic transfers. But it enacted Section 7(B) to exempt consumer wire transfers. It did so because wire transfers were different: they were much larger, they were already well

established and understood, and they had long been (and soon would further be) subject to a slate of other federal and state regulations. Shortly thereafter, the States met Congress's expectations by enacting Article 4A to comprehensively govern banks' and customers' rights and liabilities with respect to wire transfers.

The NYAG seeks to nullify Section 7(B)'s wire-transfer exemption by arguing that a consumer wire transfer is not actually a single electronic fund transfer, but at least three separate ones, and that Section 7(B) excludes only the bank-to-bank component. That creative theory does not work under EFTA's plain text. Most importantly, it is contrary to both the ordinary and the technical meaning of the key statutory language, "transfer of funds." The NYAG's newfound reliance on a distinction between the term "transfer" and "transaction" fares no better: EFTA, its implementing regulations, and even the NYAG use the terms "transfer of funds" and "transaction" interchangeably.

The NYAG's novel theory also would layer superfluity on superfluity. It would render Section 7(B) meaningless because the one thing that the exemption would cover under the NYAG's construction—the bank-to-bank component of a consumer wire transfer—is not covered by EFTA in the first

2

place. The NYAG still fails to come up with even a single hypothetical that would give Section 7(B) any work to do. Nor does the NYAG offer any explanation for Congress's handiwork in the 2010 Dodd-Frank Act. If EFTA has always covered the consumer-to-bank component of all consumer wire transfers, as the NYAG posits, then Congress had no need to apply *some* of EFTA's protections to *one kind* of consumer wire transfer.

On top of all that, the NYAG fails to explain away decades of regulatory guidance, case law, and industry practice reflecting the uniform understanding that Section 7(B) exempts consumer wire transfers, in their entirety, from EFTA's scope. The NYAG argues that recent changes in banking technologies justify disregarding prior regulatory guidance, but the basic mechanics of consumer wire transfers have not materially changed. The NYAG also downplays the case law by contending that no prior litigant has advanced the same novel theory, but that only highlights how radically the NYAG has departed from the statute's ordinary meaning. Nothing in EFTA compels the sea change that the NYAG asks for here, and this Court should decline the NYAG's invitation to erase a longstanding, critical statutory exemption.

3

The NYAG's intrabank claim fails, too. The NYAG's assertion that intrabank transfers—*i.e.*, where money is moved between a consumer's own accounts—constitute "unauthorized" fund transfers is likewise contrary to EFTA's text and structure. For a fund transfer to be "unauthorized" under EFTA, the consumer must receive no "benefit." The intrabank transfers at issue involve an obvious "benefit": the consumer, and not someone else, receives the entirety of the funds resulting from such a transfer. Regardless, even if the intrabank transfers alleged here were "unauthorized" within the meaning of EFTA, the NYAG's intrabank claim still must be dismissed. That is because the NYAG seeks damages only for the later, external wire transfers—which are themselves exempt. The NYAG admits that the intrabank transfers themselves cause no monetary loss to a consumer, and its complaint does not seek any such loss. It cannot shoehorn the losses from subsequent EFTA-*exempt* fund transfers into earlier intrabank transfers.

Finally, the NYAG's SHIELD Act claim fails. This Court need not reach that issue because the NYAG failed to file a timely (or even untimely) cross-petition, and offers no justification for that oversight. But if the Court exercises its discretion and addresses the question, the district court got it right. That court correctly held that the Fair Credit Reporting Act's express

4

preemptive provisions bar Count 5 of the NYAG's complaint, which alleges that Citibank violated New York's SHIELD Act by failing to develop and implement "safeguards" to protect consumers from financial fraud. JA15, 72-74, 321-327.

FCRA broadly preempts any state-imposed "requirement or prohibition . . . with respect to the conduct required by" the provisions of a federal regulation known as the Red Flags Rule. 15 U.S.C. § 1681t(b)(5)(F); *see id.* § 1681m(e). That regulation requires banks to develop, implement, and maintain a program designed to detect, prevent, mitigate, and respond to identity-theft-related fraud in connection with consumer bank accounts. 16 C.F.R. § 681.1(b)(3), (d)(1). The portions of the NYAG's complaint relating to its SHIELD Act claim rest on state-law requirements concerning precisely the same conduct regulated by the Red Flags Rule. Indeed, the NYAG pleaded a SHIELD Act claim that extensively overlapped with a (since abandoned) direct Red Flags Rule claim (Count 6). The district court thus correctly found that the NYAG's SHIELD Act claim is "entirely coextensive with the Red Flags Rule"—and FCRA preempts state laws for far less. JA327.

5

This Court should reverse the district court's denial of Citibank's motion to dismiss with respect to the EFTA claims. If the Court exercises its discretion to reach the NYAG's SHIELD Act claim, it should affirm.

## ARGUMENT

I. **EFTA DOES NOT COVER ELECTRONICALLY INITIATED CONSUMER WIRE TRANSFERS.**

Congress enacted EFTA in 1978 to target what was then a "new generation" of electronic payment technologies that consumers generally used for modest transactions. S. Rep. No. 95-915, at 2, 6 (1978). Congress exempted "consumer-initiated wire transfers," which had long been used to transfer large amounts of funds, 77 Fed. Reg. 6,194, 6,197, 6,213 (Feb. 7, 2012), and which were (or would be) comprehensively regulated by existing federal regulatory schemes and developing state legislation. In the NYAG's telling, that exemption was far narrower: it merely excluded one artificial portion of a wire transfer, which EFTA never covered anyway. That view of EFTA clashes with the plain text; renders an entire subsection and a later amendment superfluous; and departs from decades of legislative, regulatory, and judicial consensus.

6

### A. The NYAG Misconstrues EFTA's Text.

As Citibank has explained, Congress exempted the entirety of a consumer wire transfer. Opening Br. 29-59. Any other reading of Section 7(B) would contradict both the ordinary and technical meaning of "transfer of funds," and would render Section 7(B) entirely superfluous. The NYAG's late-breaking emphasis on another statutory term, "transaction," does not cure those problems, and introduces several of its own.

#### 1. The ordinary and specialized meaning of "transfer of funds" controls.

The NYAG recognizes (at 30-31) that the controlling question here is whether a "transfer of funds," as used in EFTA, refers to a complete transfer of funds from sender to recipient. If it does, then Section 7(B)'s exclusion carves out from EFTA's scope the entirety of a consumer wire transfer, including the consumer-to-bank segment. So the NYAG insists (at 31-32) that a "transfer of funds" refers to a much narrower unit of measurement: each so-called "subsidiary transfer[]," or "payment order," that is part of the overarching transfer of funds from one person to another. There are several problems with that approach.

a. For starters, the NYAG does not use the "ordinary meaning" of the phrase "transfer of funds," including at the time Congress enacted

7

EFTA. *United States* v. *Bedi*, 15 F.4th 222, 226 (2d Cir. 2021). The NYAG makes no effort to rebut Citibank's argument that the ordinary meaning of "transfer of funds" refers to the completed movement of money from the payor to the ultimate payee, rather than some constituent step along the way. *See* Opening Br. 31-32. For example, if Sue agrees to send a "transfer of funds" or "wire transfer" to make a down payment to purchase John's house, no one would reasonably mean (whether now or in 1978) that the "transfer of funds" *ends* when Sue's bank debits Sue's account. Instead, any ordinary speaker would use "transfer of funds" to refer to the overall movement of funds from Sue's bank account to John's.

Like the district court, the NYAG's only response (at 26) uses "transfer" in isolation. The NYAG (at 32-33) cites several dictionaries to support its argument that the term "transfer" refers to the constituent steps within a conveyance of funds rather than the "entire" conveyance of funds from sender to ultimate recipient. But that is wrong for at least three reasons. First, as Citibank has already pointed out, the phrase "transfer of funds" has a different ordinary meaning than some uses of "transfer" alone. *See* Opening Br. 44-45. As the Supreme Court has made clear, terms often assume "a more particular meaning" when understood together than when

8

"those words [are read] in isolation." *FCC* v. *AT&T Inc.*, 562 U.S. 397, 406 (2011). The NYAG offers no reason why this fundamental canon of statutory interpretation does not apply here.

Second, even if there are multiple available definitions of "transfer" in isolation, courts must give meaning to "relevant words . . . with reference to the statutory context." *Abramski* v. *United States*, 573 U.S. 169, 179 (2014). And EFTA repeatedly uses the word "transfer" in ways that target real-world "transfer[s] of funds" from senders to ultimate recipients. For instance, EFTA defines "electronic fund transfer" to include certain payment-transfer methods that involve multiple segments, such as an ACH or point-of-sale transfer. 15 U.S.C. § 1693a(7); *see* Opening Br. 36-37.[1] Section 7 likewise uses the phrase "transfer of funds" to begin with and include a consumer's "initiat[ing]" consumer-to-bank segment. *See* Opening Br. 37. Up and down, the statute makes clear that a "transfer of funds" is what ordinary people think it is: the movement of funds from the sender's account to the beneficiary's, not the sender's account to her transferring

---

[1] As the Fifth Circuit has explained, even a simple point-of-sale transfer at a coffee shop involves a multi-step, "invisible" process that begins with the consumer's "swipe (or tap)" of her debit card, proceeds with several component actions by the merchant's bank and the consumer's bank, and concludes with the shop's receiving the money. *Pulse Network, L.L.C.* v. *Visa, Inc.*, 30 F.4th 480, 484-485 (5th Cir. 2022).

9

bank's.   The NYAG does not address, let alone rebut, any of these confirmatory textual signals.

Third, even the NYAG's four dictionary definitions (at 32-33) do not support its artificially narrow construction of the term "transfer."  For one thing, each of these proffered definitions of "transfer" relates to the term's use as a verb, while Sections 7 and 7(B) use "transfer [of funds]" as a noun.  That difference matters because "similar words used as different parts of speech" may have "disparate" meanings.  *Bacher for Bacher* v. *Boehringer Ingelheim Pharms.*, 110 F.4th 95, 102 (2d Cir. 2024) (citation omitted); *see* Opening Br. 46-47.  Further, the more natural reading of "transfer," even as a standalone term, encompasses the end-to-end conveyance of an asset from one party to another (*i.e.*, from the sender to the recipient), not just a single step within that conveyance.  *See, e.g.*, Webster's Third New International Dictionary (1961) (defining "transfer" as "the conveyance of right, title, or interest in either real or personal property from one person to another by sale, gift, or other process").  Again, the NYAG skips over these issues.

b.     The specialized meaning of "transfer of funds" is the same as its ordinary one.  As Citibank explained, decades of technical regulatory usage before and after EFTA's enactment back up its plain-text arguments that

"transfer of funds" refers to the entire payment journey. *See* Opening Br. 32-35. The NYAG fails to engage meaningfully with any of these examples, much less offer its own counterexamples. The NYAG's primary response is that some—but not all—postdate EFTA's enactment. Br. 46-49. Fair enough, but the NYAG offers no reason to believe that the meaning of the phrase "transfer of funds" drifted between the time of EFTA's passage and those countless occasions where Congress, the States, federal regulators, and federal courts interpreted that phrase to cover an entire transfer of funds from start to finish.

Congress's 2010 Dodd-Frank amendment likewise shows that Congress understood the term "transfer of funds" to *include* the initial consumer-to-provider segment along with the subsequent steps that move the funds from sender to "designated recipient." *See* Opening Br. 43 (citing 15 U.S.C. § 1693*o*-1(g)). The NYAG tries (at 49) to downplay Congress's decision to provide an end-to-end definition for remittance transfers, claiming that the law provided protections that could "operate[] independently" from certain other provisions of EFTA. That response misses the point. Independent or not, Dodd-Frank offers further evidence that the accepted meaning of "transfer of funds"—as used by Congress, just

11

as by federal regulators—refers to the entire payment journey from sender to ultimate recipient.

c. Nevertheless, the NYAG contends that Congress must have used the term "transfer" in a narrow way here because of the qualifier "made by a [bank] on behalf of a consumer *by means of*" a wire-transfer "service." 15 U.S.C. § 1693a(7)(B) (emphasis added). In the NYAG's view, only the bank-to-bank segment of a fund transfer uses a covered service like Fedwire, and so only the bank-to-bank segment is excluded from EFTA's reach.

Not so. True, only the bank-to-bank segment is conducted over Fedwire. But it is still ordinary English to say that, in conducting that Fedwire component, the full "transfer of funds" on the consumer's behalf occurs *by means of* a wire-transfer "service." As the Supreme Court has explained on multiple occasions, the phrase "by means of" indicates that a "given result (the 'end') is achieved, *at least in part, through* the specified . . . method (the 'means')." *Loughrin* v. *United States*, 573 U.S. 351, 363 (2014) (emphasis added); *accord Maslenjak* v. *United States*, 582 U.S. 335, 348-349 (2017) ("by means of" entails a specified method "played a role" in achieving some end). This Court has similarly emphasized that the "ordinary meaning" of "by means of" is that a specified method is "an integral part of

12

the . . . process" to achieve an end—not that it is the *only* step in that process. *United States* v. *An Antique Platter of Gold*, 184 F.3d 131, 135-136 (2d Cir. 1999). Or to put it in more colloquial terms: if Jane commutes from Brooklyn to Central Park "by means of" the subway, all New Yorkers would understand that Jane's "commute" *includes* walking to a station, riding the subway, and walking to her ultimate destination on the other side.

Section 7(B)'s plain text is no different. It excludes from EFTA's reach any "transfer of funds" that is achieved, at least in part, "by means of" interbank movements of funds using a wire-transfer service like Fedwire. That covers the consumer wire transfers at issue here.

### 2. The statute's reference to "transactions" does not change that result.

For the first time on appeal, the NYAG switches focus to a different statutory term. It now contends (at 31-35) that Congress deliberately used the term "transaction" when it wanted to refer to an entire end-to-end method of payment, while it used the term "transfer" to single out a subpart of a transaction. Because Congress used both terms in EFTA, the NYAG invokes the presumption that Congress's use of "one term in one place and a materially different term in another" means that "the different term denotes

13

a different idea." *Southwest Airlines Co.* v. *Saxon*, 596 U.S. 450, 458 (2022) (citation omitted). But the meaningful-variation canon does not apply here.

First, the meaningful-variation canon "mostly applie[s] to terms with some heft and distinctiveness, whose use drafters are likely to keep track of and standardize." *Pulsifer* v. *United States*, 601 U.S. 124, 149 (2024). The canon plays no role, by contrast, if there is only "a shade of difference between the words" because it is implausible "that Congress made that shade a criterion of intention." *Lynch* v. *Turrish*, 247 U.S. 226, 230 (1918). The terms at issue here—"transfer" and "transaction"—are used interchangeably in colloquial and technical speech. The NYAG's own dictionary definitions of these terms (at 32-33) prove the point because they largely overlap. And to the extent there is any discernible difference, it is that a "transaction" may refer to any kind of deal, whereas a "transfer" more often refers to an exchange of funds or property.[2] But neither term is more narrowly focused on a piece of a deal, as the NYAG needs "transfer" to be for its argument to work.

---

[2] *Compare, e.g.*, Webster's New Collegiate Dictionary (1977) (defining "transaction" as "a business deal"), *with id.* (defining "transfer" as the "conveyance of right, title, or interest in real or personal property from one person to another").

Second, Section 1693a(7) treats these terms as interchangeable. That provision offers as examples of "transfer[s] of funds" both (1) a "point-of-sale *transfer[]*" and (2) an "[ATM] *transaction[].*" 15 U.S.C. § 1693a(7) (emphasis added). If a "transfer [of funds]" were narrower than a "transaction," as the NYAG maintains, then EFTA would not use them interchangeably—and it could not use one type of "transaction" as an example of a covered "transfer." Other parts of EFTA suggest the same equivalence. For instance, in defining the term "electronic fund transfer," Congress noted that the term "includes a *transaction*" involving a balance inquiry. 15 U.S.C. § 1693b(d)(3)(D)(ii) (emphasis added).

EFTA's legislative and regulatory history similarly undercuts the NYAG's meaningful-variation theory. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 388 (2012) (accepting the use of legislative history to show "that a particular word or phrase is capable of bearing a particular meaning"). The 1978 Senate Report expressly refers to the fund transfers covered by EFTA as "EFT *transactions.*" S. Rep. No. 95-915, at 3 (1978) (emphasis added). The Federal Reserve, which administered the statute for three decades, also toggled between the two terms when discussing relevant regulations. *See, e.g.,* 41 Fed. Reg. 3,097,

15

3,098 (Jan. 21, 1976) (referring to an "ACH transaction" as a "transfer[] of funds"); 44 Fed. Reg. 18,468, 18,477 (Mar. 28, 1979) (using "unauthorized [electronic fund transfer]" and "unauthorized transaction" synonymously when promulgating EFTA's implementing regulations).

Against all that evidence that EFTA uses "transaction" and "transfer" interchangeably, the NYAG relies on just two counterexamples (at 33-34): Section 7's exclusion of "transaction[s] originated by . . . paper instrument" and Section 7(C)'s exclusion of "transaction[s] the primary purpose of which is the purchase or sale of securities." But neither is actually a counterexample. Both are carveouts from EFTA's definition of the "transfer[s] of funds" it covers, and both show that Congress sometimes used the term "transaction" rather than "transfer" to identify an end-to-end conveyance of funds. But neither suggests that Congress used "transfer" to identify some lesser part. To the contrary, EFTA's implementing regulations swap "transaction" for "transfer of funds" in these very sections. *See* 12 C.F.R. § 1005.3(c)(1) (implementing Section 7 by excluding "[a]ny *transfer of funds* originated by . . . paper instrument"); *id.* § 1005.3(c)(4) (implementing Section 7(C) by excluding "[a]ny *transfer of funds* the primary purpose of which is the purchase or sale of a security").

16

The NYAG's own use of these terms in its papers further undermines its new meaningful-variation argument. In its complaint, the NYAG referred to the receipt of a "payment order" as a "transaction." JA37. Likewise, in its opposition brief below, the NYAG repeatedly referred to the isolated bank-to-bank component of a wire transfer as a "transaction." NYAG MTD Opp., ECF No. 25, at 3, 19. But here, the NYAG claims (at 26, 31-33) that a "transfer" refers to each discrete "payment order" or "subsidiary transfer[]" within a transaction, while only "transaction" refers to "the entire end-to-end transmission of funds." The NYAG's own inconsistency underscores that the NYAG, like Congress and the agencies entrusted with administering EFTA, has always understood these terms to be synonymous in this context.

Third, and in any event, even if the meaningful-variation canon applied here, that cannot overcome other indicia of statutory meaning. As the Supreme Court has repeatedly explained, the canon "is no more than a rule of thumb that can tip the scales when a statute could be read in multiple ways." *Sebelius* v. *Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156 (2013) (citation and alterations omitted). Thus, even if the meaningful-variation canon were in play, it could not "take precedence over [the] more convincing reasons" that Citibank has offered for why Section 7(B)'s exemption should be read to

17

cover the entirety of a consumer wire transfer. *Hakala* v. *Deutsche Bank AG*, 343 F.3d 111, 116 (2d Cir. 2003); *see supra* pp. 7-13, *infra* pp. 18-29.

### 3. The NYAG's interpretation creates multiple superfluities.

The NYAG's proposed interpretation would render the 53-word wire-transfer exemption superfluous. *See* Opening Br. 38-42. This is not tolerable belt-and-suspenders superfluity; it would make an entire subsection pointless. And it gets worse. Under the NYAG's view, it was not just the 1978 Congress that added a pointless subsection; the 2010 Congress also wasted ink when it extended parts of EFTA, for the first time, to a single subtype of wire transfer (cross-border remittances). Despite its efforts, the NYAG fails to give effect to either statutory provision.

a. The NYAG disputes (at 41-44) that its construction of Section 7(B) would generate any surplusage. Notably, it told the district court the opposite: that its interpretation would render Section 7(B) "technically redundant." NYAG MTD Opp., ECF No. 25, at 21; *see* JA248-249 (agreeing at oral argument that Section 7(B) was not "technically necessary"). The NYAG does not acknowledge its flip-flop, but it was right before for three reasons.

18

First, the NYAG offers up a single hypothetical that does not work. It describes (at 42) a situation where a consumer initiates a wire transfer "in person" by "speak[ing] to a teller," claiming that the subsequent bank-to-bank component would be covered by EFTA "but for" Section 7(B)'s "carve-out." But EFTA could never have applied to the bank-to-bank component in this example. Under Section 7, only transfers of funds *initiated electronically* are covered by EFTA, not fund transfers initiated "in person" and orally at a bank. *See* 15 U.S.C. § 1693a(7). Even if the bank-to-bank portion is initiated electronically, Section 8 makes clear that it must be the *consumer* who initiates the fund transfer using an "electronic device" that she personally operates or has access to. *Id.* § 1693a(8); *see* 12 C.F.R. pt. 1005, supp. I, § 2(h), cmt. 3 (clarifying that the "computer equipment operated" by a bank's employee is not an "electronic terminal" under EFTA). Plus, under Sections 2 and 7, even if the bank-to-bank component were viewed independently, it would fall outside EFTA's coverage anyway because it merely debits or credits the bank's own account (as opposed to the *consumer's* account as EFTA requires). *See* 15 U.S.C. § 1693a(2), (7). In short, the hypothetical does not involve any EFTA coverage that Section 7(B) might then be understood to exclude.

19

Second, the NYAG contends (at 44) that if its reading renders Section 7(B) superfluous, that should be tolerated because the statute contains redundancies elsewhere too. That is not how the canon works: some superfluity is not a license to create more. Regardless, the only supposed redundancy the NYAG can muster is Section 7(A), which exempts "check guarantee or authorization service[s]" that do not "directly result" in a debit or credit to a consumer account. 15 U.S.C. § 1693a(7)(A). On the NYAG's view, Section 7(A)'s exclusion is superfluous because EFTA already excludes transfers that do not "debit or credit a consumer account." NYAG MTD Opp., ECF No. 25, at 21. The NYAG overlooks that a consumer's point-of-sale use of a check-guarantee service may electronically authorize or instruct a consumer's bank to *temporarily* debit or credit the consumer's account until a paper check is settled. Thus, the use of a check-guarantee service can prompt an electronic fund transfer that would have been covered under EFTA but for Section 7(A)'s exclusion. A superfluous Section 7(B) would therefore be an anomaly.

Third, the NYAG embraces this surplusage, and asserts (at 44) that it is "consistent with the statutory framework" because the statute was "designed" by Congress "with the understanding that certain sections of the

20

statute may become superfluous as technology evolves." But this is not a provision that originally had content and has since become superfluous. The NYAG does not give a single viable example of how this provision did work in 1978 or at any point since. After all, the basic details of how a wire transfer is executed have not changed since the statute's introduction. Even by 1978, consumers already had ample means to electronically initiate wire transfers, whether through a telephone, 46 Fed. Reg. 46,876, 46,880 (Sept. 23, 1981), or Telex (an electronic messaging service), *United Tel. Workers, AFL-CIO* v. *FCC*, 436 F.2d 920, 922-924 & n.3 (D.C. Cir. 1970). And within a few years after that, consumers could initiate wire transfers through home computers connected to bank networks. 46 Fed. Reg. 46,876, 46,877, 46,879; *see Home Banking by Computer*, N.Y. Times, Mar. 29, 1983, at D1, https://perma.cc/S936-663B.

b. On its Dodd-Frank surplusage problem, the NYAG claims (at 49) that Congress's 2010 amendment "cannot . . . inform this Court's interpretation" because it was promulgated "after the fact." But "[w]hen Congress acts to amend a statute," courts "presume it intends its amendment to have real and substantial effect." *Pierce Cnty.* v. *Guillen*, 537 U.S. 129, 145 (2003) (citation omitted); *see id.* (rejecting construction that

21

would have required finding that a later amendment served to "protect . . . only [what] was already protected before the amendment"). That principle governs here. If EFTA already covered every consumer wire transfer, Congress's extension of *some* of EFTA's protections to *one* category of consumer wires in 2010 would have been "an exercise in futility." *Id.*

The NYAG fails to offer any substantive explanation for the Dodd-Frank amendments or the common understandings that led to them. As the CFPB's statements make clear, the CFPB understood that EFTA excluded consumer wire transfers in their entirety until EFTA's limited extension in 2010. Opening Br. 42-43, 53 & n.6; *see* 77 Fed. Reg. 6,194, 6,195, 6,211-6,212 (Feb. 7, 2012) (explaining in official rulemaking that until the 2010 amendment "wire transfers [were] entirely exempt from the EFTA", as "Congress had specifically structured the EFTA to exclude wire transfers"); *see also id.* at 6,277-6,278. The NYAG has no response, beyond asking the Court to ignore this history.

### 4. The NYAG's interpretation creates significant irregularities for ACH transfers.

The NYAG's theory also generates serious irregularities with respect to EFTA's treatment of ACH transfers. Recall that Section 7(B) exempts "any transfer of funds" carried out through a service that is not "designed

primarily" to transfer funds on behalf of a consumer, "*other than* those processed by [ACH]." 15 U.S.C. § 1693a(7)(B) (emphasis added). Or, put more simply, Section 7(B) exempts wire transfers but states that the exemption does not cover ACH transfers. On Citibank's view, that exception-within-an-exception makes sense: Congress excluded the entirety of consumer fund transfers sent by wire services, but made sure that EFTA governed consumer fund transfers sent by ACH services. As explained below, Congress reasonably viewed ACH transfers as different from consumer wire transfers. *See infra* pp. 24-25.

By contrast, if the NYAG is correct that "transfer of funds" in Section 7(B) refers only to "interbank" payment orders (at 34) and not "end-to-end" fund transfers, then it is not at all clear why Congress would go out of its way to include the ACH exception. After all, the NYAG's construction would mean that Section 7(B) excludes only the bank-to-bank portion of a wire transfer, and the ACH carveout thus is meant to *include* under EFTA the parallel bank-to-bank portion of an ACH transfer. The NYAG has embraced that result, JA255, but it makes no sense. Neither bank-to-bank component is covered by EFTA in the first place, so Congress would have had no reason to exclude coverage over the interbank component of a wire transfer, and

23

even less reason to *preserve* coverage over that same narrow component of an ACH transfer. Thus, if the NYAG's construction is accepted, it injects still more superfluity.

The NYAG instead offers (at 38) what it believes is a competing oddity: that, under Citibank's view, Congress provided different protections for wire transfers and ACH transfers, even though these services "look[] similar, if not identical," from the consumer's perspective. But that distinction appears on the face of Section 7(B) itself. After all, for the phrase "*other than* those processed by [ACH]" to have any meaning, EFTA must be read to treat wire transfers and ACH transfers differently. Plus, to the extent relevant, there are several good reasons why Congress distinguished between these methods of payment. For starters, as the NYAG agrees (at 7), Congress enacted EFTA to regulate "new technologies" for transferring money. ACH payments were first introduced in 1972, just a few years before EFTA's enactment. Federal Reserve History, *Automated Clearing House Payments* (Sept. 28, 2023), https://perma.cc/2A4U-3M58. Wire transfers, by contrast, had been in use for over a century by 1978, and Congress knew that they were already meaningfully—and soon would be comprehensively—regulated under alternate state and federal frameworks. Opening Br. 7, 9, 50-51.

24

Moreover, it is undisputed that ACH transfers are not "identical" to consumers in a very important way: they generally involve much smaller sums than wire transfers. *See* Br. 40. This difference alone may ground Congress's reasonable policy judgment to treat the two methods of payment differently. *See infra* pp. 29-33.

### B. EFTA's History And Context Reinforce Its Plain Text.

EFTA's history and statutory context provide additional evidence that the statute has excluded consumer wire transfers from the outset. The NYAG does not dispute that, until this litigation, no federal agency or federal court had ever understood the consumer-to-bank portion of a wire transfer to fall within Section 7's general rule. *See* Opening Br. 52-58. The NYAG also glides over EFTA's statutory history, which shows that the wire-transfer exemption was added as an amendment to give States leeway to "regulate [the exempted] electronic funds transfer transactions" through the UCC, 124 Cong. Rec. S11756, 11758 (July 25, 1978), and that it was understood to "exclude[]" "[w]ire transfers" from the "scope" of Section 7's general rule. S. Rep. No. 95-1273, at 52 (1978); *see* Opening Br. 48-51. The NYAG's few attempts to downplay this mountain of evidence lack merit.

25

1.    The NYAG first discounts EFTA's long regulatory history by invoking *Loper Bright Enterprises* v. *Raimondo*, 603 U.S. 369 (2024).  But Citibank is not asking for now-defunct *Chevron* deference here.  Instead, as *Loper Bright* acknowledged, the Executive Branch's interpretation of a statute can be persuasive authority, especially when it was originally "issued roughly contemporaneously with enactment of the statute" and has "remained consistent over time."  *Id.* at 386.  Both are true here.  This regulatory understanding emerged at the same time as EFTA's enactment and has been reaffirmed over many decades, without a single break before this litigation.  If ever there were a case to give significant respect to the Executive Branch's "body of experience and informed judgment," *id.* at 402 (citation omitted), this is it.

Next, the NYAG attacks Regulation E, EFTA's implementing regulation.  In its view (at 46), Regulation E should be discounted because it "was most recently revised in 2013, before the proliferation of online banking and the integration of [wire transfers] into online banking platforms."  Thus, Regulation E "does not reflect any agency's 'informed judgment'" about wire transfers.  *Id.*  The NYAG is simply wrong that consumers could not initiate wire transfers through the internet in 2013.  *See* Kevin V. Tu, *Regulating the*

*New Cashless World*, 65 Ala. L. Rev. 77, 100 (2013); Federal Reserve Board, *Minutes and Recommendations of the Federal Advisory Council*, 11 (Feb. 1, 2002), https://perma.cc/MHB9-AD69. Customers have been able to use the internet to initiate wire transfers since at least the late 1990s. *See, e.g.*, Federal Reserve Bank of Boston, *Communities and Banking*, 14 (1999), https://perma.cc/N7QP-YT2R. Regulation E is thus not some archaic rule for a pre-internet era. Further, Regulation E was not last "revised in 2013"; it has been amended multiple times since then. CFPB, *Electronic Fund Transfers (Regulation E); Amendments* (July 1, 2021), https://perma.cc/DGE4-ZURA. And as the NYAG acknowledges (at 45-46), Regulation E's implementation of Section 7(B) has excluded "wire transfers" by name since its inception. *See* 44 Fed. Reg. 18,468, 18,481 (Mar. 28, 1979); 12 C.F.R. § 1005.3.

The NYAG then turns around and argues (at 46) that Regulation E cuts in the NYAG's favor because it shows that "different transfers within a single transaction may be subject to different regulatory frameworks." As evidence, the NYAG points (at 47) to Regulation E's explanation that a Fedwire fund transfer initiated through "a telephone transfer agreement" could be covered under both EFTA and Article 4A. *But see* 12 C.F.R. pt.

27

1005, supp. I, § 3(c)(3), cmt. 2 (official comment confirming that Article 4A, rather than EFTA, applies to telephone-initiated consumer wire transfers). The NYAG completely misreads Regulation E's discussion of "hybrid" transfers. Regulation E makes clear that the entire consumer wire transfer carried out on a wire network is exempt from EFTA, *unless* that movement of funds includes a separate payment sent using ACH. In that case, the ACH payment alone is governed by EFTA, while the wire transfer remains outside of EFTA's coverage in light of Section 7(B). The Federal Reserve's official commentary thus explains that "Fedwire funds transfers to or from consumer accounts are exempt from the [EFTA]," whereas dual coverage of both EFTA and Article 4A applies only in the "limited circumstances" of a movement of funds that uses *both* an exempt wire transfer (Article 4A) and a non-exempt ACH payment (EFTA). 55 Fed. Reg. 40,791, 40,798, 40,804 (Oct. 5, 1990). If the consumer component of an ordinary consumer wire transfer alone triggered EFTA's protections, this guidance would make no sense. *See* 46 Fed. Reg. 46,876, 46,879 (Question 3-3) (Sept. 23, 1981).[3]

---

[3] Apart from this unique instance of dual coverage, Regulation E reaffirms that EFTA "does not apply to funds transfers sent through Fedwire." 55 Fed. Reg. 40,791, 40,792; *see id.* at 40,804 (explaining that EFTA excludes Fedwire transfers where the "originators or beneficiaries" are "consumers"); *id.* at 40,791 (noting that Article 4A was drafted "to

2.     The NYAG also fails to meaningfully engage with the decades of case law excluding wire transfers from EFTA, including two decisions from other courts of appeals and several district-court decisions within this Circuit. *See, e.g.*, *Nazimuddin* v. *Wells Fargo Bank, N.A.*, 2025 WL 33471, at *2 (5th Cir. Jan 6, 2025); *Wright* v. *Citizen's Bank of East Tennessee*, 640 Fed. Appx. 401, 402-404 (6th Cir. 2016); *Bodley* v. *Clark*, 2012 WL 3042175, at *4 (S.D.N.Y. July 23, 2012); *Fischer & Mandell LLP* v. *Citibank, N.A.*, 2009 WL 1767621, at *4 (S.D.N.Y. June 22, 2009); *see also* Opening Br. 56-58 & n.8; *Degtiarova* v. *JPMorgan Chase Bank N.A.*, 2026 WL 482300, at *3 (D. Colo. Feb. 20, 2026). The NYAG notes (at 50) that some of those lawsuits were "filed by pro se litigants[] with no allegations regarding the mechanics of the underlying transactions." But the fact that no other litigant, whether counseled or not, has ever been creative enough to proffer the NYAG's trifurcated theory of fund transfers is hardly a point in the NYAG's favor. It only underscores the NYAG's unnatural reading of the statutory language.

## C.     The NYAG's Appeals To Policy Fail.

At bottom, the NYAG's arguments rest on policy concerns. The NYAG insists (at 39) that Congress, in enacting EFTA, would have included wire

---

provide a legal framework" for the fund transfers not covered by EFTA, including "wire transfers").

transfers within that statute's regulatory reach if it had known how popular wire transfers would become or how these transfers would "look identical" from the consumer's perspective to ACH transfers. Such "policy considerations" are "more properly addressed to Congress than to this Court." *Reiter* v. *Sonotone Corp.*, 442 U.S. 330, 345 (1979); *see Garland* v. *Cargill*, 602 U.S. 406, 428 (2024) ("[I]t is never our job to rewrite statutory text under the banner of speculation about what Congress might have done.") (citation and alteration omitted). But even if policy concerns mattered in the face of the clear statutory text, Congress reasonably struck a different balance—a balance that does not leave wire transfers *unregulated* but simply regulates them *differently*.

To be clear, consumer wire transfers are not unregulated simply because they fall outside EFTA's scope. For nearly four decades, until this litigation, the banking industry, consumer-protection groups, the States, Congress, and federal agencies have uniformly understood that Article 4A of the UCC regulates wire transfers and provides key "protections" to consumers in the event of an unauthorized consumer wire transfer. 77 Fed. Reg. 6,194, 6,211-6,212 (Feb. 7, 2012). Article 4A requires, among other things, that banks refund consumers for unauthorized fund transfers, with

30

interest, if the bank cannot show that it accepted the transfer in good faith and in compliance with commercially reasonable security procedures. N.Y. U.C.C. §§ 4-A-202(2), 4-A-204(1). Article 4A's comprehensive framework also imposes liability on banks for delayed or erroneous execution of wire transfers. *Id.* §§ 4-A-303, 4-A-305.

As various trade-group amici have explained, switching from Article 4A's commercial-reasonableness system to EFTA's strict-liability system would come with real costs: it would require the banking industry to reconsider the pricing, contractual terms, and potentially even the availability of consumer wire transfers. *See* TCH Amicus Br. 24-27. The NYAG's response to these concerns is hardly reassuring. The NYAG contends (at 53-54) that the banking industry could simply apply the same guardrails to wire transfers that attach to ACH transfers or other payment systems like Zelle—presumably including daily limits in the hundreds or few thousands of dollars. But that "solution" ignores the important distinction between wire transfers and other methods of payment. Wire transfers, as the NYAG acknowledges, are regularly in six or even seven figures and tend to be used for significant purchases such as a vehicle, wedding reception, or down payment on a house. Zelle, by contrast, is more often used by friends

31

to split the restaurant bill. If wire transfers must be limited in the same way as other methods of payment, then wire transfers will lose the characteristics that make them a valuable and popular method of payment. Congress reasonably chose instead to preserve variety in our banking system.

The NYAG next appeals (at 40) to Congress's general "focus on consumer protection." But it is a familiar mistake "to assume . . . that any interpretation of a law that does more to advance a statute's putative goal must be the law." *Luna Perez* v. *Sturgis Pub. Schools*, 598 U.S. 142, 150 (2023) (citation omitted); *see Rodriguez* v. *United States*, 480 U.S. 522, 525-526 (1987) ("[N]o legislation pursues its purposes at all costs."). In any event, the NYAG oversimplifies Congress's policy objectives in enacting EFTA. As Citibank has explained, Congress enacted EFTA to regulate then-novel payment systems that were predominantly designed for consumers, rather than payment systems that were designed for businesses and that were already subject to federal or state regulation. It was thus perfectly sensible for Congress to single out new technologies such as ATMs, ACH transfers, and point-of-sale transfers, which tended to facilitate low-dollar fund transfers.

32

The statutory text underscores Congress's primary focus on novel, low-dollar transactions. EFTA differentiates among liability levels in fairly small increments, which shows that Congress keyed the statute to the types of fund transfers that it expected EFTA to cover. For example, depending on the timeliness of a consumer's notification to her bank of an unauthorized transfer, her losses are capped at either $50 or $500. 15 U.S.C. § 1693g(a). For a $1,000 ACH transfer, that difference is material: a timely consumer could be credited $950 while a tardy consumer would receive only $500— roughly half as much. The gap (*i.e.*, recovery of either 95% or 50% of the losses) furthers EFTA's express policy goal of providing a "financial incentive" to the consumer to guard her credentials and "promptly" report any loss. S. Rep. No. 95-915, at 6, 14 (1978). But those incentives fall apart for a $100,000 consumer wire. Whether the consumer acts now or waits for months would affect only whether the bank owes her $99,950 or $99,500 (*i.e.*, 99.95% or 99.50% of the losses)—rendering the incentive to move quickly an afterthought at best. 15 U.S.C. § 1693g(a). It would be puzzling for Congress to assign risk around such modest numbers if it expected EFTA to handle wire transfers that involve hundreds of thousands, if not millions, of dollars.

## II. EFTA DOES NOT COVER INTRABANK TRANSFERS.

The NYAG asserts that an intrabank transfer constitutes an "unauthorized" fund transfer under EFTA even if the consumer suffers no direct loss from the intrabank transfer. This argument flies in the face of Section 1693a(12)'s plain text and EFTA's structure. For a fund transfer to be "unauthorized" under EFTA, it must be sent "without actual authority" and the consumer must "receive[] no benefit" from that particular transfer. 15 U.S.C. § 1693a(12). The intrabank transfers at issue in this case fail the second requirement. When money is moved between two bank accounts controlled by the same consumer, the consumer receives the most straightforward benefit such a transfer can provide: a credit in the entire amount of the transfer, without any losses or costs.

Even if the intrabank transfers were "unauthorized" under Section 1693a(12), that would not save the NYAG's claim here. That is because the NYAG seeks damages only for later, external transfers that are (as discussed above) exempt from EFTA. The NYAG cannot bootstrap the losses from those exempt external transfers into its intrabank claim. If that were permitted, then litigants could circumvent EFTA's clear coverage limitations

34

by recovering for fund transfers that are expressly exempt from EFTA, including wire transfers and even *non*-electronic transfers.

### A. Intrabank Transfers Do Not Meet EFTA's Definition Of Unauthorized Electronic Fund Transfers.

The NYAG does not dispute that when an intrabank transfer occurs, the consumer receives the entirety of the transmitted funds into her own account. *See* Br. 27, 56. Instead, the NYAG seeks to disqualify that benefit as either too neutral or negated by the "downstream consequences" from later, external fund transfers. Br. 56, 60. But the NYAG's efforts to discredit this benefit are contrary to Section 1693a(12)'s text, EFTA's framework, and case law.

1. The NYAG first claims (at 56) that it is "illogical" to consider an intrabank transfer's "credit standing alone to be a benefit" because it leaves a consumer's "net wealth" unchanged. But the NYAG's framing rewrites the statutory question. Section 1693a(12) does not ask whether the transfer increases the consumer's "net wealth." Instead, the relevant question is whether the consumer receives any benefit from the specific transfer at issue. That is why, for example, this Court explained in *Aikens* v. *Portfolio Recovery Associates* that a consumer received an eligible benefit even though the transfer at issue *decreased* her overall account balance by

35

crediting a creditor's account. 716 Fed. Appx. 37, 40 (2d Cir. 2017). By that same logic, a consumer receives a benefit here because she receives a credit from the specific transfer at issue, regardless of the lack of change to her "net" wealth. *See Becker* v. *Genesis Fin. Servs.*, 2007 WL 4190473, at \*12 (E.D. Wash. Nov. 21, 2007) (finding that the consumer received a "benefit" from an allegedly unauthorized transfer between accounts because she "received a . . . credit to her [own] account"). Contemporaneous regulatory and congressional findings likewise confirm that an intrabank transfer provides a "benefit" to a consumer, even if the transfer does not result in a net wealth change.[4]

The NYAG sidesteps this Court's straightforward "benefit" analysis in *Aikens*. In a footnote (at 61 n.11), it points out that this Court identified multiple reasons why the fund transfer at issue there was not "unauthorized." That is not responsive. This Court's reasoning remains controlling, even if it provided other, independently sufficient reasons for the

---

[4] *See, e.g.*, S. Rep. No. 95-915, at 2 (1978) (suggesting that the ability to "transfer [funds] *between* accounts" will provide a "benefit" to consumers); Federal Reserve Bank of Dallas, Circular No. 79-179, *Regulation E: Proposed and Final Amendments* 4 (Nov. 2, 1979), https://perma.cc/92ZS-3UHF (providing that "intra-institutional transfers," meaning fund transfers "from a consumer's savings account to a checking account," are "beneficial for consumers").

outcome. *See Woods* v. *Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum."); *Pyett* v. *Pennsylvania Bldg. Co.*, 498 F.3d 88, 93 (2d Cir. 2007). Similarly, the NYAG's efforts to brush aside *Becker* rest on incorrectly claiming (at 56) that the court there found a "minimal" benefit because the consumer did not have to pay fees "normally" charged for a balance transfer. But *Becker* never hinted that the benefit relevant for EFTA purposes was anything other than the "credit" itself. *Becker*, 2007 WL 4190473, at *12-13.

2.     The NYAG next attempts to negate this benefit by pointing (at 27, 59) to the downstream harms caused by *other* fund transfers—*i.e.*, the external wire transfer that may come after the intrabank consolidation transfer. But Section 1693a(12) defines an "unauthorized" transfer as one where the consumer receives "no benefit" from "*such transfer*"—without referring to the benefit (or harm) resulting from other fund transfers that may come before or after a particular disputed transfer. 15 U.S.C. § 1693a(12) (emphasis added). Congress's deliberate decision to employ the referential term "such" makes clear that the inquiry is keyed only to the specific transfer at issue. *See, e.g.*, Black's Law Dictionary (4th ed. 1951)

37

(defining "such" as "[i]dentical with, being the same as what has been mentioned"). In other words, under EFTA's plain text, each separate fund transfer calls for its own, separate "benefit" inquiry, not one that takes the purported harm from fund transfer B and applies it to fund transfer A.

Nonetheless, the NYAG asserts (at 61) that case law "uniformly" considers a disputed fund transfer's "downstream consequences" (including harms of *other* fund transfers) when determining whether that transfer produced a "benefit." The case law says no such thing. In *Aikens* and *Becker*, for instance, the courts looked only to the "benefit" of the contested fund transfers themselves, not to any consequential harms from the debits (like the alleged denial of a car loan or increased debt). *See* Opening Br. 62-64. And *Park* v. *Webloyalty.com*, which is the only case that the NYAG cites for this assertion of "uniform[]" case law, is not to the contrary. 685 Fed. Appx. 589 (9th Cir. 2017). There, the Ninth Circuit focused only on the benefits (or the lack thereof) of the disputed charges to the consumer's account, not any downstream consequences. *Id.* at 591-592. That analysis makes sense because, again, EFTA is concerned with each "'transfer' itself," not with "entire fraudulent scheme[s]" surrounding the "specific transfer"

38

alleged to be unauthorized. *Sanchez* v. *Navy Fed. Credit Union*, 2023 WL 6370235, at \*22 (C.D. Cal. Aug. 14, 2023).

Nor is the NYAG's downstream-harm theory consistent with EFTA's statutory structure, which presumes a monetary loss resulting from each particular unauthorized transfer raised by a consumer. Specifically, Sections 1693f (EFTA's error-resolution framework) and 1693g (EFTA's liability framework) make clear that an "unauthorized" transfer covered by the Act is one that results in actual monetary "losses" that can be remedied through "reimbursement" and "recredit[ing]." 15 U.S.C. § 1693g(a), (a)(2); *id.* § 1693f(c), (e)(1). Indeed, the principal way for a bank to avoid civil liability for an EFTA violation under Section 1693m is by complying with EFTA's error-resolution and reimbursement framework—which is impossible here, where there is no actual loss to reimburse for the intrabank transfers. *See id.* § 1693m(a); *see also id.* §§ 1693f(b), (c), 1693g(a). The NYAG fails to engage with these relevant frameworks or explain how its theory is workable in light of EFTA's broader remedial scheme.

## B. Even If Intrabank Transfers Are "Unauthorized," They Result In No Recoverable Damages Here.

1. Even if this Court holds that the intrabank transfers at issue here are "unauthorized" under EFTA, the NYAG's intrabank claim still

39

warrants dismissal. The NYAG is entitled to recover only for the actual damages resulting from these transfers—not the external transfer that follows. And here, as the NYAG has conceded (at 27), each challenged intrabank "transfer itself does not change the consumer's net wealth." In other words, these transfers result in no actual damages recoverable under EFTA. *See Wike* v. *Vertrue, Inc.*, 566 F.3d 590, 593 (6th Cir. 2009) (under EFTA, "[a] consumer is injured only if, and only when, funds are withdrawn from her account"). Indeed, the only losses pleaded by the NYAG result exclusively from subsequent *external* wire transfers. JA66-68, 80-81. But for the reasons explained above, those losses are exempt from EFTA's reach and cannot be bootstrapped to earlier transfers that themselves result in no injury. So whether EFTA covers intrabank transfers or not is ultimately academic in this case; the intrabank claim should be dismissed either way.

A pair of recent decisions addressing materially identical fact patterns illustrates that plaintiffs cannot use covered initial transfers to seek damages for exempt subsequent transfers. In *Vitalis* v. *cPort Credit Union*, fraudsters gained access to a consumer's account and executed an intrabank transfer that moved funds from the consumer's savings account to her checking account. 2026 WL 207156, at *1 (D. Me. Jan. 27, 2026). The

40

scammers then tricked the account owner into making subsequent withdrawals and handing over the cash. *Id.* at *4. The court correctly concluded that the relevant "cause of [the consumer's] loss" was not the intrabank transfer, even though it was "essential to the scam," but rather the "subsequent" withdrawals. *Id.* at *4-5. And because the consumer herself made those withdrawals outside of EFTA's coverage, the court held that recovery for her broader loss was unavailable through an intrabank-transfer claim. *Id.* at *5. The court thus dismissed the EFTA claim to the extent it sought actual damages. *Id.*

*Day* v. *First National Financial Corporation*, 2026 WL 413308 (E.D. Ky. Feb. 13, 2026), is of a piece. The scammers in that case followed a similar playbook by first executing several intrabank transfers between the consumers' savings and checking accounts, then inducing the consumers to make wire transfers from their "erroneously" inflated checking account. *Id.* at *1-2. As in *Vitalis*, the consumers alleged that the bank was liable under EFTA for failing to "recredit" them for that subsequent *external* transfer. *Id.* at *2. And as in *Vitalis*, the court rejected that attempt to recover for exempt external transfers through a claim centered on intrabank transfers. *Id.* at *4. The court thus granted summary judgment on the intrabank claim

41

to the extent that the consumers were seeking actual damages arising from the amounts "wired from their account." *Id.* at \*6.

To avoid the same result as *Vitalis* and *Day*, the NYAG now pivots to claiming that some losses could at least conceivably result from the intrabank transfers themselves. Specifically, the NYAG asserts (at 59) that in some cases, the scammer moves money from an interest-bearing account to a non-interest-bearing account, "depriving the consumer" of "that interest." But that late-breaking claim is wrong twice over. First and most simply, those are *not the losses the NYAG is suing to recover*. As the district court correctly held, the NYAG's complaint "makes no allegations regarding any consumer's loss of earned interest." JA309 n.15. That is dispositive: when assessing a Rule 12(b)(6) motion to dismiss, "the only facts to be considered are those alleged in the complaint." *Doe* v. *Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016); *see, e.g.*, *Day*, 2026 WL 413308, at \*3.[5]

---

[5] The NYAG claims in a footnote (at 59 n.10) that it "preserved" this interest-related argument, citing its brief in opposition to Citibank's motion to dismiss. But "a party is not entitled to amend its complaint through statements made in motion papers." *Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (citation omitted). What matters is that the NYAG never pleaded that consumers lose earned interest due to intrabank transfers or that it was entitled to recover for such alleged damages. *Cf.* JA66-68, 80-81.

42

Second, there is a reason the NYAG did not plead this theory: intrabank transfers likely would not meet EFTA's minimum thresholds. EFTA's thresholds require the consumer to bear the first $50 or $500 lost from an unauthorized transfer. 15 U.S.C. § 1693g(a). Depending on the account-specific and temporal allegations, the interest lost from an intrabank transfer would likely amount to zero, pennies, or at most a few dollars. *Day*, for example, described these losses of a few days' interest as "miniscule." 2026 WL 413308, at *3. That is why the NYAG is unquestionably not bringing this suit to obtain damages for pennies of theoretically lost interest, or for any harm resulting from the intrabank transfers themselves. It seeks the amount of the "stolen funds" from the exempted external wire transfers. JA68, 80-81.

2.     The NYAG insists (at 58) that its bootstrapping theory is "consistent" with EFTA's "broader framework." But there is nothing consistent about using EFTA to recover for EFTA-*exempted* fund transfers. The NYAG fails to dispute that its theory would circumvent the most basic limits that Congress imposed on EFTA by effectively extending its coverage to exempted wire transfers and even *paper*-based transfers. Opening Br. 66.

43

To say the least, that result would constitute a "strange application" of the statute. *Vitalis*, 2026 WL 207156, at *5; *see Day*, 2026 WL 413308, at *4.

3.    In a final attempt to cure the defects in its intrabank-transfer claim, the NYAG asserts (at 58) that "even if the consumer does not suffer [any] monetary loss," under Section 1693m, consumers might be able to obtain a statutory award or attorney's fees for an EFTA violation. But to be clear, the NYAG demands no such relief here under Section 1693m. *See, e.g.*, JA66-68, 80-81.

In any event, that move runs headlong into *Aikens*. There, applying the Supreme Court's holding in *Spokeo, Inc.* v. *Robins*, 578 U.S. 330 (2016) to an EFTA claim, this Court held that "even in the context of a statutory violation," a plaintiff "may not allege a bare procedural violation, divorced from any concrete harm." *Aikens*, 716 Fed. Appx. at 40 (dismissing EFTA claim for lack of standing because consumer failed to show "that she suffered any financial harm" or to plead that she was exposed to a material risk of "real harm"). Here, the NYAG advances exactly such a "bare procedural violation." As pleaded, the intrabank transfers result in no actual damages— and thus cannot sustain a claim.

44

In short, the NYAG's intrabank transfers are fund transfers in search of a loss. But the only place the NYAG can find that loss is the external wire transfer, which is exempted from EFTA's reach. That leaves the NYAG's intrabank claim devoid of any recoverable damages and subject to dismissal, regardless of whether intrabank transfers are "unauthorized" within the meaning of Section 1693a(12).

## III. THE NYAG'S PROPOSED CROSS-APPEAL CLAIM FAILS.

The NYAG's proposed cross-appeal fails on procedural and legal grounds. First, it should be rejected as non-compliant under the Federal Rules of Appellate Procedure because the NYAG failed to file a cross-petition or offer any justification for that oversight. Second, even if the Court exercises its discretion to hear the NYAG's SHIELD Act claim, the Court should affirm the district court's decision on the merits. That claim is predicated on Citibank's alleged failure to implement a program to detect and prevent fraudulent fund transfers indicated by anomalous account behavior (*i.e.*, red flags). JA15, 72-74. FCRA's express preemption provision covers just such claims: it preempts state laws that regulate conduct covered by the Red Flags Rule, a federal rule that regulates the protection of consumer bank-account information and prevention of identity theft.

45

### A. The Court Should Decline To Hear The NYAG's Proposed Cross-Appeal.

The motions panel granted Citibank's petition for interlocutory appeal, but referred the NYAG's "request for its submissions to be treated as a cross-appeal" to the merits panel. JA459. The Court should decline to hear the NYAG's cross-appeal because the NYAG failed to file a cross-petition as Rule 5(b)(2) requires. Once a party files a petition seeking discretionary appeal, Rule 5(b)(2) dictates that other parties "may file an answer in opposition or a cross-petition within 10 days after the petition is served." Fed. R. App. P. 5(b)(2). The NYAG chose to file only an opposition, in which it urged this Court not to hear Citibank's interlocutory appeal. *See* NYAG § 1292(b) Opp., Case No. 25-1179, ECF No. 14. It should be held to that strategic decision.

In a footnote (at 62 n.12), the NYAG brushes off its failure to file a cross-petition by arguing that "judicial and litigant efficiency" would be enhanced if this Court allowed "full review of [its] complaint as part of a single appeal." But that conclusory justification would apply every time an appellate court grants interlocutory review—thus eliminating any incentive for parties to actually comply with Rule 5(b)(2)'s terms. That result cannot be squared with the Supreme Court's repeated endorsement of the cross-

appeal requirement as "inveterate and certain." *Greenlaw* v. *United States*, 554 U.S. 237, 245 (2008). "[I]n more than two centuries of repeatedly endorsing the cross-appeal requirement," the Supreme Court has never "recognized an exception to the rule." *Id.* at 245 (citation omitted). And the "interests animating the cross-appeal requirement" do not "offer any leeway" for a would-be cross-appellant in the context of an interlocutory appeal. *El Paso Nat. Gas Co.* v. *Neztsosie*, 526 U.S. 473, 482 (1999).

In keeping with the Supreme Court's instructions, this Court has fastidiously enforced the cross-appeal requirement. *See, e.g.*, *Tranello* v. *Frey*, 962 F.2d 244, 248 (2d Cir. 1992); *In re Johns-Manville Corp.*, 476 F.3d 118, 124 (2d Cir. 2007); *Clubside, Inc.* v. *Valentin*, 468 F.3d 144, 162 (2d Cir. 2006); *Rangolan* v. *County of Nassau*, 370 F.3d 239, 254 (2d Cir. 2004). Although this Court has wavered on whether this requirement is "jurisdictional" or a "claim-processing rule," it has recognized the need to "strictly" "enforce th[is] limit" and to "overlook[]" the failure to cross-appeal only on a showing of "exceptional circumstances." *Johns-Manville*, 476 F.3d at 124; *but see Tranello*, 962 F.2d at 248 (calling failure "a jurisdictional defect"). The other courts of appeals have likewise routinely declined to hear

47

interlocutory cross-appeals if the would-be cross-appellant failed to file a cross-petition.[6]

At best for the NYAG, this Court has discretion to hear a cross-appeal in the absence of a timely cross-petition in "exceptional circumstances." *Johns-Manville*, 476 F.3d at 124 (rejecting "excusable neglect" justification and declining to hear cross-appeal filed one day late); *see Texport Oil Co.* v. *M/V AMOLYNTOS*, 11 F.3d 361, 366 (2d Cir. 1993) (hearing cross-appeal because it "was filed only one business day late" and involved claims "closely interrelated" to the direct appeal). No such "exceptional circumstances" are present here. Indeed, the NYAG does not make any effort to explain its failure to comply with Rule 5. Nor could it. The NYAG is a sophisticated litigant that was undoubtedly aware of its obligation to file a cross-petition, yet it failed to do so (belatedly or otherwise). It makes no showing that its cross-appeal on the SHIELD Act is closely interrelated to the EFTA issues or would independently satisfy the requirements for interlocutory appeal

---

[6] *See, e.g.*, *Sikes* v. *Teleline, Inc.*, 281 F.3d 1350, 1367 n.44 (11th Cir. 2002) (a "plaintiff's failure to cross-appeal violates the requirement of [Rule] 5(b)(2) and means that the plaintiffs have not preserved this issue for appeal"); *Roth* v. *King*, 449 F.3d 1272, 1282-1283 (D.C. Cir. 2006); *Reese* v. *BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).

under Section 1292(b). *See, e.g.*, *Roth*, 449 F.3d at 1283. This Court should therefore decline to consider the SHIELD Act claim.

### B. Alternatively, The Court Should Affirm The District Court's Dismissal Of The NYAG's SHIELD Act Claim.

If the Court hears the NYAG's proposed cross-appeal, it should affirm the district court's dismissal of the New York SHIELD Act claim (Count 5). The NYAG alleges that Citibank violated state law through its alleged failure to implement a program "capable of detecting [fraudulent] electronic activity in consumer accounts" and to "train employees" to use that program. JA326; *see* JA72-74. But the district court recognized that FCRA squarely precludes that claim. *See* JA321-327. That is because FCRA preempts any state-law claim that purports to govern conduct regulated by the Red Flags Rule, a multi-agency federal regulation promulgated by the FTC and OCC. A comparison between the NYAG's complaint and the requirements of the Red Flags Rule confirms that the district court got it right.

### 1. FCRA's text, structure, and purpose establish a broad preemptive scope.

FCRA's preemption provisions broadly bar States from directly or indirectly regulating conduct required by the Red Flags Rule. *See* 15 U.S.C.

49

§ 1681t(b)(5)(F); *id.* § 1681m(h)(8)(B); JA321-328. FCRA's structure, history, and purpose confirm that conclusion.

a. Congress "may preempt state law expressly or it may preempt state law implicitly." *Galper* v. *JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015). In FCRA, it spoke expressly, through a host of cross-referencing provisions. *Id.* at 444. Two are most relevant here, along with certain accompanying regulations.

First, 15 U.S.C. § 1681m(e) of FCRA instructs several federal agencies to promulgate "Red Flag Guidelines and Regulations" requiring banks to detect and combat identity theft. More specifically, the statute requires those agencies to (1) establish guidelines for banks "regarding identity theft with respect to account holders" and "customers," (2) identify red flags as part of such guidelines (*i.e.*, the "patterns, practices, and specific forms of activity" indicating the "possible existence of identity theft"), and (3) "prescribe regulations requiring" each bank to establish "reasonable policies and procedures" implementing such guidelines. 15 U.S.C. § 1681m(e)(1)(A), (1)(B), (2)(A).

Under that authority, the FTC and OCC have each promulgated a materially identical so-called Red Flags Rule. *See* 16 C.F.R. § 681.1 (FTC);

50

12 C.F.R. § 41.90 (OCC).  The Red Flags Rule requires banks to "develop and implement" an "Identity Theft Prevention Program . . . that is designed to detect, prevent, and mitigate identity theft in connection with the opening of a covered account or any existing covered account."  16 C.F.R. § 681.1(d)(1); *accord* 12 C.F.R. § 41.90(d)(1).  The regulations define "identity theft" broadly, as any "fraud committed or attempted using the identifying information of another person without authority."  16 C.F.R. § 681.1(b)(8) (incorporating 12 C.F.R. § 1022.3(h)).

Second, multiple provisions in FCRA preserve exclusive federal authority over the conduct that the Red Flags Rule targets.  Most importantly, Section 1681t(b)(5)(F) states that "[n]o requirement or prohibition may be imposed under the laws of any State . . . with respect to the conduct required by" Section 1681m(e).  15 U.S.C. § 1681t(b)(5)(F).  That language expressly preempts state-law regulation of any *conduct* covered by the Red Flags Rule.  Meanwhile, Congress also prohibited States from directly enforcing the Red Flags Rule, limiting its enforcement to specified "Federal agencies and officials."  15 U.S.C. § 1681m(h)(8)(B).

b.    In evaluating an express-preemption provision like Section 1681t(b)(5)(F), the "best evidence of the scope of Congress's preemptive

51

intent" is the statute's plain text. *Galper*, 802 F.3d at 443. The text here is unequivocal. A state law or state-law claim that looks to regulate a covered bank's policies with respect to detecting, preventing, or responding to identity theft is plainly a "requirement or prohibition" imposed "with respect to the conduct" required by the Red Flags Rule. 15 U.S.C. § 1681t(b)(5)(F). By focusing on "conduct" and by using the term "with respect to," Congress deliberately cast a "sweeping" net to catch state laws covering such conduct. *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 542 (2001); *see Macpherson* v. *JPMorgan Chase Bank, N.A.*, 665 F.3d 45, 47 (2d Cir. 2011) (Section 1681t(b)'s preemptive language "sweeps broadly").

The statute's "structure and purpose" also reinforce Subsection (b)(5)'s broad preemptive sweep. *Galper*, 802 F.3d at 443. Section 1681t sets out a general *conflict*-based preemption standard in Subsection (a). 15 U.S.C. § 1681t(a). But as the NYAG recognizes (at 63-64), FCRA then *carves out* Subsections (b) and (c) from that general standard and expressly preempts broad swaths of state law in several particular areas—including this one— even if the state laws are not "inconsistent" with FCRA. Put differently, in enacting FCRA, Congress generally told States that they could not enact conflicting regulations; when it came to the conduct covered by the Red

52

Flags Rule, however, Congress told States to stay out altogether, conflict or not.

Additionally, while some express-preemption provisions in Section 1681t are tailored to more specific conduct or subject to exceptions, the provision at issue here—Section 1681t(b)(5)(F)—is not similarly limited, as the district court recognized. *See* JA323 & n.23. Subsections (b)(2), (3), and (4), for example, all provide exceptions for specified state laws. *See* 15 U.S.C. § 1681t(b)(2)-(4); *see also id.* § 1681t(b)(1)(F)(i)-(ii). Subsection (b)(5), however, forbids all requirements or prohibitions imposed by state law "with respect to the conduct required by" the Red Flags Rule. *Id.* § 1681t(b)(5)(F). The contrast between Subsection (b)(5) and its neighboring provisions shows that Congress clearly knew how to narrow the scope of preemption under FCRA when it wanted to do so, yet Congress deliberately chose the broadest formulation when it enacted Subsection (b)(5)(F). *See* JA323 & n.23.

c. The statutory history also shows Congress's desire for courts to construe Section 1681t(b)(5)(F)'s preemptive scope expansively. In 1996, when Congress first enacted Section 1681t(b), it initially provided for these preemption provisions to sunset in 2004. *See* Consumer Credit Reporting Reform Act, Pub. L. No. 104-208, § 2419, 110 Stat. 3009-453 (1996). But in

2003, Congress not only removed those sunsets, but took the *further* step of eliminating a savings clause that would have insulated state laws that "supplement[ed]" this statutory scheme by providing "greater protection to consumers" from preemption. *Id.*; *see* Fair and Accurate Credit Transactions Act, Pub. L. No. 108-159, § 711, 117 Stat. 1952, 2011 (2003). Again, the message could not be clearer: Section 1681t(b)(5)(F) preempts even state laws that purport to "supplement" federal law by providing equal or "greater protection to consumers." Pub. L. No. 104-208, § 2419. Congress chose federal regulation only.

The legislative history for the 1996 and 2003 amendments gilds the lily. The Senate Report accompanying the 1996 amendments to FCRA, for instance, explains the important role that Section 1681t(b) plays in "establish[ing] the FCRA as the national uniform standard" in the area of consumer protection "[b]y preempting state and local provisions relating to the [same] subject matter regulated by these provisions of the FCRA." S. Rep. No. 104-185, at 55 (1995). For that reason, Congress recognized the importance of a powerful preemption provision that would establish "national standards" notwithstanding concerns that these amendments would "preclude . . . state activity." S. Rep. No. 108-166, at 10-11 (2003). And the

54

House Report accompanying the 2003 amendments recognized the harms that would flow from States "enact[ing] differing additional requirements" absent such a provision. H.R. Rep. No. 108-263, at 24 (2003). The statutory structure, purpose, and legislative history of the 1996 and 2003 amendments all confirm that Section 1681t(b)(5) broadly preempts state laws in this area.

### 2. The NYAG's SHIELD Act claim is preempted.

Because the NYAG's allegations "concern[] [the] subject matter" of the federal Red Flags Rule, its SHIELD Act claim is preempted. *Galper*, 802 F.3d at 446. Indeed, as the district court correctly held, the NYAG's SHIELD Act allegations not only concern subject matter covered by the Red Flags Rule, but are "entirely coextensive" with it. JA327.

a. The core of the NYAG's SHIELD Act claim is that Citibank did not "develop" and "implement" "administrative and technical safeguards" (*i.e.*, a "security program") to "detect, prevent, and respond to" scammers' "infiltration" and "compromising" of consumers' online or mobile banking accounts. JA15, 73-74. But the FTC's and OCC's Red Flags Rule, as mandated by FCRA, regulates precisely such conduct. It requires banks to "develop" and "implement" a program designed to "detect, prevent, . . . mitigate," and "[r]espond" to "identity theft in connection with" consumers'

55

bank accounts. 16 C.F.R. § 681.1(d)(1), (2)(iii).[7] Again, "identity theft" includes any "fraud committed or attempted using the identifying information of another person without authority," which covers the types of scams alleged in the complaint. 16 C.F.R. § 681.1(b)(8) (incorporating 12 C.F.R. § 1022.3(h)); *see* 15 U.S.C. § 1681a(q)(3); JA11-15, 18-19, 35-38, 42, 44, 47-48, 53, 56, 61-62, 73-76. In short, both the Red Flags Rule and the NYAG's SHIELD Act allegations address whether Citibank has developed and implemented programs that detect and prevent fraudulent fund transfers from consumer accounts.

When the NYAG was tasked below with identifying how its SHIELD Act allegations fell outside of the scope of the conduct regulated by the Red Flags Rule, it came up empty. It first posited that the SHIELD Act claim uniquely concerns Citibank's alleged "failures to safeguard consumer financial information." JA326. But as the district court observed, that is "precisely" what the plain text of the Red Flags Rule requires. JA326. The

---

[7] The Red Flags Rule also requires banks to implement procedures that identify, detect, and respond to "Red Flags," which are any "pattern, practice, or specific activity that indicates the possible existence" of fraud committed using someone's identifying information. 16 C.F.R. § 681.1(b)(9), (d)(2); *see* 15 U.S.C. § 1681m(e)(2)(A). These include, for example, "[t]he unusual use of, or other suspicious activity related to, a covered account." 16 C.F.R. pt. 681, Appx. A(II)(c)(4).

NYAG next pointed to its allegation that Citibank failed to "train . . . employees in its security program" to better respond to instances of fraudulent account access. JA72, 326-327. The Red Flags Rule likewise requires banks to "[t]rain staff . . . to effectively implement" their identity-theft programs. 16 C.F.R. § 681.1(e)(3). So the NYAG has not pointed to a single SHIELD Act allegation in its complaint that is not already covered under the Red Flags Rule.

Indeed, the NYAG embraced that overlap below. It rested on the same allegations in its complaint as support for *both* its SHIELD Act claim (Count 5) and its now-abandoned direct Red Flags Rule claim (Count 6). For example, the NYAG alleges that Citibank violated both the SHIELD Act and the Red Flags Rule by failing to employ a program that prevented fraud based on "anomalous account activity" in the form of (1) changes to consumers' "passwords," (2) "changes in consumers' account type or status," (3) recent "enrollments" in wire transfer services, and (4) transfers leaving "near-zero balances." *Compare* JA73-74 (SHIELD Act claim), *with* JA75-76 (Red Flags Rule claim relying on the same categories of account activity). These "anomalous" activities, which are the NYAG's premise for violations of both laws, constitute "Red Flags" within the meaning of the Red Flags Rule.

57

*Supra* p. 56 n.7; 16 C.F.R. pt. 681, Appx. A(II)(c).  And if those activities were the alleged basis for a direct (albeit barred) Red Flags Rule claim, then the parallel SHIELD Act claim here surely involves "conduct" that "concerns [the] subject matter" of the federal Red Flags Rule.  *Galper*, 802 F.3d at 446.

b.      On appeal, the NYAG seeks to differentiate between the Red Flags Rule and its SHIELD Act allegations.  It claims that the Red Flags Rule "does not require companies to implement any *data security* measures" to protect consumers' data from unauthorized access.  Br. 5 (emphasis added).  That is wrong.  FCRA requires that banks implement measures to protect "account holders or customers," as well as "the safety and soundness of the institution or [its] customers" from "identity theft"-related risks (*i.e.*, fraud using consumers' information without authority).  15 U.S.C. § 1681m(e)(1)(A)-(B).  In turn, the Red Flags Rule explains that those measures should, among other things, authenticate customers, monitor transactions, verify account information changes, and take into account factors that heighten the risk of identity theft, including "data security" incidents.  16 C.F.R. pt. 681, Appx. A(III), (IV).

The NYAG's data-security distinction is also affirmatively waived.  The NYAG's complaint says the opposite:  it alleges that Citibank violated the

58

Red Flags Rule by "failing to maintain a *data security* program" to protect consumer accounts from fraud. JA15 (emphasis added). And in its brief in opposition to Citibank's motion to dismiss, the NYAG similarly argued that Citibank's "*data security* practices and procedures" violated *both* the SHIELD Act and the Red Flags Rule. NYAG MTD Opp., ECF No. 25, at 37 (emphasis added). The NYAG cannot now argue that data security is exclusively a SHIELD Act issue that the Red Flags Rule does not touch. *See Doe* v. *Trump Corp.*, 6 F.4th 400, 409 n.6 (2d Cir. 2021) ("While we have discretion to consider forfeited arguments, a waived argument may not be revived."); *Town of Southold* v. *Wheeler*, 48 F.4th 67, 81 n.8 (2d Cir. 2022) ("[W]here a party has shifted his position on appeal and advances arguments available but not pressed below, waiver will bar raising the issue on appeal.") (citation omitted).

The NYAG also now contends (at 67-69 & n.16) that the SHIELD Act is different from the Red Flags Rule because the SHIELD Act requires "prophylactic steps" and can be violated even "if no data breach occurs." But as discussed above, the program and procedures required by the Red Flags Rule *are* prophylactic. *See* 15 U.S.C. § 1681m(e)(1)(B); 16 C.F.R. § 681.1(d)(1). After all, one of their key purposes is to "prevent" fraud and

59

the misuse of consumer accounts. 16 C.F.R. § 681.1(d)(1); *see* JA75-76 (alleging that the Red Flags Rule requires banks to establish "prevention" programs to "prevent" identity theft, including "large-dollar" wire fraud). Nor does the Red Flags Rule require a "data breach" to occur, as the NYAG suggests (at 68). It can be violated, for example, if a covered entity fails to implement the requisite program. *See* 15 U.S.C. § 1681s(a); 16 C.F.R. § 681.1(d)(1). In short, the NYAG's attempt to twist the Red Flags Rule into a reactive, mass-data-breach regulation is contrary to the law's text (and the NYAG's own allegations).

The NYAG further asserts (at 66-68) that because the SHIELD Act and the Red Flags Rule are not coterminous, the SHIELD Act claim here cannot be preempted. But "[p]re-emption is not a matter of semantics," and "a proper analysis requires consideration of what the state law in fact does, not how the litigant might choose to describe it." *Wos* v. *E.M.A. ex rel. Johnson*, 568 U.S. 627, 636-637 (2013). Although the two laws may not be carbon copies, what matters is that the NYAG seeks to leverage the SHIELD Act to impose requirements on a covered entity that overlap with those required by the federal regulation. That is enough for preemption under Section 1681t(b)(5)(F), even if the NYAG does not seek to directly

60

enforce the Red Flags Rule on its terms (which Section 1681m(h)(8)(B) would separately prohibit) or to layer on conflicting requirements (which Section 1681t(a) would separately prohibit).

c.       To try to stave off preemption, the NYAG invokes (at 65-66) this Court's decision in *Galper*, which found that one of FCRA's preemption provisions did not preempt a state-law tort claim related to the adverse reporting of information to consumer reporting agencies. 802 F.3d at 441-442, 445-447. But *Galper* is distinguishable for at least two important reasons. First, it dealt with a different FCRA preemption provision, which contains limiting language that is absent from Section 1681t(b)(5)(F). *See id.* at 447; *compare* 15 U.S.C. § 1681t(b)(1)(F) (preempting state-law requirements, subject to certain exceptions, so long as they "relat[e] to the responsibilities of persons who furnish information to consumer reporting agencies"), *with id.* § 1681t(b)(5)(F) (preempting state-law requirements, without qualification, with respect to the "conduct required" by any provision of the Red Flags Rule); *see also* JA323 & n.23. Second, the plaintiff's allegations in *Galper* centered on the conduct of bank employees (not the bank), who allegedly facilitated fraud in exchange for bribes in a manner that was irrelevant to the bank's FCRA obligations. *See* 802 F.3d at 442, 447.

61

Here, by contrast, the NYAG's allegations squarely concern Citibank's "legal responsibilities" under FCRA, *id.* at 446, to implement adequate protections to detect and prevent "scammers' fraudulent payment activity" in light of "anomalous" activity, JA73-74. That is precisely what the Red Flags Rule requires.

The NYAG also relies (at 66) on *Macpherson* v. *JPMorgan Chase Bank, N.A.*, 665 F.3d 45 (2d Cir. 2011), for this same argument, but that decision suffers from the same defect as *Galper* and the out-of-circuit cases the NYAG cites in a footnote (at 66 n.15): it addresses a different preemption provision. Regardless, *Macpherson* emphasized the "broadly-sweeping preemption" of that FCRA provision and held that the plaintiff's state common-law claims were preempted. 665 F.3d at 48.

Nor can the NYAG's appeals to a presumption against preemption (at 62, 65) save its claim. That presumption does not apply when a court construes an express preemption provision because the best reading of the statutory text is all that matters. *See Puerto Rico* v. *Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *Buono* v. *Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023). In any event, this presumption only kicks in if "the text is

62

ambiguous," and there is no ambiguity here. *Council for Responsible Nutrition* v. *James*, 159 F.4th 155, 171 n.8 (2d Cir. 2025).

d.      To be sure, as the district court noted, FCRA may not preempt *all possible* claims under the SHIELD Act. *See* JA327. For instance, SHIELD Act claims might be viable "in cases not concerning identity theft" or in cases brought against entities not regulated by FCRA. *Id.*; *see, e.g.*, *Matter of Investigation of GEICO*, Assurance No. 24-082 (Nov. 21, 2024) (obtaining relief from insurance company under SHIELD Act after massive hacking incident exposed customers' vehicle and driver's license data). They may also be viable where they overlap only with the requirements of *other* federal laws, like the Gramm Leach Bliley Act, that do not prohibit complementary state-law enforcement. Section 1681t(b)(5)(F) has nothing to say about those applications of the SHIELD Act. But the way the NYAG seeks to use state law here—to vindicate the alleged failure by a bank to implement a program and procedures to detect and prevent fraudulent fund transfers indicated by red flags—runs headlong into Section 1681t(b)(5)(F)'s clear prohibitions.

In the end, the NYAG's SHIELD Act claim and now-abandoned Red Flags Rule claim are two sides of the same coin. They rely on the same

63

general conduct.  This SHIELD Act claim thus falls comfortably within the

language of Section 1681t(b)(5)(F) and is preempted.[8]

---

[8]   If this Court were to reverse the district court's preemption ruling on the SHIELD Act, the proper remedy would be to remand for consideration of Citibank's additional arguments for dismissal, which the district court did not reach.  JA321.  This Court's "settled practice" is "to allow the district court to address arguments in the first instance."  *Farricielli* v. *Holbrook*, 215 F.3d 241, 246 (2d Cir. 2000).

## CONCLUSION

For the foregoing reasons, Citibank respectfully requests that the Court reverse the portions of the district court's order denying Citibank's motion to dismiss with respect to the NYAG's EFTA claims, including Counts 1-3 and portions of Counts 7-8, and affirm the dismissal of the NYAG's SHIELD Act claim (Count 5).

Respectfully submitted,

/s/ *Jeffrey B. Wall*

| | |
|---|---|
| Charles Michael | Jeffrey B. Wall |
| STEPTOE LLP | Morgan L. Ratner |
| 1114 Avenue of the Americas | Rishabh Bhandari |
| New York, NY 10036 | SULLIVAN & CROMWELL LLP |
| (212) 506-3900 | 1700 New York Avenue, N.W. |
| | Washington, DC 20006 |
| Julia B. Strickland | (202) 956-7500 |
| STEPTOE LLP | |
| 2029 Century Park East | Miles H. Greene |
| Suite 980 | SULLIVAN & CROMWELL LLP |
| Los Angeles, CA 90067 | 125 Broad Street |
| (213) 439-9400 | New York, NY 10004 |
| | (212) 558-4000 |

*Counsel for Appellant-Cross-Appellee*

February 23, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with Second Circuit Local Rule 28.1.1(a) because it contains 13,362 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type styles requirements of Fed. R. App. P. 32(a)(6). It has been prepared in 14-point font using a proportionally spaced typeface.

/s/ *Jeffrey B. Wall*
Jeffrey B. Wall

Dated: February 23, 2026

## CERTIFICATE OF SERVICE

I certify that on February 23, 2026, the foregoing brief was filed with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit through the ACMS system.  I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ *Jeffrey B. Wall*
Jeffrey B. Wall

Dated:  February 23, 2026